secured by accounts receivable and inventory. The minimum availability under the CIT Exit Facility on Closing shall be $25,000,000;

(n)     Her Majesty in Right of Canada, as represented by the Minister of Natural Resources Canada, shall have confirmed in form satisfactory to the Purchaser that FPI has qualified for the PPGTP Credits in the minimum amount of Twenty-Three Million Dollars (Cdn.$23,000,000) and that such credits are validly transferred and assigned to the Purchaser on Closing;

(o)     the Vendors shall have legally amended the Existing U.S. Collective Agreements with the Unions on such terms as may be acceptable to the Purchaser in its sole and absolute discretion by January 15, 2010 (the "New U.S. Collective Agreements");

(p)     the amount of the Assumed Liabilities on Closing shall not exceed $48,000,000;

(q)     the Existing Canadian Collective Agreements shall have been legally amended such that the Purchaser shall have no liability for any Pension Plan (the "Amended Canadian Collective Agreements");

(r)     the Purchaser shall be satisfied, in its sole and absolute discretion, that the Purchaser shall have no liability or obligations whatsoever for any Pension Plan of the Vendors;

(s)     at the option of the Purchaser, the Pension Plans will be wound up or otherwise dealt with to the sole and absolute satisfaction of the Purchaser on or before the Closing Date;

(t)     all Consents and Approvals shall have been obtained or filed, on terms and conditions satisfactory to the Purchaser in its sole discretion in respect of the Purchased Assets, including, without limitation, the Contracts, the Permits, the Timber Licences and the PPGTP Credits, and the Purchaser shall be satisfied that such Purchased Assets are validly transferred or assigned to the Purchaser on Closing;

(u)     the Unions, whose members participate in the Old Hourly FP Plan or the U.S. Pension Plan, shall have confirmed in a form satisfactory to the Purchaser, in its sole and absolute discretion, that neither the Purchaser, nor its officers, directors, employees, agents or delegates, nor the officers, directors, employees, agents or delegates of the Vendors, shall have any liabilities with respect to the Old FP Hourly Plan or the U.S. Pension Plan, as applicable;

(v)     no Material Adverse Effect shall, individually or in the aggregate; have occurred between the Effective Date and the Closing Date; and

(w)     delivery of legal opinions from the Vendors' counsel confirming that on Closing and upon the consummation of the transactions contemplated in the Agreement and the Ancillary Agreements, the Purchaser should not be liable for and should not assume any liabilities whatsoever, whether by operation of law or otherwise, under or pursuant to the Pension Plans or the Existing Collective Agreements.

The foregoing conditions are for the exclusive benefit of the Purchaser. Any condition may be waived by the Purchaser in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing.

## Section 10.2    Conditions for the Benefit of the Vendors.

The obligations of the Vendors to consummate the transactions contemplated hereby are, unless waived by the Vendors, subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)    payment of the Purchase Price as set forth in Section 3.2, subject to adjustment as set forth in Section 3.8;

(b)    the representations and warranties of the Purchaser set forth in Article 5 shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) on and as of the Closing Date with the same effect as though such representations and warranties had been made at and as of the Closing (except for representations and warranties that are made as of a particular date specified therein, which representations and warranties shall be true and correct in all material respects as of such date);

(c)    (i) no Law shall be in effect, and (ii) no Governmental Authority shall have enacted, issued, promulgated or entered an Order which is in effect, in each case that has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(d)    the Purchaser shall have performed and complied in all material respects with all covenants and agreements set forth in this Agreement required to be performed or complied with by the Purchaser prior to or concurrently with the Closing;

(e)    each of the Vendors shall have received the Ancillary Agreements required to be delivered to it by the Purchaser at or before the Closing pursuant to this Agreement duly executed by all necessary Persons (other than the Vendors);

(f)    each of the Vendors shall have approved as to form, substance and legality all actions, proceedings, instruments and documents required to complete the Transaction, including this Agreement and the Ancillary Agreements;

(g)    (i) the Canadian Court shall have entered the Canadian Approval and Sales Process Order; and (ii) the Bankruptcy Court shall have entered the U.S. Approval and Sales Process Recognition Order, which orders shall not have been stayed, modified or amended in any way;

(h)    (i) the Canadian Court shall have entered the Canadian Approval and Vesting Order; and (ii) the Bankruptcy Court shall have entered the U.S. Approval and Vesting Recognition Order, which orders  shall have become Final Orders, and shall not have been stayed, modified or amended in any way, provided, however, that after entry of the Canadian Approval and Vesting Order and the U.S. Approval and Vesting Recognition Order, the

- 48 -

Purchaser, in its sole discretion, shall have the right, but not the obligation, to waive the requirement that the Canadian Approval and Vesting Order and the U.S. Approval and Vesting Recognition Order become Final Orders; and

(i)     no injunction or other Order shall have been issued to enjoin, restrict or prohibit any of the transactions contemplated by this Agreement.

The foregoing conditions are for the exclusive benefit of the Vendors. Any condition may be waived by the Vendors in whole or in part. Any such waiver shall be binding on the Vendors only if made in writing.

## ARTICLE 11
## TAXES

**Section 11.1  Payment of Taxes and Other Costs.**

The Purchaser shall assume and become solely liable for and will pay or cause to be paid all of its own Transactional Costs (except with respect to expenses provided for and subject to Section 16.3 of this Agreement) and Transactional Taxes payable under any Law on or with respect to the sale and purchase of the Purchased Assets under this Agreement. On the Closing Date, the Purchaser will either pay the Transactional Taxes to the Vendors or deliver to the Vendors evidence confirming the Purchaser's payment of or exemption from payment of the Transactional Taxes in form and substance acceptable to the Vendors, acting reasonably. The Purchaser will prepare and file any affidavits or returns required in connection with the foregoing at its own cost and expense. To the extent that any Transactional Taxes are required to be paid by or are imposed upon the Vendors, the Purchaser will reimburse to the Vendors such taxes within five (5) Business Days of payment of such taxes by the Vendors. The Purchaser will indemnify and hold the Vendors harmless in respect of any Transactional Taxes.

**Section 11.2  Elections.**

(a)     The Vendors and the Purchaser will on or before the Closing Date jointly execute an election, if available, in the prescribed form and containing the prescribed information, to have subsection 167(1.1) of the *Excise Tax Act* (Canada) apply to the sale and purchase of the Purchased Assets hereunder so that no tax is payable in respect of such sale and purchase under Part IX of the *Excise Tax Act* (Canada). The Purchaser will file such election with the Minister of National Revenue within the time prescribed by the *Excise Tax Act* (Canada).

(b)     The Vendors and the Purchaser agree to make, execute and file with the appropriate taxing authorities such other elections or purchase exemption certificates as the parties hereto agree are mutually desirable, if any, in prescribed form and within the prescribed time. After the Closing, the Purchaser shall make or cause to be made all necessary filings with respect to all Transactional Costs and Transactional Taxes. Promptly after the Closing, the Purchaser shall reimburse the Vendors for all deposits, prepayments or advances which the Vendors may have made with respect to Transactional Taxes, other than any such deposits, prepayments or advances that are Excluded Assets.

(c)    Notwithstanding anything to the contrary in this Section 11.2, the Purchaser shall indemnify and hold the Vendors harmless in respect of any goods and services tax, sales tax, penalties, interest and other amounts or Taxes which may be assessed against the Vendors as a result of the transactions under this Agreement not being eligible for such elections provided for in this Section 11.2 or as a result of the Purchaser's failure to file the elections within the prescribed time.

**ARTICLE 12**
**CLOSING**

**Section 12.1    Location and Time of the Closing.**

Upon the terms and subject to the conditions hereof, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of ThorntonGroutFinnigan LLP, located at Suite 3200, 100 Wellington St. West, Toronto-Dominion Centre, Toronto, Ontario, M5K 1K7, or such other place as the Purchaser and the Vendors may mutually agree, no later than three (3) Business Days following the date on which the conditions set forth in Section 10.1 and Section 10.2 of this Agreement have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or such other date as the Vendors and the Purchaser may mutually agree (the "Closing Date"). The Closing shall be deemed to have been consummated and become effective for all purposes as of 12:01 a.m. Toronto time on the Closing Date.

**Section 12.2    Closing Deliveries of the Vendors.**

At the Closing, the Vendors shall deliver or cause to be delivered to the Purchaser:

(a)    a General Conveyance and Assumption of Liabilities Agreement, together with such other deeds of conveyance (in the case of the Lands relating to the Madawaska Assets and the Madawaska Mill, one or more quitclaim deed with covenant), bills of sale, assurances, transfers, assignments, consents, and such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transactions provided for in this Agreement;

(b)    a certificate, dated the Closing Date, confirming that all of the representations and warranties of the Vendors contained in this Agreement are true as of the Closing Date, with the same effect as though made on and as of the Closing Date.  For greater certainty, the representations and warranties of the Vendors contained in this Agreement made as of the Closing Date shall not be qualified by knowledge;

(c)    the Schedules to this Agreement updated and delivered for Closing pursuant to the terms of this Agreement in form and content satisfactory to the Purchaser, in its sole and absolute discretion;

(d)    an acknowledgement, dated the Closing Date, that each of the conditions precedent in Section 10.2 of this Agreement have been fulfilled, performed or waived as of the Closing Date;

- 50 -

(e)     a certified copy of the Canadian Approval and Sales Process Order and the Canadian Approval and Vesting Order;

(f)     a certified copy of the U.S. Approval and Sales Process Recognition Order and the U.S. Approval and Vesting Recognition Order;

(g)     to the extent available, the originals and, if originals are not available, copies of the Books and Records;

(h)     the Consents and Approvals;

(i)     a certified copy of the Amended Canadian Collective Agreements;

(j)     a certified copy of the New U.S. Collective Agreements;

(k)     an executed copy of the Monitor's Certificate;

(l)     legal opinions referred to in Section 10.1(w);

(m)     if applicable, a certificate issued by Maine Revenue Services certifying that the sale of the Lands relating to the Madawaska Assets and/or the Madawaska Mill is exempt from Maine income tax withholding under 36 M.R.S. § 5250 A;

(n)     a counterpart signature page to each Ancillary Agreement, duly executed by each of the Vendors, as applicable; and

(o)     such other certificates, instruments and documents, in form and substance reasonably satisfactory to the Purchaser, as may be contemplated by this Agreement or as the Purchaser may reasonably request.

**Section 12.3   Closing Deliveries of the Purchaser.**

At the Closing, the Purchaser shall deliver, or cause to be delivered, to the Vendors:

(a)     payment of the Purchase Price as set forth in Section 3.2;

(b)     an executed copy of a General Conveyance and Assumption of Liabilities Agreement duly executed by the Purchaser;

(c)     a counterpart signature page to each Ancillary Agreement, duly executed by the Purchaser;

(d)     payment or evidence of payment of applicable Transactional Taxes or alternatively, appropriate exemption certificates, as required under this Agreement;

(e)     a certificate, dated the Closing Date, confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true as of the Closing Date, with the same effect as though made on and as of the Closing Date;

10124776.13
13742-2154

          (f)     the Promissory Note payable to the Monitor, in trust for the benefit of the Vendors;

          (g)     the Preferred Shares issued in the name of GNB or to a trustee on its behalf;

          (h)     the Common Shares issued in the name of the Monitor, in trust for the benefit of the Vendors;

          (i)     an acknowledgement, dated the Closing Date, that each of the conditions precedent in Section 10.1 of this Agreement have been fulfilled, performed or waived as of the Closing Date; and

          (j)     such other certificates, instruments and documents in form and substance reasonably acceptable to the Vendors, as the Vendors may reasonably request.

## Section 12.4   Maine Real Estate Transfer Taxes.

At Closing, the Purchaser and the Vendors, as applicable, conveying the Lands relating to the Madawaska Assets and/or the Madawaska Mill shall execute one or more real estate transfer declarations that shall establish the portion of the Purchase Price that is allocable to such Lands. The Purchaser and the Vendors, as applicable, shall use best commercial efforts to establish that the transfer of such Lands hereunder is exempt from taxation under 36 MRSA Sec. 4641-C(14).

## Section 12.5   Possession.

The Purchaser shall be entitled to vacant possession of the Purchased Assets on and after Closing. The Vendors shall deliver to the Purchaser on Closing such keys, lock and safe combinations and other similar items as the Purchaser may require to obtain immediate and full occupation, possession and control of the Purchased Assets.

## ARTICLE 13
## INDEMNIFICATION

### Section 13.1   Indemnification by the Vendors

The Vendors shall, jointly and severally, indemnify and save the Purchaser harmless for and from:

          (a)     all losses, costs and damages suffered by the Purchaser as a result of any breach of representation, warranty or covenant on the part of any of the Vendors contained in this Agreement, the Ancillary Agreements, or in any certificate, document or instrument delivered to the Purchaser hereunder or thereunder;

          (b)     all losses, costs and damages suffered by the Purchaser as a result of the failure of any of the Vendors to perform any of its obligations relating to or in respect of the Business not assumed by the Purchaser pursuant to this Agreement or any Ancillary Agreement;

(c)    all losses, costs and damages suffered by the Purchaser as a result of the failure of any of the Vendors to perform any of its obligations arising under contracts or other agreements assumed by the Purchaser pursuant to this Agreement or any Ancillary Agreement, but relating to or arising out of action or inaction of the Vendors and relating to events which occurred prior to the Closing Date (for greater certainty, not including the Assumed Liabilities);

(d)    all losses, costs and damages suffered by the Purchaser (for greater certainty, not including the Assumed Liabilities) arising from the Vendors' operation of the Business prior to the Closing Date;

(e)    all losses, costs and damages suffered by the Purchaser as a result of any failure of the Vendors to transfer legal and beneficial ownership of the Purchased Assets to the Purchaser free and clear of all Encumbrances, except Permitted Encumbrances; and

(f)    all claims, demands, costs and expenses, including legal fees, in respect of the foregoing.

## Section 13.2    Indemnification by the Purchaser

The Purchaser shall indemnify and save the Vendors harmless for and from:

(a)    all losses, costs and damages suffered by the Vendors as a result of any breach of representation, warranty or covenant on the part of the Purchaser contained in this Agreement or in any certificate, document or instrument delivered to the Vendors hereunder;

(b)    all losses, costs and damages suffered by the Vendors as a result of the Purchaser's failure to pay, discharge or perform any of the Assumed Liabilities; and

(c)    all claims, demands, costs and expenses, including legal fees, in respect of the foregoing.

## Section 13.3    Notice of Claim

If the Purchaser or the Vendors wish to make a claim for indemnification (a "Claim") pursuant to this Article 13 (such party herein called the "Indemnified Party") against the Vendors, on the one hand, or the Purchaser, on the other hand (the party or parties against whom the claim is made herein called the "Indemnifying Parties"), the Indemnified Party shall promptly give notice to the Indemnifying Parties of the Claim. Such notice shall specify whether the Claim originates with the Indemnified Party (an "Original Claim") or with a Person other than the Indemnified Party (a "Third Party Claim"), and shall also specify with reasonable particularity (to the extent that the information is available):

(a)    the factual basis for the Claim; and

(b)    the amount of the Claim, or, if an amount is not then determinable, an approximate and reasonable estimate of the potential amount of the Claim.

### Section 13.4    Original Claims

Following receipt of notice of an Original Claim from an Indemnified Party, the Indemnifying Parties shall have 30 days to make such investigation of the Original Claim as the Indemnifying Parties consider necessary or desirable. For the purpose of such investigation, the Indemnified Party shall make available to the Indemnifying Parties the information relied upon by the Indemnified Party to substantiate the Original Claim. If the Indemnified Party and the Indemnifying Parties agree at or prior to the expiration of such 30 day period (or any mutually agreed upon extension thereof) to the validity and amount of the Original Claim, the Indemnifying Parties shall immediately pay to the Indemnified Party the full agreed upon amount of the Original Claim. If the Indemnified Party and the Indemnifying Parties do not agree within such period (or any mutually agreed upon extension thereof), the Indemnifying Parties and the Indemnified Party agree that the dispute shall be submitted for dispute resolution in accordance with Article 14 set out herein.

### Section 13.5    Third Party Claims.

With respect to any Third Party Claim, the Indemnifying Parties shall have the right, at their own expense, to participate in or assume control of the negotiation, settlement or defence of the Third Party Claim and, in such event, the Indemnifying Parties shall reimburse the Indemnified Party for all of the Indemnified Party's out-of-pocket expenses as a result of such participation or assumption. If the Indemnifying Parties elect to assume such control, the Indemnified Party shall cooperate with the Indemnifying Parties, shall have the right to participate in the negotiation, settlement or defence of such Third Party Claim at its own expense and shall have the right to disagree on reasonable grounds with the selection and retention of counsel, in which case counsel satisfactory to the Indemnifying Parties and the Indemnified Party shall be retained by the Indemnifying Parties.

### Section 13.6    Additional Rules and Procedures

The obligation of the Parties to indemnify each other pursuant to this Article shall also be subject to the following:

(a)    any Claim arising as a result of a breach of a representation or warranty contained in Article 5 or Article 6 shall be made during the Holdback Period.

(b)    in the event that any Third Party Claim is of a nature such that the Indemnified Party is required by applicable law to make a payment to a Third Party with respect to such Third Party Claim before the completion of settlement negotiations or related legal proceedings, the Indemnified Party may make such payment and the Indemnifying Parties shall, forthwith after demand by the Indemnified Party, reimburse the Indemnified Party for any such payment. If the amount of any liability under the Third Party Claim in respect of which such a payment was made, as finally determined, is less than the amount which was paid by the Indemnifying Parties to the Indemnified Party, the Indemnified Party shall, forthwith after receipt of the difference from the Third Party, pay such difference to the Indemnifying Parties.

10124776.13
13742-2154

(c)      the Indemnified Party shall not negotiate, settle, compromise or pay any Third Party Claim except with the prior written consent of the Indemnifying Parties (which consent shall not be unreasonably withheld).

(d)      the Indemnified Party shall not permit any right of appeal in respect of any Third Party Claim to terminate without giving the Indemnifying Parties notice thereof and an opportunity to contest such Third Party Claim.

(e)      the Purchaser and the Vendors shall cooperate fully with each other with respect to Third Party Claims, shall keep each other fully advised with respect thereto (including supplying copies of all relevant documentation promptly as it becomes available) and shall each designate a senior officer who will keep himself informed about and be prepared to discuss the Third Party Claim with his counterparts and with counsel at all reasonable times.

(f)      the Indemnifying Parties shall not settle any Third Party Claim or conduct any related legal or administrative proceeding in a manner which would, in the opinion of the Indemnified Party, acting reasonably, have a material adverse impact on the Indemnified Party.

**Section 13.7    Indemnification Claims**

(a)      Except for fraud, fraudulent misrepresentation, or intentional breach, and except as provided in Section 15.3 and Section 16.3 of this Agreement, the Parties agree that Article 13 sets out the sole and exclusive manner by which the Purchaser may seek monetary compensation from the Vendors, or by which the Vendors may seek monetary compensation from the Purchaser, for any matter in respect of which the Purchaser or the Vendors may make a Claim under Section 13.1 and Section 13.2, and the Parties further agree that, except for fraud, fraudulent misrepresentation, or intentional breach, and except as provided in Section 15.3 and Section 16.3, the Purchaser may have recourse for monetary compensation against the Holdback Amount.

(b)      Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Claim by the Purchaser, as an Indemnified Party against any or all of the Vendors, as an Indemnifying Party, in excess of the Holdback Amount may be subject to compromise in the CCAA Proceedings.

**ARTICLE 14**
**DISPUTE RESOLUTION**

**Section 14.1    Arbitration**

Subject to Section 14.2, disputes, disagreements, controversies, questions or claims arising out of or relating to this Agreement, and the Ancillary Agreements, including, without limitation, with respect to their formation, execution, validity, application, interpretation, performance, breach, termination or enforcement, or, for greater certainty, with respect to the Purchase Price adjustment or the indemnification obligations set out herein, ("Disputes") shall be determined by arbitration under the *Arbitration Act, 1991* (Ontario) (the "Arbitration Act"), provided that:

- 55 -

(a)     any hearing in the course of the arbitration shall be held in Toronto, Ontario in the English language;

(b)     the application of section 7(2) of the Arbitration Act is expressly excluded;

(c)     subject to section 44 of the Arbitration Act, any Party shall have the right to appeal any award or determination of an arbitrator on any ground, including, for greater certainty, any appeal on a question of law, a question of fact, or a question of mixed fact and law, to the Canadian Court;

(d)     despite section 28(1) of the Arbitration Act, an arbitrator shall not, without the written consent of all Parties to the arbitration, retain any expert;

(e)     an arbitrator may apportion the costs of the arbitration, including the reasonable fees and disbursements of the Parties, between or among the Parties in such manner as the arbitrator considers reasonable;

(f)     all awards for the payment of money shall include prejudgment and postjudgment interest in accordance with sections 127 to 130 of the *Courts of Justice Act* (Ontario) with necessary modifications; and

(g)     all matters relating to the arbitration shall be kept confidential to the full extent permitted by Law and no individual shall be appointed as an arbitrator unless he or she agrees in writing to be bound by this dispute resolution provision.

## Section 14.2    Exceptions

Section 14.1 shall not apply, unless otherwise agreed to by the Parties, acting reasonably, in respect of:

(a)     any Dispute involving a claim which exceeds, or an approximate and reasonable estimate of the potential amount of which exceeds, $5,000,000; and

(b)     any Dispute that arises within 60 days after the Closing Date, in which case, the Parties shall submit the Dispute to the Canadian Court in the CCAA Proceedings for resolution.

## ARTICLE 15
## RISK AND TERMINATION

## Section 15.1    Risk of Loss.

The Purchased Assets shall be and remain the risk of the Vendors until Closing and at the risk of the Purchaser from and after Closing. If, prior to Closing, the Purchased Assets shall be substantially damaged or destroyed by fire or other casualty, then, at its option, the Purchaser may decline to complete the Transaction. Such option shall be exercised within five (5) Business Days after notification to the Purchaser by the Vendors of the occurrence of damage or

destruction (or prior to the Closing Date if such occurrence takes place within five (5) Business Days of the Closing Date) in which event this Agreement shall be terminated automatically and the Purchaser shall be entitled to the Termination Fee (as hereinafter defined). If the Purchaser does not exercise such option, it shall complete the Transaction and shall be entitled to an assignment of the proceeds of insurance referable to such damage or destruction. Where any damage or destruction is not substantial, the Purchaser shall complete the Transaction and shall be entitled to an assignment of the proceeds of insurance referable to such damage or destruction provided that such damage or destruction is insured or, otherwise by an agreed abatement. If any dispute arises under this Section as to whether damage or destruction is substantial or with respect to the amount of any abatement, such dispute will be determined in accordance with Article 14 herein.

**Section 15.2   Termination.**

This Agreement may be terminated at any time prior to the Closing:

(a)   by mutual written consent of the Parties;

(b)   by either the Vendors or the Purchaser, upon written notice to the other upon the entry of an Order by the Canadian Court approving an Alternative Transaction;

(c)   by either the Vendors or the Purchaser, upon written notice to the other:

(i)   if the Canadian Approval and Sales Process Order shall not have been issued and entered by December 14, 2009;

(ii)   if the Canadian Approval and Vesting Order shall not have been issued and entered within five (5) Business Days of the completion of the Sales Process;

(iii)   if the U.S. Approval and Sales Process Recognition Order shall not have been issued and entered by January 8, 2010;

(iv)   if the U.S. Approval and Vesting Recognition Order shall not have been issued and entered by February 26, 2010; or

(v)   if the Closing does not take place by February 26, 2010 or on or before such later date as the Parties agree to in writing (the "Termination Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 15.2(c) shall not be available to the Party seeking to terminate if such Party has failed to perform any one or more of its material obligations or covenants under this Agreement to be performed at or prior to Closing and the Closing has not occurred because of such failure.

(d)   by the Purchaser if any of the Vendors withdraw or seek authority to withdraw any of the Canadian Approval and Sales Process Order Motion, the Canadian Approval and Vesting Order Motion, the U.S. Approval and Sales Process Recognition Motion or the U.S. Approval and Vesting Recognition Motion, or publicly announce any stand alone plan of

- 57 -

reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business;

(e)     by the Purchaser in the event of a material breach by the Vendors of the Vendors' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 10.1 of this Agreement provided, however, that the right to terminate this Agreement pursuant to this Section 15.2(e) shall not be available to the Purchaser where a breach of this Agreement by the Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause;

(f)     by the Vendors in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 10.2 of this Agreement provided, however, that the right to terminate this Agreement pursuant to this Section 15.2(f) shall not be available to the Vendors where a breach of this Agreement by the any of the Vendors has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause;

(g)     by the Purchaser if any of the conditions in Section 10.1 of this Agreement have not been satisfied by Closing and the Purchaser has not waived such condition at or prior to Closing; or

(h)     by the Vendors if any of the conditions in Section 10.2 of this Agreement have not been satisfied by Closing and the Vendors have not waived such condition at or prior to Closing.

**Section 15.3   Termination Payments.**

In the event that this Agreement is terminated for any reason, other than pursuant to Section 15.2(a) or Section 15.2(f) of this Agreement, then the Vendors shall pay to the Purchaser in immediately available funds within two (2) Business Days following such termination; (i) a cash fee of $2,000,000 (the "Termination Fee"); and (ii) the expenses provided for and subject to Section 16.3 of this Agreement.

10124776.13
13742-2154

**Section 15.4    Effects of Termination.**

If this Agreement is terminated pursuant to Section 15.2, all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of: (i) Section 6.21 (Survival of Covenants, Representations and Warranties); (ii) Article 13 (Indemnification); (iii) Section 15.2 (Termination); (iv) Section 15.3 (Termination Payments); (v) Section 15.4 (Effects of Termination); and (vi) Article 16 (Miscellaneous), provided, that neither the termination of this Agreement nor anything in this Section shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof.

**ARTICLE 16**
**MISCELLANEOUS PROVISIONS**

**Section 16.1    Confidentiality.**

The Parties hereby agree to keep confidential this Agreement and the terms and conditions contained herein, and not at any time to disclose such information except: (i) where such information is in the public domain through no breach of the terms of this Agreement by either Party, (ii) where such information is required by Law to be disclosed to any Governmental Authority (including, without limitation, any stock exchange), (iii) on a need to know basis to each of the Parties' Representatives, (iv) as required in connection with the CCAA Proceedings and the Bankruptcy Case, or as otherwise directed by the Canadian Court and the Bankruptcy Court, or (v) where disclosure is agreed to in writing between the Parties.

**Section 16.2    Non-Disclosure.**

Except (i) as and to the extent required by Law, the CCAA Proceedings or the Bankruptcy Case, (ii) to its Representatives, (iii) to the Monitor and its Representatives, or (iv) to the DIP Lenders and their Representatives, neither the Purchaser nor the Vendors shall, and each shall direct its Representatives not to, without the prior written consent of the other Party, directly or indirectly, make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of the existence of discussions regarding, a possible transaction between the Parties or any of the terms, conditions or other aspects of the Transaction or the contents of this Agreement or the Ancillary Agreements.

**Section 16.3    Expenses.**

The Vendors shall promptly pay, as and when requested by the Purchaser, any and all out-of-pocket fees and expenses incurred by the Purchaser or any Affiliate thereof in connection with this Agreement, the Ancillary Agreements, any and all documents, discussions, negotiations, correspondence, enquiries and other activities relating hereto, and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, including, without limitation, the fees and expenses of legal and financial advisors, accountants, appraisers or other consultants or advisors, but subject to an aggregate maximum amount of one million dollars ($1,000,000) or, if an Alternative Transaction is approved by the Canadian Court, then an aggregate maximum amount of one million five hundred thousand dollars ($1,500,000).

10124776.13
13742-2154

### Section 16.4    Solicitors and Agents and Tender

Any notice, approval, waiver, agreement, instrument, document or communication permitted, required or contemplated in this Agreement may be given or delivered and accepted or received by the Purchaser's Solicitors on behalf of the Purchaser and by the Vendors' Solicitors on behalf of the Vendors and any tender of this Agreement or the Ancillary Agreements and the balance of the Purchase Price may be made upon the Vendors' Solicitors and the Purchaser's Solicitors, as the case may be.

### Section 16.5    Successors and Assigns.

This Agreement shall enure to the benefit of, and be binding on, the Parties and their respective successors and permitted assigns. This Agreement may not be assigned by either Party without the prior written consent of the other, which consent shall not be unreasonably withheld; provided, however, that the Purchaser may, without the consent of the Vendors, assign and delegate its rights under this Agreement to one or more Affiliates of the Purchaser and in interpreting this Agreement, any such assignee(s) shall be considered the "Purchaser".

### Section 16.6    Third Party Beneficiaries

Each Party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the Parties hereto and their successors and permitted assigns, and no Person, other than the Parties hereto and their successors and their permitted assigns, shall be entitled to rely on the provisions hereof in any action, suit, proceeding, hearing or other forum.

### Section 16.7    Notices.

(a)    <u>Mode of Giving Notice</u>. Any notice, direction, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if (i) delivered personally, (ii) sent by prepaid courier service or mail, or (iii) sent prepaid by fax or other means of electronic communication, in each case to the applicable address set out below:

(i)  if to the Purchaser, to:

c/o Brookfield Asset Management Inc.
181 Bay Street, Suite 300
Brookfield Place
Toronto, Ontario  M5J 2T3

| Attention: | Sam Pollock/Justin Beber |
| Email: | spollock@brookfield.com/jbeber@brookfield.com |
| Fax No.: | 416.365.9642 |

with a copy to:

Torys LLP
Suite 3000, 79 Wellington Street West
Toronto-Dominion Centre
Toronto, Ontario  M5K 1N2

| | |
|---|---|
| Attention: | Tony DeMarinis/Natasha De Cicco |
| Email: | tdemarinis@torys.com/ndecicco@torys.com |
| Fax No.: | 416.865.7380 |

(ii) if to the Vendors, to:

c/o Fraser Papers Inc.
181 Bay Street, Suite 200
Brookfield Place
Toronto, Ontario  M5J 2T3

| | |
|---|---|
| Attention: | Glen McMillan |
| Email: | gmcmillan@toronto.fraserpapers.com |
| Fax No.: | (416) 359-8606 |

with a copy to:

Thornton Grout Finnigan LLP
Suite 3200, 100 Wellington Street West
Toronto-Dominion Centre
Toronto, Ontario  M5K 1K7

| | |
|---|---|
| Attention: | Robert Thornton/D.J. Miller |
| Email: | rthornton@tgf.ca/djmiller@tgf.ca |
| Fax No.: | 416.304.1313 |

with a copy to counsel for the Monitor:

Goodmans LLP
250 Yonge Street
Suite 2400
Toronto, Ontario  M5B 2M6

| | |
|---|---|
| Attention: | Robert Chadwick/Cathy Costa |
| email: | rchadwick@goodmans.ca/ccosta@goodmans.ca |
| Fax: | 416.979.1234 |

10124776.13
13742-2154

(b)     Deemed Delivery of Notice. Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a Business Day and the communication is so delivered, faxed or sent before 4:30 p.m. (Toronto time) on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day. Any such communication sent by mail shall be deemed to have been given and made and to have been received on the fifth Business Day following the mailing thereof; provided however that no such communication shall be mailed during any actual or apprehended disruption of postal services. Any such communication given or made in any other manner shall be deemed to have been given or made and to have been received only upon actual receipt.

## Section 16.8   Time of Essence.

Time shall be of the essence of this Agreement in all respects.

## Section 16.9   Further Assurances.

Each of the Parties hereto shall promptly do, make, execute or deliver, or cause to be done, made, executed or delivered, all such further acts, documents and things as the other Party hereto may reasonably require from time to time for the purpose of giving effect to this Agreement and shall use reasonable efforts and take all such steps as may be reasonably within its power to implement to their full extent the provisions of this Agreement.

## Section 16.10   Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed to be an original and both of which taken together shall be deemed to constitute one and the same instrument. To evidence its execution of an original counterpart of this Agreement, a Party may send a copy of its original signature on the execution page hereof to the other Party by facsimile transmission or other means of electronic communication and such transmission shall constitute delivery of an executed copy of this Agreement to the receiving Party.

## Section 16.11   Paramountcy.

In the event of any conflict or inconsistency between the provisions of this Agreement and any other agreement, document or instrument executed or delivered in connection with the Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such inconsistency.

**[Remainder of the Page Intentionally Left Blank; Signature Page Follows]**

10124776.13
13742-2154

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first above written.

**FRASER PAPERS INC.**

By: _____

Name: GLEN MCMILLAN

Title: SR. VP & CFO

By: _____

Name: Peter Gordon

Title: CEO

**FRASER PAPERS LIMITED**

By: _____

Name: GLEN MCMILLAN

Title: SECRETARY

By: _____

Name: Peter Gordon

Title: Chairman

**FPS CANADA INC.**

By: _____

Name: GLEN MCMILLAN

Title: SECRETARY

By: _____

Name: Peter Gordon

Title: Chairman

- 63 -

10124776.13
13742-2154

**FRASER PAPERS HOLDINGS INC.**

By: _____

    Name: GLEN MCMILLAN

    Title: SECRETARY

By: _____

    Name: Peter Gordon

    Title: Chairman

**FRASER TIMBER LIMITED**

By: _____

    Name: GLEN MCMILLAN

    Title: SECRETARY

By: _____

    Name: Peter Gordon

    Title: Chairman

**FRASER N.H. LLC**

By: _____

    Name: GLEN MCMILLAN

    Title: SECRETARY

By: _____

    Name: Peter Gordon

    Title: Chairman

- 64 -

**BROOKFIELD ASSET MANAGEMENT INC.**

By: _____

Name: Sam Pollock

Title: Senior Managing Partner

By: _____

Name: Aleks Novakovic

Title: Senior Vice President

EXHIBIT "L"                    268

### FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT

**THIS FIRST AMENDMENT TO ASSET PURCHASE AGREEMENT** is made as of this _26_ day of February, 2010.

BETWEEN:                  **FRASER PAPERS INC., FRASER PAPERS LIMITED, FPS CANADA INC., FRASER PAPERS HOLDINGS INC., FRASER TIMBER LIMITED AND FRASER N.H. LLC**

                                 (collectively, the "Vendors")

                                 - and -

                                 **BROOKFIELD ASSET MANAGEMENT INC.**, a corporation amalgamated under the laws of the Province of Ontario

                                 ("Brookfield")

RECITALS:

A.      On June 18, 2009, the Vendors commenced proceedings in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c.C-36, as amended, pursuant to which, *inter alia*, PricewaterhouseCoopers Inc. was appointed as monitor;

B.      On June 19, 2009, the Vendors sought and obtained recognition and provisional relief in an ancillary proceeding pursuant to Chapter 15 of Title 11 of the *United States Code* 11 U.S.C. §§ 101 1532C, as amended in the United States Bankruptcy Court for the District of Delaware;

C.      Pursuant to an asset purchase agreement (the "Purchase Agreement") dated as of December 22, 2009 between the Vendors and Brookfield, the Vendors agreed to sell and Brookfield or its designate(s) agreed to purchase, free and clear of all Encumbrances (except Permitted Encumbrances) all right, title and interest of the Vendors in and to the Purchased Assets, except the Excluded Assets;

D.      Brookfield emerged as the successful bidder pursuant to the Sales Process approved by the Canadian Court pursuant to the Canadian Approval and Sales Process Order issued by the Canadian Court on December 10, 2009; and

E.      The Vendors and Brookfield desire to enter into this amendment agreement to amend certain terms and conditions of the Purchase Agreement.

**NOW THEREFORE** this amendment agreement witnesses that for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged):

1.     **Defined Terms**

All terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Purchase Agreement.

2.     **Amendment to Section 9.2 of the Purchase Agreement**

Section 9.2 is amended by deleting "As soon as practicable, but in any event no later than two (2) Business Days from the date of the completion of the Sales Process," and replacing it with "By no later than March 26, 2010;".

3.     **Amendment to Section 10.1 of the Purchase Agreement**

Section 10.1 is amended by deleting "and" after the ";" in paragraph (v); deleting "." at the end of paragraph (w) and replacing it with "; and" and adding the following:

"(x)     Brookfield shall be satisfied, to its sole and absolute discretion, that the labour applications and grievances filed by the Communications, Energy and Paperworkers Union of Canada, including all of its various locals, against Brookfield in Ontario, Quebec and New Brunswick shall have been unconditionally and irrevocably dismissed, withdrawn, and/or terminated on terms satisfactory to Brookfield in its sole and absolute discretion and all claims relating thereto shall have been released in form satisfactory to Brookfield in its sole and absolute discretion."

4.     **Amendment to Section 15.2 of the Purchase Agreement**

Section 15.2 is amended by deleting each of Section 15.2(c)(ii), (iv) and (v) in its entirety and replacing it with the following:

"(ii)     if the Canadian Approval and Vesting Order shall not have been issued and entered by April 8, 2010 or such later date as the Parties agree to in writing;

(iv)     if the U.S. Approval and Vesting Recognition Order shall not have been issued by April 8, 2010 or such later date as the Parties agree to in writing; or

(v)     if the Closing does not take place by April 8, 2010 or on or before such later date as the Parties agree to in writing (the "Termination Date"); provided, however, that the right to terminate this Agreement pursuant to this Section 15.2(c) shall

- 3 -

not be available to the Party seeking to terminate if such Party has failed to perform any one or more of its material obligations or covenants under this Agreement to be performed at or prior to Closing and the Closing has not occurred because of such failure."

**5.**      **Amendment to Section 16.3 of the Purchase Agreement**

Section 16.3 is amended by deleting "one million dollars ($1,000,000)" and replacing it with "one million five hundred thousand dollars ($1,500,000)".

**6.**      **Effect of Amendment Agreement**

This amendment agreement is an amendment to the Purchase Agreement. Unless the context of this amendment agreement otherwise requires, the Purchase Agreement and this amendment agreement shall be read together and shall have effect as if the provisions of the Purchase Agreement and this amendment agreement were contained in one agreement. The term "Agreement" when used in the Purchase Agreement means the Purchase Agreement as amended, supplemented or modified from time to time (including as amended by this amendment agreement).

**7.**      **Enurement**

This amendment agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

**8.**      **Governing Law**

This amendment agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

**9.**      **Counterparts**

This amendment agreement may be executed in any number of counterparts, each of which will be deemed to be an original and all of which taken together will be deemed to constitute one and the same instrument.

**10.**     **Electronic Transmission**

Delivery of an executed signature page to this amendment agreement by any party by electronic transmission will be as effective as delivery of a manually executed copy of this amendment agreement by such party.

271

- 4 -

**11.**       **No Other Amendments**

Except as amended hereby, the Purchase Agreement remains in full force and effect, unamended.

**[Signature Page To Follow]**

272

IN WITNESS WHEREOF the parties have executed this amendment agreement.

**FRASER PAPERS INC.**

By: _____
Name:
Title:

By: _____
Name: GLEN MCMILLAN
Title: SVP & CFO

**FRASER PAPERS LIMITED**

By: _____
Name:
Title:

By: _____
Name: GLEN MCMILLAN
Title: SECRETARY

**FPS CANADA INC.**

By: _____
Name:
Title:

By: _____
Name: GLEN MCMILLAN
Title: SECRETARY

[Signature Page – First Amendment to APA]

273

**FRASER PAPERS HOLDINGS INC.**

By: _____

Name: _____

Title: _____

By: _____

Name: GLEN MCMILLAN

Title: SECRETARY

**FRASER TIMBER LIMITED**

By: _____

Name: _____

Title: _____

By: _____

Name: GLEN MCMILLAN

Title: SECRETARY

**FRASER N.H. LLC**

By: _____

Name: _____

Title: _____

By: _____

Name: GLEN MCMILLAN

Title: SECRETARY

[Signature Page - First Amendment to APA]

271

BROOKFIELD ASSET MANAGEMENT INC.

By: _____
Name: Sachin Shah
Title: Senior Vice President

By: _____
Name: Meks Nuvakovic
Title: SUP

[Signature Page – First Amendment to APA]

EXHIBIT "M"

275

DRAFT

SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT

**THIS SECOND AMENDMENT TO ASSET PURCHASE AGREEMENT** is made as of this _____ day of April, 2010.

BETWEEN:                    **FRASER PAPERS INC., FRASER PAPERS LIMITED, FPS CANADA INC., FRASER PAPERS HOLDINGS INC., FRASER TIMBER LIMITED AND FRASER N.H. LLC**

(collectively, the "Vendors")

- and -

**BROOKFIELD ASSET MANAGEMENT INC.,** a corporation amalgamated under the laws of the Province of Ontario

("Brookfield")

RECITALS:

A.      On June 18, 2009, the Vendors commenced proceedings in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c.C-36, as amended, pursuant to which, *inter alia*, PricewaterhouseCoopers Inc. was appointed as monitor;

B.      On June 19, 2009, the Vendors sought and obtained recognition and provisional relief in an ancillary proceeding pursuant to Chapter 15 of Title 11 of the *United States Code* 11 U.S.C. §§ 101 1532C, as amended in the United States Bankruptcy Court for the District of Delaware;

C.      Pursuant to an asset purchase agreement (the "Purchase Agreement") dated as of December 22, 2009 between the Vendors and Brookfield, the Vendors agreed to sell and Brookfield or its designate(s) agreed to purchase, free and clear of all Encumbrances (except Permitted Encumbrances), all right, title and interest of the Vendors in and to the Purchased Assets, except the Excluded Assets;

D.      Brookfield emerged as the successful bidder under the Sales Process approved by the Canadian Court pursuant to the Canadian Approval and Sales Process Order issued by the Canadian Court on December 10, 2009;

E.      The Vendors and Brookfield are party to the first amendment to asset purchase agreement dated as of February 26, 2010 (the "First Amendment"); and

F.      The Vendors and Brookfield desire to enter into this amendment agreement to further amend certain terms and conditions of the Purchase Agreement.

        **NOW THEREFORE** this amendment agreement witnesses that for good and valuable consideration (the receipt and sufficiency of which are hereby acknowledged) the parties agree as follows:

1.      **Defined Terms**

        All terms used herein and not otherwise defined herein shall have the respective meanings ascribed thereto in the Purchase Agreement.

2.      **Amendments to Certain Definitions**

        2.1     The definition of "Agreement" is deleted in its entirety and replaced with the following:

        ""Agreement" shall mean this Asset Purchase Agreement, as amended by the First Amendment Agreement and the Second Amendment Agreement, including all Schedules and exhibits attached thereto, in each case as may be further amended, restated, modified or supplemented from time to time."

        2.2     The following definition shall be added after the definition of "Alternative Transaction":

        ""Amended and Restated Guarantee and Reimbursement Agreement" shall mean the amended and restated guarantee and reimbursement agreement dated as of September 22, 2008 between each of the Vendors and Brookfield (as amended, modified or restated from time to time)."

        2.3     The definition of "Ancillary Agreements" is amended by deleting "and" before "(iii)" in the last line thereof, and adding the following after "Tolling Agreement" in the last line thereof: "; (iv) the Escrow Agreement; and (v) the Unanimous Shareholder Agreement; each in such form as is substantially set out in Exhibit "A" attached hereto and, in any case, as may be satisfactory to the Purchaser, in its sole discretion."

        2.4     The following definition shall be added after the definition of "Ashland Mill":

        ""Assumed Accounts Payable" shall have the meaning given to such term in Schedule 12(a)."

2.5    The definition of "Common Shares" is amended by: (a) deleting "the Monitor, in trust for the benefit of the Vendors" and replacing it with "FPI, on behalf of itself and the other Vendors,"; and (b) adding the following after "Agreement" on the 6th line thereof: ", which common shares shall be (i) in such form as is substantially set out in Exhibit "B" attached hereto and, in any case, as may be satisfactory to the Purchaser, in its sole discretion and (ii) subject to the terms of the Unanimous Shareholder Agreement".

2.6    The definition of "Cure Costs" shall be deleted from the Purchase Agreement.

2.7    The following definitions shall be added after the definition of "Equity Interests":

""Escrow Agent" shall mean PricewaterhouseCoopers Inc., in its capacity as escrow agent under the Escrow Agreement.

"Escrow Agreement" shall mean an escrow agreement between the Vendors, the Purchaser and the Escrow Agent to be entered into at Closing on terms and conditions satisfactory to the parties thereto, acting reasonably, with respect to the Holdback Amount, substantially as set out in Exhibit "C" attached hereto."

2.8    The following definition shall be added after the definition of "Final Order":

""First Amendment Agreement" shall mean the first amendment to asset purchase agreement dated as of February 26, 2010 between the Vendors and Brookfield."

2.9    The following definition shall be added after the definition of "Juniper Mill":

""Labour Board Proceedings" shall mean labour board and grievance proceedings commenced and filed by the Communications, Energy and Paperworkers Union of Canada, including all of its various locals, against, among others, Brookfield in Ontario, Quebec and New Brunswick, including without limitation the following proceedings: (i) Application under Section 69 and/or Subsection 1(4) of the *Labour Relations Act* (Ontario) (Sale of Business and/or Related Employer) OLRB File No. 2838-09-R; (ii) Requête pour déclaration d'employeur unique suivant Les Articles 39, 114 et 118 du Code du Travail (L.R.Q.c. C-27) Numéro AM-2000-5537, AM-2000-5536, AM-2000-5538; (iii) Two "Demands de déclaration des droits de successeur présentées à la Commission du travail et de l'emploi" filed with the Labour and Employment Board on January 7, 2010 (File Numbers: IR-001-10 and IR-002-10); (iv) Ontario Grievance dated December 17, 2009; (v) Grievance of Local 894 dated November 12, 2009, #61719; (vi)

278

Grievance of Local 894 dated November 12, 2009, #61720; (vi) Grievance of Local 894 dated December 22, 2009, #64523; (vii) Grievance of Local 189 dated November 16, 2009, #53590; (ix) Grievance of Local 189 dated November 16, 2009, #53589; and (x) Grievance of Local 189 dated December 22, 2009, #53593."

2.10    The following definitions are added after the definition of "Monitor's Certificate":

"<u>"NB Hourly Employees</u>" shall mean the New Brunswick hourly employees of FPI who are pension plan members of the Old FP Hourly Plan.

"<u>NB Salaried Employees</u>" shall mean the New Brunswick salaried employees of FPI who are pension plan members of the Old FP Salaried Plan."

2.11    The definition of "Preferred Shares" is amended by adding "Class B" after "non-voting" on the first line and by adding ", such terms and conditions substantially as are set out in Exhibit "D" attached hereto and as the Purchaser and the Vendors, in consultation with GNB, may agree, acting reasonably."

2.12    The definition of "Promissory Note" is amended by deleting it in its entirety and replacing it with the following:

"<u>"Promissory Note</u>" shall mean the unsecured promissory note dated the Closing Date to be issued by the Purchaser in favour of FPI, on behalf of itself and the other Vendors, in the amount of Forty Million Dollars ($40,000,000), subject to adjustment in Section 3.8, in consideration of a portion of the Purchase Price payable under this Agreement, substantially in the form set out in Exhibit "E" attached hereto and, in any case, having terms and conditions as may be satisfactory to the Purchaser, in its sole discretion.  For greater certainty, the promissory note shall: (a) mature 10 years from the issue date (except for any promissory note which may be distributed, subject to the claims and rights of prior ranking creditors of the Vendors, by FPI to or for the benefit of the claims represented by the Pension Plans governing the NB Hourly Employees and the NB Salaried Employees in accordance with such Orders of the Canadian Court and the Bankruptcy Court as may be subsequently made, which promissory note shall mature eight (8) years from the Closing Date); (b) be non-interest bearing; (c) not include any restrictive or positive covenants on the part of the Purchaser other than in relation to (i) payment on maturity; and (ii) agreement to issue a replacement promissory note as set out therein; and

- 5 -

(d) otherwise be in form as may be determined by agreement of the Purchaser and the Vendors prior to Closing."

2.13   The following definition shall be added after the definition of "Sales Process":

""Second Amendment Agreement" shall, mean the second amendment to asset purchase agreement dated as of April [8], 2010 between the Vendors and Brookfield."

2.14   The following definition shall be added after the definition of "Unaudited Financial Statements":

""Unanimous Shareholder Agreement" shall mean a unanimous shareholder agreement dated as of April [8], 2010 between, among others, Brookfield, FPI and Twin Rivers Paper Company Inc., substantially as set out in Exhibit "F" attached hereto and, in any case, having terms and conditions as may be satisfactory to the Purchaser, in its sole discretion."

3.        **Amendment to Section 3.1 of the Purchase Agreement**

Section 3.1 is amended by deleting it in its entirety and replacing it with the following:

"**Section 3.1    Purchase Price.**

The aggregate purchase price (the "Purchase Price") payable by the Purchaser to the Vendors for the Purchased Assets shall be: (i) One Hundred and Eighty-Two Million Six Hundred Thousand Dollars ($182,600,000) in consideration on Closing, subject to adjustment in accordance with Section 3.8; and (ii) Six Million One Hundred and Twenty-Five Thousand Dollars (Cdn.$6,125,000) in consideration on the dates and in the manner set out in Section 3.2(e); all as follows:

(a)     Thirty-Five Million Dollars ($35,000,000) in cash;

(b)     Six Million One Hundred and Twenty-Five Thousand Dollars (Cdn.$6,125,000) payable in accordance with Section 3.2(e);

(c)     Forty Million Dollars ($40,000,000) in the form of the Promissory Note;

(d)     Thirty-Five Million Dollars ($35,000,000) in the form of the Preferred Shares;

(e)     Twenty-Five Million Dollars ($25,000,000) in the form of the Common Shares; and

- 6 -                                                  -    230

(f)    the assumption of the Assumed Liabilities up to a maximum amount of Forty-Seven Million Six Hundred Thousand Dollars ($47,600,000)."

4.    **Amendment to Section 3.2 of the Purchase Agreement**

Section 3.2 is amended by deleting it in its entirety and replacing it with the following:

"**Section 3.2    Payment of Purchase Price.**

On Closing, the Purchaser shall pay the Purchase Price as follows:

(a)    an amount equal to Thirty-Five Million Dollars ($35,000,000) in cash to FPI, on behalf of itself and the other Vendors, to be immediately distributed as follows:

(i)    Ten Million Dollars ($10,000,000) to be immediately distributed to CIT in payment of amounts owing under the CIT Financing Agreement; and

(ii)    Twenty-Five Million Dollars ($25,000,000) to be immediately distributed to CIBC in payment of the CIBC Existing Facility, which facility is subject to a guarantee by Brookfield in favour of CIBC and a secured Amended and Restated Guarantee and Reimbursement Agreement by the Vendors in favour of Brookfield;

(b)    delivery of the Promissory Note as follows:

(i)    as to $10,000,000, to the Escrow Agent, on account of a holdback (the "Holdback Amount"); and

(ii)    as to $30,000,000, subject to adjustment in accordance with Section 3.8 of this Agreement, to FPI, on behalf of itself and the other Vendors, to be distributed in accordance with such Orders of the Canadian Court and the Bankruptcy Court as may be subsequently made.

(c)    issuance and delivery of the Preferred Shares to FPI, on behalf of itself and the other Vendors, in trust, to be immediately distributed to GNB in full satisfaction of all amounts owing under or in relation to the GNB Loan Agreement;

281

(d)    issuance and delivery of the Common Shares to FPI, on behalf of itself and the other Vendors, to be distributed in accordance with such Orders of the Canadian Court and the Bankruptcy Court as may be subsequently made;

(e)    an aggregate amount equal to Six Million One Hundred and Twenty-Five Thousand Dollars (Cdn.$6,125,000) in cash to FPI, on behalf of itself and the other Vendors, payable in 14 equal bi-annual installments, to be paid on October 1 and March 31 of each year, such installment payments commencing on October 1, 2011 and ending on March 31, 2018, each in the amount of Four Hundred and Thirty-Seven Thousand Five Hundred Dollars (Cdn.$437,500), to be paid and distributed by FPI immediately upon receipt to a trust settled by FPI for the benefit of the Old FP Hourly Plan and in accordance with such Orders of the Canadian Court and the Bankruptcy Court as may be subsequently made; and

(f)    the assumption of up to a maximum amount of Forty-Seven Million Six Hundred Thousand Dollars ($47,600,000) of Assumed Liabilities which shall be satisfied by the Purchaser's execution and delivery of the General Conveyance and Assumption of Liabilities."

5.    **Amendment to Section 3.8(b) of the Purchase Agreement**

Section 3.8(b) is amended by deleting "$32,400,000" in the 7th line thereof and replacing it with "$30,000,000".

6.    **Amendment to Section 3.11 of the Purchase Agreement**

Section 3.11 of the Purchase Agreement is amended by adding ", the Promissory Note" after "the Common Shares" in the second to last line thereof.

7.    **Amendment to Section 4.1(a) of the Purchase Agreement**

Section 4.1(a) of the Purchase Agreement is amended by deleting it in its entirety and replacing it with the following:

"(a)    Notwithstanding anything that may be contained herein to the contrary, none of Brookfield, the Purchaser or any of their respective Affiliates shall assume or be deemed to assume, agree to become responsible for, perform, discharge or pay when due, any Liabilities whatsoever of the Vendors, including without limitation the Excluded Liabilities (as such term is defined herein), except for

- 8 -                                282

the Liabilities specifically and expressly set out in Schedule 12 attached hereto and any such additional Liabilities that the Purchaser may agree to assume in writing in its sole and absolute discretion (collectively, the "Assumed Liabilities").

      (a.1)   For greater certainty, on Closing the Purchaser shall only assume the Assumed Accounts Payable set out in the updated Schedule 12(a) delivered by the Vendors on Closing and mutually agreed to by the Parties in an amount not to exceed $■ in the aggregate.  Neither the Purchaser nor any of its Affiliates shall assume or be deemed to assume any Liabilities with respect to the Ordinary Course accounts payable and trade payables that (a) are to be paid by the Vendors in the Ordinary Course before the Closing, or (b) are incurred by the Vendors between the effective date of the Second Amendment Agreement and Closing in excess of $■ in the aggregate.

      (a.2)   For greater certainty, notwithstanding anything else in this Agreement, any and all Liabilities under or in respect of any of the following shall not be Assumed Liabilities: (a) Liabilities under or in relation to the Pension Plans; (b) Liabilities under or in relation to the Benefit Plans, to the extent such Benefits Plans are not assumed by the Purchaser pursuant to Section 7.3 of this Agreement; and (c) Liabilities in respect of Designated Employees of the Juniper Mill who are not Transferred Employees.  For the purposes of this Section 4.1(a.2), "Benefit Plans" shall not include the Post-Retirement Liabilities assumed in accordance with the terms of this Agreement."

**8.**     **Amendment to Section 4.3 of the Purchase Agreement**

    8.1   Paragraphs (d) and (f) of Section 4.3 of the Purchase Agreement shall be amended by deleting them in their entirety and replacing them with the following:

      "(d)    other than as specified in Schedule 12 attached hereto, any and all Liabilities with respect to any Benefit Plan;".

      "(f)    any and all Taxes imposed on the Business or the Purchased Assets that is attributable to any pre-Closing tax period (other than any Transactional Taxes and any Realty Taxes referenced in Schedule 12 attached hereto)."

**9.**     **Amendment to Section 9.2 of the Purchase Agreement**

    9.1   Section 9.2 is amended by deleting "March 26" and replacing it with "March 31".

**10.**    **Amendment to Section 9.4(a) of the Purchase Agreement**

    10.1   Section 9.4(a) is amended by deleting it in its entirety and replacing it with the following:

-9-                        ~  233

"(a) As promptly as practicable, but in any event no later than 30 days before Closing, the Vendors shall file with the Bankruptcy Court a motion (the "U.S. Sale Motion") and a proposed order seeking, among other things, a 363 order and recognition of the Canadian Approval and Vesting Order vesting the Purchased Assets in the Purchaser free and clear of all Encumbrances, other than Permitted Encumbrances, such order to be in form and on terms as the Purchaser may reasonably require (as approved, the "U.S. Sale Order")."

10.2    The defined terms "U.S. Approval and Vesting Recognition Motion" and "U.S. Approval and Vesting Recognition Order" shall be replaced with "U.S. Sale Motion" and "U.S. Sale Order", respectively, throughout the Purchase Agreement.

11.           **Amendment to Section 10.1 of the Purchase Agreement**

11.1    Section 10.1 is amended by changing "February 10" to "April 6" in paragraph (m) and by changing "January 15" to "March 31" in paragraph (o).

11.2    Section 10.1(x) is amended by deleting it in its entirety and replacing it with the following:

"(x)    Brookfield shall be satisfied, to its sole and absolute discretion, that the Labour Board Proceedings shall have been unconditionally and irrevocably dismissed, withdrawn, and/or terminated and all claims relating thereto shall have been released, all on terms and in form satisfactory to Brookfield in its sole and absolute discretion;"

11.3    Section 10.1 is amended by deleting "and" after the ";" in paragraph (w) and by adding the following:

"(y)    Brookfield shall be satisfied, to its sole and absolute discretion, with the form and content of the Special Regulation and/or legislative amendments to the *New Brunswick Pension Benefits Act* to be passed in respect of this Transaction; and

(z)    Receipt by the Purchaser of such acknowledgements, releases, confirmations, other documents or court orders as it may deem necessary or desirable in connection with the satisfaction of the requirements of Section 10.1(j) and to ensure that none of the Purchaser, Brookfield, their respective Affiliates, or any of their respective directors, officers, employees, delegates, agents and representatives shall have any liability or obligation whatsoever for or in respect of any event, fact, matter or circumstance occurring or existing on or before the Closing

284

Date in relation to or in connection with the Vendors or their respective businesses or property, other than, in the case of the Purchaser, in relation to the Assumed Liabilities."

12.    **Amendment to Section 12.3(f) and (g) of the Purchase Agreement**

Section 12.3(f) and (g) are amended by deleting them in their entirety and replacing them with the following:

"(f) the Promissory Note payable to FPI, subject to Section 3.2(b) of this Agreement;"

"(g) the Common Shares issued in the name of FPI, subject to Section 3.2(d) of this Agreement;"

13.    **Schedules and Exhibits**

Attached hereto as Exhibit "G" are updated Schedules 1-20 inclusive to the Purchase Agreement effective as of the date hereof, which Schedules, together with Schedules 12(a)-(f) inclusive shall be updated by the Vendors on Closing to the satisfaction of the Purchaser in its sole and absolute discretion.

14.    **Effect of Amendment Agreement**

This amendment agreement is an amendment to the Purchase Agreement.  Unless the context of this amendment agreement otherwise requires, the Purchase Agreement, the First Amendment and this amendment agreement shall be read together and shall have effect as if the provisions of the Purchase Agreement, the First Amendment and this amendment agreement were contained in one agreement. The term "Agreement" when used in the Purchase Agreement means the Purchase Agreement as amended, supplemented or modified from time to time (including as amended by the First Amendment and this amendment agreement).

15.    **Enurement**

This amendment agreement shall enure to the benefit of and be binding upon the parties hereto and their respective successors and permitted assigns.

16.    **Governing Law**

This amendment agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

- 11 -                                                285

17.        <u>Counterparts</u>

      This amendment agreement may be executed in any number of counterparts, each of which will be deemed to be an original and all of which taken together will be deemed to constitute one and the same instrument.

18.        <u>Electronic Transmission</u>

      Delivery of an executed signature page to this amendment agreement by any party by electronic transmission will be as effective as delivery of a manually executed copy of this amendment agreement by such party.

19.        <u>No Other Amendments</u>

      Except as amended hereby and pursuant to the First Amendment, the Purchase Agreement remains in full force and effect, unamended.

**[Signature Page To Follow]**

286

IN WITNESS WHEREOF the parties have executed this amendment agreement as of the date first written above.

FRASER PAPERS INC.


By: _____
     Name:
     Title:

By: _____
     Name:
     Title:


FRASER PAPERS LIMITED


By: _____
     Name:
     Title:


By: _____
     Name:
     Title:


FPS CANADA INC.


By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

[Signature Page - Second Amendment to APA]

287

**FRASER PAPERS HOLDINGS INC.**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**FRASER TIMBER LIMITED**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

**FRASER N.H. LLC**

By: _____
     Name:
     Title:

By: _____
     Name:
     Title:

[Signature Page - Second Amendment to APA]

238

**BROOKFIELD ASSET MANAGEMENT INC.**

By: _____

   Name:

   Title:

By: _____

   Name:

   Title:

[Signature Page - Second Amendment to APA]

**Schedule 12**

**Assumed Liabilities**

(i)    Subject to Section 4.1(a.1) of this Agreement, Ordinary Course  trade payables and accrued payables outstanding as of the Closing Date for goods provided and services rendered to the Vendors by Person(s) listed in Schedule 12(a) attached hereto following the Filing Date in relation solely to the Purchased Assets, up to an aggregate maximum amount of $■  (which aggregate maximum amount shall, for greater certainty, include any trade payables or accrued payables arising from  Liabilities set out in clause (ii) of this Schedule 12), but excluding, for greater certainty, any and all Intercompany Receivables and Intercompany Liabilities and any and all trade payables and accrued payables to be paid by the Vendors in the Ordinary Course prior to the Closing Date (the "Assumed Accounts Payable");

(ii)    Liabilities  in respect of: (a) executory obligations to be performed or satisfied from and after the Closing Date pursuant to  the Contracts specifically listed in Schedule 12(b) attached hereto  which are assigned to the Purchaser effective as of the Closing Date (the "Assigned Contracts"); and (b) unpaid arrears to be specifically assumed by the Purchaser as of the Closing Date pursuant to any consent to assignment agreements which may be delivered by the Vendors to the Purchaser on or prior to Closing on terms and conditions satisfactory to the Purchaser, in its sole discretion, in respect of any Assigned Contracts, up to an aggregate maximum amount of $■;

(iii)    Transactional Taxes payable in connection with the transactions contemplated by this Agreement as set forth in Section 11.1 of the Agreement;

(v)    Realty Taxes in an amount not to exceed $■ in the aggregate;

(vi)    Liabilities arising from ownership of the Purchased Assets from and after the Closing Date;

(vii)    Liabilities arising from  asset retirement obligations in respect of the Purchased Assets, up to  an amount not to exceed $■ in the aggregate;

(viii)    Liabilities under the Workers Compensation L/C relating to the U.S. Transferred Employees;

(ix)    Liabilities arising from the employment of the Transferred Employees and the Unionized Employees from and after the Closing Date including, in respect of the Transferred Employees, the Benefit Plans, as applicable, assumed by the Purchaser on Closing pursuant to Section 7.3 of this Agreement, all such amounts not to exceed $■ in the aggregate; and

290

- 2 -

    (x)    the Post-Retirement Liabilities in an amount not to exceed $■ in the aggregate.

291

**Schedule 12(a)**

**Assumed Accounts Payable**

10841695.4
13742-2191

292

**Schedule 12(b)**

**Assumed Contracts**

293

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| Gelco | T&E system | Portland | | 20/06/2009 |
| IKON | Copier | Portland | 13/06/2008 | 12/06/2011 |
| MotorLease Corp | Sales auto leases | Portland | 30/12/2003 | |
| MTI | University of Maine | Portland | | |
| One Communications | Portland phones & Internet | Portland | | 01/09/2010 |
| Second Portland Limited (Sable Oaks) | Office Lease | Portland | | 01/09/2013 |
| Aliant | Dedicated internet | Plaster Rock | 23/05/2007 | |
| Aliant | Line contract | Plaster Rock | 07/02/2005 | |
| Caterpillar Financial Services | Loader leases | Plaster Rock | 09/04/2007 | 08/04/2010 |
| Energy Efficiency and Conservation Agency of NB | GNB Incentive program to improve efficiency | Plaster Rock | 08/04/2009 | |
| Inglesund tools | Partner chip | Plaster Rock | Sept 01,08 | Aug 31,09 |
| Irving Oil Limited | Irving gas bar lease at Plaster Rock mill | Plaster Rock | | |
| Jeff Deleavey | Freight contract | Plaster Rock | 01/05/2005 | 30/04/2006 |
| Maritime Lumber Bureau | Grading inspection services | Plaster Rock | 12/09/2006 | N/A |
| NB Power | Power Purchase Agreement | Plaster Rock | | |
| Norman Jensens | Brokerage | Plaster Rock | | |
| TELUS | cell phones | Plaster Rock | 28/03/2008 | 27/03/2011 |
| ACOA | | Montreal | | |
| Norbord Industries | Lease agreement FTC in Montreal | Montreal | | |
| University of New Brunswick | Connected with ACOA | Montreal | | |
| 3E Company | MSDS resources | Madawaska | | |
| ABB Inc | Control Systems | Madawaska | | |
| ACP | Inside Headers | Madawaska | 01/09/2008 | 31/08/2010 |
| ADM Coating System | Paper coating | Madawaska | | |
| Albany | Fabric | Madawaska | 01/01/2009 | 31/12/2009 |
| Alstrom Power (ABB) | Service Agreement | Madawaska | 23/08/1996 | evergreen |
| AON | Customs bond | Madawaska | 14/04/2009 | 14/04/2010 |
| AT&T | Telecom/Data Services | Madawaska | | |
| BASF (CIBA) | Fluorocarbon, Retention Aid, Chemicals | Madawaska | | 01/09/2010 |
| Besette and Boudreau | Transportation services | Madawaska | | |
| C. H. Sprague | Bunker "C" Oil | Madawaska | | |
| Cascades Conversion | Roll Wrap/Headers | Madawaska | 01/01/2009 | 31/12/2011 |
| Ceridian | U.S. Payroll Service | Madawaska | 01/09/2009 | 01/02/2010 |
| CNG | Pulp | Madawaska | 23/10/2009 | 31/12/2012 |
| Dupont | TiO2 | Madawaska | 23/05/2005 | 23/05/2010 |
| Envirem Tech | Waste Water Treatment Solids | Madawaska | | 31/12/2009 |
| Exopack | BladePak | Madawaska | | |
| Fairpoint | Telephone Services PRI | Madawaska | 04/04/2009 | 01/04/2011 |
| Fairpoint | Telephone Services PRI | Madawaska | 04/04/2009 | 01/04/2011 |

294

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| Fairpoint | Telephone Services T-1 Line, PRI | Madawaska | 01/07/2008 | 01/07/2010 |
| GAC | Alum | Madawaska | 01/01/2009 | 31/12/2009 |
| Hammer Packaging | Wet-Strength Agreement | Madawaska | 01/05/2009 | 31/12/2010 |
| Honeywell | Optivision Maintenance Agreement | Madawaska | 01/10/2009 | 01/10/2010 |
| Honeywell | Service Agreement | Madawaska | 31/03/2008 | 31/03/2010 |
| Hyster Captial | Fork Lifts | Madawaska | | |
| ITW Shippers | Air bags | Madawaska | 30/04/2008 | 30/04/2010 |
| Kadant | Nozzles | Madawaska | | |
| Kleinschmidt | Electronic Data Interchange | Madawaska | 12/11/2009 | |
| Levesque Office Supply | Multiple copiers and maintenance | Madawaska | | various |
| Maine Public Service | Power, Emergency Back-Up | Madawaska | 01/10/2001 | |
| MMA | Land leases and tariffs, including transportation and assessorials | Madawaska | | |
| National Starch | Starch for paper making process | Madawaska | | |
| NEC | Telephone Systems Lease - Madawaska | Madawaska | 01/09/2008 | 01/09/2010 |
| Nestle | BladePak | Madawaska | | 12/01/2010 |
| New England Communications (NEC) | Maintenance for the Madawaska/Edmundston telephone switch and voice mail system | Madawaska | | |
| NH Bragg | Safety and Misc supplies | Madawaska | 01/05/2009 | 01/05/2010 |
| NH Bragg | Safety and Misc supplies | Madawaska | 01/05/2009 | 01/05/2010 |
| Rio Tinto Luzenac | Coating clays | Madawaska | | |
| Sekisui (Celanese) | PYOH | Madawaska | 01/01/2008 | 31/12/2009 |
| SFK Pulp | Wood Pulp | Madawaska | 29/07/2009 | n/a |
| Sonoco | Cores | Madawaska | 01/06/2008 | 01/06/2011 |
| Specialty Minerals ("Mintech") | PCC | Madawaska | | evergreen |
| Sun Life - US | Business Travel Accident | Madawaska | 23/04/2009 | 23/04/2011 |
| Superior Propane | Propane | Madawaska | 16/09/2005 | 15/09/2007 |
| Unifirst | Arcflash protective | Madawaska | 15/10/2007 | 15/10/2010 |
| UPS | Parcel Service | Madawaska | 01/06/2007 | 31/05/2010 |
| USW | TOP Safety Program | Madawaska | | 01/03/2011 |
| Verizon | Tele Service | Madawaska | | Current |
| Vescom | Security Service | Madawaska | 15/04/2009 | 15/04/2010 |
| Voith | fabric | Madawaska | | |
| Aliant | Allegiance Program Loyalty | Juniper, Plaster Rock | 09/07/2009 | 08/07/2012 |
| I-beam International | Land agreement | Juniper | 27/06/2004 | 24/06/2104 |
| Aliant | Dedicated internet | Juniper | 23/05/2007 | |
| Aliant | Managed service contract | Juniper | 03/05/2007 | 02/05/2010 |
| NB Power | Power Purchase Agreement | Juniper | 14/07/2004 | 13/07/2005 |

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| Highline Corp | Canadian Payroll software maintenance | Edmundston, Juniper, Plaster Rock | | |
| Xerox | Multiple copiers and maintenance | Edmundston, Plaster Rock | 15/04/2008 | 15/04/2011 |
| Bell Mobility | Cell phones | Edmundston, Juniper, Plaster Rock | | |
| No Global Borders | Customs software - CDN | Edmundston, Juniper, Plaster Rock | | |
| CN | Rail Siding Agreements and Rail Freight agreements | Edmundston, Juniper | | |
| Acadian Timber | Crown Lands Services Agreement - AT Limited Partnership and Fraser Papers Inc | Edmundston | | 31/01/2031 |
| Acadian Timber | Fiber Contract: Cogen - AT - Big John Green River Freehold | Edmundston | | 30-Jun-10 |
| Acadian Timber | Fiber Contract: Cogen - AT - Big John Plaster Rock Freehold | Edmundston | | 30-Jun-10 |
| Acadian Timber | Fiber Contract: Cogen - AT - Harding Plaster Rock Freehold | Edmundston | | 30-Jun-10 |
| Acadian Timber | Fiber Contract: Cogen - AT - Linton Plaster Rock Freehold | Edmundston | | 30-Jun-10 |
| Acadian Timber | Fiber Contract: Cogen - AT & Big John Green River Crown | Edmundston | | 31-Mar-10 |
| Acadian Timber | Fiber Contract: Cogen - AT & Harding Plaster Rock Crown | Edmundston | | 31-Mar-10 |
| Acadian Timber | Fiber Contract: Cogen - AT & HE Juniper Crown | Edmundston | | 31-Mar-10 |
| Acadian Timber | Fiber Contract: Cogen - AT & Linton Plaster Rock Crown | Edmundston | | 31-Mar-10 |
| Acadian Timber | Fiber Contract: ED Pulpwood - Acadian Timber Green River | Edmundston | | 31-Mar-10 |
| Acadian Timber | Fiber Contract: NAFP Chip Deal - Acadian Timber Freehold | Edmundston | | 28-Feb-10 |
| Acadian Timber | Fiber Contract: NAFP Chip Deal - Acadian Timber Lic 09 | Edmundston | | 28-Feb-10 |
| Acadian Timber | Fiber Contract: NAFP Chip Deal - AT TL Crown Lic 09 | Edmundston | | 28-Feb-10 |
| Acadian Timber | Fiber Contract: NAFP Chip Deal - AT TL Freehold | Edmundston | | 28-Feb-10 |

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| Acadian Timber | Fiber Contract: PR - Acadian Timber Freehold (Mass) | Edmundston | | 30-Jun-10 |
| Acadian Timber | Fiber Contract: PR - Acadian Timber Unit 09, Lic 09 (Mass) | Edmundston | | 31-Mar-10 |
| Acadian Timber | Fiber Contract: PR - EDM Logs Acadian Timber License 09 (M3) | Edmundston | | 31-Mar-10 |
| Acadian Timber | Fiber Supply Agreement - AT Limited Partnership and Fraser Papers Inc | Edmundston | | 23/01/2026 |
| Aliant | Line contract | Edmundston | | |
| Atlantic Renewable Energy Corporation | Fiber Contract: Cogen - Atlantic Renewable Energy Corporation | Edmundston | | 30-Jun-10 |
| Atlas Copco Compressors | Mill air compressor maintenance agreement | Edmundston | | |
| Baymag | MgO | Edmundston | 01/01/2009 | 31/12/2011 |
| Bell Canada | Long Distance | Edmundston | 01/12/2008 | 07/12/2011 |
| Bois Transport | Fiber Contract: ED Chips - Gino Bois Transport | Edmundston | | 28-Aug-10 |
| Brenntag | Methanol | Edmundston | 30/06/2008 | 30/06/2009 |
| Broyage Industriel Saint Laurent Inc | Fiber Contract: Cogen - Broyage Industriel Saint Laurent Inc | Edmundston | | 27-Feb-10 |
| C.F. Morin Transport | Fiber Contract: ED Chips - C.F. Morin Transport | Edmundston | | 28-Aug-10 |
| Canexus | Sodium Chlorate | Edmundston | 20/04/2009 | 31/12/2011 |
| Carleton-Victoria Marketing Board | Fiber Contract: Cogen - CVMB (Carleton) | Edmundston | | 31-Mar-10 |
| Carleton-Victoria Marketing Board | Fiber Contract: Cogen - CVMB (Victoria) | Edmundston | | 31-Mar-10 |
| Carleton-Victoria Marketing Board | Fiber Contract: PR - Carlton-Victoria Mrkt. Board (Bangor) | Edmundston | | 31-Mar-10 |
| Carleton-Victoria Marketing Board | Fiber Contract: PR - Carlton-Victoria Mrkt. Board (Mass) | Edmundston | | 31-Mar-10 |
| Copeaux de la Vallee | Fiber Contract: Cogen - Copeaux de la Vallee PQ/Godbout | Edmundston | | 31-Mar-10 |
| Copeaux de la Vallee | Fiber Contract: ED Chips - Copeaux de la Vallee/Fraser | Edmundston | | 01-Feb-10 |
| Copeaux de la Vallee | Fiber Contract: ED Chips - Copeaux de la Vallee/Gino Bois | Edmundston | | 01-Feb-10 |
| DBA | Process improvement consultants | Edmundston | | |
| Deniso Lebel Inc | Fiber Contract: Cogen - Deniso Lebel Degelis | Edmundston | | 28-Aug-10 |
| Deniso Lebel Inc | Fiber Contract: Cogen - Deniso Lebel Squateck PQ | Edmundston | | 28-Aug-10 |

297

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| Deniso Lebel Inc | Fiber Contract: Cogen - Deniso Lebel St Joseph PQ | Edmundston | | 31-Mar-10 |
| Deniso Lebel Inc | Fiber Contract: ED Chips - DENISO LEBEL CAP-CHAT | Edmundston | | 28-Aug-10 |
| Deniso Lebel Inc | Fiber Contract: ED Chips - Deniso Lebel Inc Degelis | Edmundston | | 28-Aug-10 |
| Deniso Lebel Inc | Fiber Contract: ED Chips - Deniso Lebel Inc Price | Edmundston | | 28-Aug-10 |
| Deniso Lebel Inc | Fiber Contract: ED Chips - Deniso Lebel Inc. Squateck | Edmundston | | 28-Aug-10 |
| Dynamic Transport | Fiber Contract: ED Chips - Dynamic Transport | Edmundston | | 31-Aug-10 |
| E.T. Transport Inc. | Fiber Contract: ED Chips - E.T. Transport Inc. | Edmundston | | 30-Jun-10 |
| Envirem Tech | Fly-ash composting | Edmundston | | |
| Fornebu Lumber | Fiber Contract: Cogen - Fornebu Lumber/Godbout | Edmundston | | 28-Aug-10 |
| Fornebu Lumber | Fiber Contract: ED Chips - Fornebu Lumber | Edmundston | | 28-Aug-10 |
| Fornebu Lumber | Fiber Contract: ED Stacked - Fornebu Lumber/Fraser Allocation | Edmundston | | 31-Mar-10 |
| Fornebu Lumber | Fiber Contract: NAFP Chip Deal - Fornebu - Burnt Church | Edmundston | | 29-Aug-10 |
| Fornebu Lumber | Fiber Contract: NAFP Chip Deal - Fornebu Lic 03 | Edmundston | | 29-Aug-10 |
| Fornebu Lumber | Fiber Contract: PR - Fornebu Lumber/Fraser Allocation(M3) | Edmundston | | 31-Mar-10 |
| Fraser Papers Juniper Lumbermill | Fiber Contract: Cogen - Fraser Papers Juniper Lbr | Edmundston | | 30-Jun-10 |
| Fraser Papers Juniper Lumbermill | Fiber Contract: ED Chips - Fraser Juniper Lumber | Edmundston | | 30-Jun-10 |
| Fraser Papers Plaster Rock Lumbermill | Fiber Contract: Cogen - Fraser Papers Plaster Rock | Edmundston | | 30-Jun-10 |
| Fraser Papers Plaster Rock Lumbermill | Fiber Contract: ED Chips - Fraser Plaster Rock | Edmundston | | 30-Jun-10 |
| Fraser Timber Ashland | Fiber Contract: Cogen - Fraser Timbers Ashland | Edmundston | | 30-Jun-10 |
| Fraser Timber Ashland | Fiber Contract: ED Chips - Fraser Timbers Ashland | Edmundston | | 30-Jun-10 |
| Fraser Timber Limited | Fiber Contract: ED Pulpwood - Fraser Timber Limited | Edmundston | | 31-Mar-10 |

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| Fraser Timber Masardis | Fiber Contract: Cogen - Fraser Timbers Masardis | Edmundston | | 30-Jun-10 |
| Fraser Timber Masardis | Fiber Contract: ED Chips - Fraser Timbers Masardis | Edmundston | | 30-Jun-10 |
| Fraser Timber Mill 3 | Fiber Contract: Cogen - Fraser Timbers Mill # 3 | Edmundston | | 30-Jun-10 |
| Fraser Timber Mill 3 | Fiber Contract: ED Chips - Fraser Timbers Mill 3 | Edmundston | | 30-Jun-10 |
| G.A. Levesque | Fiber Contract: PR - G.A. Levesque - CVMB (Mass) | Edmundston | | 31-Mar-10 |
| G.A. Levesque | Fiber Contract: PR - G.A. Levesque - MMB (Mass) | Edmundston | | 31-Mar-10 |
| G.A. Levesque | Fiber Contract: PR - G.A. Levesque - Northshore (Bangor | Edmundston | | 31-Mar-10 |
| G.A. Levesque | Fiber Contract: PR - G.A. Levesque - NSFP(Mass) | Edmundston | | 31-Mar-10 |
| G.A. Levesque | Fiber Contract: PR - G.A. Levesque -CVMB (Bangor) | Edmundston | | 31-Mar-10 |
| G.A. Levesque | Fiber Contract: PR - G.A. Levesque -MMB (Bangor) | Edmundston | | 31-Mar-10 |
| Glen Zetteman | Fly ash spreading | Edmundston | | |
| GMAC Leases | Vehicles | Edmundston | | |
| Godbout Transport | Fiber Contract: Cogen - Uniboard / Godbout | Edmundston | | 31-Mar-10 |
| Godbout Transport | Fiber Contract: ED Chips - Godbout Transport | Edmundston | | 28-Aug-10 |
| Groupe Savoie | Fiber Contract: Cogen - Groupe Savoie | Edmundston | | 30-Jun-10 |
| Groupe Savoie | Fiber Contract: Cogen - Groupe Savoie/Renaud Plante | Edmundston | | 30-Jun-10 |
| Groupe Savoie | Fiber Contract: ED Stacked - Groupe Savoie | Edmundston | | 31-Mar-10 |
| Groupe Savoie | Fiber Contract: ED Stacked - Groupe Savoie | Edmundston | | 31-Mar-10 |
| Groupe Savoie | Fiber Contract: NAFP Chip Deal - Groupe Savoie Lic 01 | Edmundston | | 29-Aug-10 |
| Groupe Savoie | Fiber Contract: NAFP Chip Deal - Groupe Savoie Lic 01 (Chaleur) | Edmundston | | 29-Aug-10 |
| Groupe Savoie | Fiber Contract: NAFP Chip Deal - Groupe Savoie Lic 01 (Irving) | Edmundston | | 29-Aug-10 |
| Groupe Savoie | Fiber Contract: NAFP Chip Deal - Groupe Savoie Lic 03 | Edmundston | | 29-Aug-10 |

299

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| Groupe Savoie | Fiber Contract: NAFP Chip Deal - Groupe Savoie Lic 09 | Edmundston | | 29-Aug-10 |
| Groupe Savoie | Fiber Contract: NAFP Chip Deal - Groupe Savoie Lic 09 (Irving) | Edmundston | | 29-Aug-10 |
| HC Haynes Inc. | Fiber Contract: PR - HC Haynes Inc. NB - CVMB (Mass) | Edmundston | | 31-Mar-10 |
| HC Haynes Inc. | Fiber Contract: PR - HC Haynes Inc. NB Direct Contract (Bangor) | Edmundston | | 31-Mar-10 |
| HC Haynes Inc. | Fiber Contract: PR - HC Haynes Inc. NB Direct contract (Mass) | Edmundston | | 31-Mar-10 |
| HC Haynes Inc. | Fiber Contract: PR - HC Haynes Inc. NB - YSC (Mass) | Edmundston | | 31-Mar-10 |
| HC Haynes Inc. | Fiber Contract: PR - HC Haynes NB - CVMB (Bangor) | Edmundston | | 31-Mar-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving Baker Brook | Edmundston | | 30-Aug-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving Begin Clair | Edmundston | | 30-Aug-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving Chip Plant | Edmundston | | 30-Aug-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving Deersdale | Edmundston | | 30-Aug-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving Fort Kent ME | Edmundston | | 30-Aug-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving Kedgwick | Edmundston | | 30-Aug-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving St Leonard | Edmundston | | 30-Aug-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving Veneer | Edmundston | | 25-Sep-10 |
| J.D. Irving Limited | Fiber Contract: Cogen - J.D. Irving Woods Hwd Chips Freehold | Edmundston | | 30-Aug-10 |
| J.D. Irving Limited | Fiber Contract: ED Chips - J.D. Irving Chip Pile Down (St.Leonard) | Edmundston | | 27-Mar-10 |
| J.D. Irving Limited | Fiber Contract: ED Chips - J.D. Irving Chip Pile Down (Veneer) | Edmundston | | 27-Mar-10 |
| J.D. Irving Limited | Fiber Contract: ED Chips - J.D. Irving Chip Plant | Edmundston | | 15-Sep-10 |
| J.D. Irving Limited | Fiber Contract: ED Chips - J.D. Irving Kedgwick | Edmundston | | 15-Sep-10 |
| J.D. Irving Limited | Fiber Contract: ED Chips - J.D. Irving St. Leonard | Edmundston | | 15-Sep-10 |

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| North American Forest Products | Fiber Contract: NAFP Chip Deal - NAFP CHIP PLANT SERVICE CONTRACT | Edmundston | | 29-Aug-10 |
| North American Forest Products | Fiber Contract: NAFP Chip Deal - NAFP Hauling | Edmundston | | 29-Aug-10 |
| Pitney Bowes | Postage Meter | Edmundston | | |
| Praxair | Oxygen/Nitrogen | Edmundston | | 01/02/2014 |
| Province of New Brunswick | Forest Management Agreements - License # 09 | Edmundston | | 31/03/2022 |
| Province of New Brunswick | Forest Management Agreements - License # 10 | Edmundston | | 31/03/2017 |
| Savoie Grinders | Fiber Contract: Cogen - Groupe Savoie Grinders | Edmundston | | 30-Jun-10 |
| Scierie Chaleur | Fiber Contract: Cogen - Scierie Chaleur Sawmills | Edmundston | | 28-Aug-10 |
| Scierie Chaleur | Fiber Contract: ED Chips - Drum Scierie Chaleur | Edmundston | | 28-Aug-10 |
| Scierie Chaleur | Fiber Contract: NAFP Chip Deal - Chaleur Lic 01 | Edmundston | | 28-Feb-10 |
| Scierie Chaleur | Fiber Contract: NAFP Chip Deal - Chaleur Lic 03 | Edmundston | | 29-Aug-10 |
| Scierie Chaleur Sawmill | Fiber Contract: ED Chips - Scierie Chaleur Sawmill | Edmundston | | 28-Aug-10 |
| Scierie St. Elzear Inc. | Fiber Contract: ED Chips - Scierie St. Elzear Inc. | Edmundston | | 30-Aug-10 |
| Sunbury Transport | Fiber Contract: ED Biomass - Sunbury (Hauling) | Edmundston | | 30-Jan-10 |
| Sunbury Transport | Fiber Contract: ED Chips - Sunbury Transport B Train | Edmundston | | 19-Nov-11 |
| Sunbury Transport | Fiber Contract: ED Chips - Sunbury Transport Triaxle | Edmundston | | 19-Nov-11 |
| Temrex Nouvelle | Fiber Contract: Cogen - Temrex Nouvelle PQ | Edmundston | | 30-Jun-10 |
| Temrex Nouvelle | Fiber Contract: ED Chips - Temrex Nouvelle | Edmundston | | 28-Aug-10 |
| TNT Road Company | Fiber Contract: Cogen - TNT Road Company Zone 1 | Edmundston | | 31-Dec-10 |
| TNT Road Company | Fiber Contract: Cogen - TNT Road Company Zone 2 | Edmundston | | 31-Dec-10 |
| TNT Road Company | Fiber Contract: Cogen - TNT Road Company Zone 3 | Edmundston | | 31-Dec-10 |

| Vendor Name | Product/Service | Mill Location | Contract Date | Expiry Date |
|---|---|---|---|---|
| Transport FL | Fiber Contract: ED Chips - TRANSPORT FL | Edmundston | | 28-Aug-10 |
| Uniboard Exchange | Fiber Contract: Cogen - Fraser / Uniboard Exchange | Edmundston | | 31-Mar-10 |
| Warren Transport | Fiber Contract: ED Chips - Warren Transport | Edmundston | | 28-Aug-10 |
| William Parker | Fly-ash land spreading program (Cogen) | Edmundston | | |
| Buckman | Chemicals | All mills | 01/01/2009 | 31/12/2009 |
| Cascades Enviropak | Risers Dunnage | All mills | 01/04/2009 | 01/04/2011 |
| Dunn & Bradstreet | Credit Reports | All mills | | |
| Hercules | Chemicals | All mills | | |
| Kemira | H2O2 & Chemicals | All Mills | | |
| Motion Industries | MRO | All mills | 01/05/2009 | 30/04/2011 |
| Nalco | Speciality Chemicals | All mills | | 31/12/2009 |
| Norfalco | Sulfuric Acid | All mills | 01/07/2009 | 30/06/2010 |
| Olin (PCI) | Caustic/Chlorine | All mills | 01/01/2007 | 31/12/2009 |
| P-Cards | Purchasing cards | All Mills | | |