# EXHIBIT B

# EXHIBIT "J"

- 194

*Execution Copy*

~~DRAFT~~

ASSET PURCHASE AGREEMENT

BY AND AMONG

FRASER PAPERS INC., FRASER PAPERS LIMITED, FPS CANADA INC., FRASER
PAPERS HOLDINGS INC., FRASER TIMBER LIMITED AND FRASER N.H. LLC

As the Vendors

AND

THE PURCHASER, AS HEREIN DEFINED

As the Purchaser

DATED AS OF DECEMBER ■,22, 2009

## TABLE OF CONTENTS

Page

**ARTICLE 1**
    **DEFINITIONS; INTERPRETATION**................................................................2
    Section 1.1    Definitions...............................................................................2
    Section 1.2    Headings and Table of Contents.............................................18
    Section 1.3    Gender and Number and Extended Meanings.........................18
    Section 1.4    Statutory References. ...........................................................~~19~~18
    Section 1.5    Currency. .............................................................................19
    Section 1.6    Generally Accepted Accounting Principles. ...........................19
    Section 1.7    Interpretation. ......................................................................19
    Section 1.8    Invalidity of Provisions. .......................................................19
    Section 1.9    Entire Agreement..................................................................19
    Section 1.10    Waiver, Amendment.............................................................20
    Section 1.11    Governing Law. ....................................................................20
    Section 1.12    Schedules.............................................................................20

**ARTICLE 2**
    **PURCHASED ASSETS** ...........................................................................21
    Section 2.1    Agreement to Purchase and Sell Purchased Assets. ...............21
    Section 2.2    Assignment of Purchased Assets............................................22
    Section 2.3    Thurso PPTGP Credits..........................................................~~23~~22
    Section 2.4    Excluded Assets....................................................................23
    Section 2.5    Designation of Excluded Assets .............................................~~24~~23

**ARTICLE 3**
    **PURCHASE PRICE AND RELATED MATTERS** ...............................24
    Section 3.1    Purchase Price.......................................................................24
    Section 3.2    Payment of Purchase Price. ...................................................24
    Section 3.3    Holdback Amount..................................................................25
    Section 3.4    Closing Date Estimated Balance Sheet ...................................~~26~~25
    Section 3.5    Closing Date Balance Sheet ...................................................26
    Section 3.6    Determination of Purchase Price and Adjustment of Amount Paid
            on Closing Date.....................................................................26
    Section 3.7    Financial Statements .............................................................~~27~~26
    Section 3.8    Purchase Price Adjustment....................................................~~27~~26
    Section 3.9    Payments. .............................................................................27
    Section 3.10    Allocation of Purchase Price. ................................................~~28~~27
    Section 3.11    Issuance of Common Shares, Preferred Shares and Promissory
            Note......................................................................................~~28~~27

**ARTICLE 4**
    **ASSUMPTION OF LIABILITIES**..........................................................28
    Section 4.1    Assumed Liabilities. .............................................................28
    Section 4.2    Quantification and Allocation of Assumed Liabilities ............29
    Section 4.3    Excluded Liabilities. .............................................................29

- i -

- 196

## TABLE OF CONTENTS
(continued)

Page

**ARTICLE 5**
**REPRESENTATIONS AND WARRANTIES REGARDING THE**
**PURCHASER** .................................................................................30
Section 5.1    Organization. ...............................................................30
Section 5.2    Authorization, Execution and Enforceability. ......................3130
Section 5.3    Financing. ...................................................................31
Section 5.4    Brokers; Finders. ..........................................................31
Section 5.5    Vendors' Acknowledgment; Exclusivity of Representations and
               Warranties. ..................................................................31

**ARTICLE 6**
**REPRESENTATIONS AND WARRANTIES OF THE VENDORS**.................31
Section 6.1    Organization. ...............................................................31
Section 6.2    Authorization, Execution and Enforceability. ......................32
Section 6.3    Financial Statements. .....................................................32
Section 6.4    Permits. ......................................................................32
Section 6.5    Intellectual Property Matters ...........................................3332
Section 6.6    Sufficiency of Purchased Assets........................................3332
Section 6.7    Compliance with Laws. ..................................................33
Section 6.8    Title. ..........................................................................33
Section 6.9    Environmental and Health and Safety Matters.......................33
Section 6.10   No Conflict. .................................................................34
Section 6.11   Contracts.....................................................................34
Section 6.12   Litigation. ...................................................................3534
Section 6.13   Tax Liens.....................................................................35
Section 6.14   Lands. ........................................................................35
Section 6.15   Employment Matters......................................................35
Section 6.16   Timber Licences. ..........................................................36
Section 6.17   Brokers; Finders...........................................................3736
Section 6.18   Operation of the Business. ..............................................37
Section 6.19   Non Residents...............................................................37
Section 6.20   Schedules.....................................................................37
Section 6.21   Survival of Covenants, Representations and Warranties ...........37

**ARTICLE 7**
**EMPLOYEE MATTERS** ......................................................................3837
Section 7.1    Offers of Employment. ...................................................3837
Section 7.2    Information from Vendors. ...............................................3938
Section 7.3    Employee Benefit Plans. .................................................3938
Section 7.4    Responsibility for Accrued Claims.....................................39
Section 7.5    Privacy Laws. ...............................................................39
Section 7.6    Hourly Employees Pension Plan. .......................................39
Section 7.7    Salaried Employees Pension Plan.......................................4039

- ii -

TABLE OF CONTENTS
(continued)

Page

Section 7.8    U.S. Pension Plan ................................................................40

**ARTICLE 8**
    **ADDITIONAL AGREEMENTS OF THE PARTIES** ................................**41**
    Section 8.1    Conduct by the Purchaser. ..............................................41
    Section 8.2    Conduct by the Vendors. ................................................41
    Section 8.3    Conduct of Business. ......................................................42
    Section 8.4    Sale**Sales** Process. ..........................................................42
    Section 8.5    Access to Information. ....................................................42
    Section 8.6    Regulatory Matters. ................................................43**42**
    Section 8.7    Maintenance of Books and Records; Access after Closing. ....43
    Section 8.8    Ancillary Agreements. ....................................................43
    Section 8.9    Accounts Receivable. ......................................................43
    Section 8.10   Insurance ........................................................................43
    Section 8.11   Vendors' Post-Closing Covenants ..........................44**43**

**ARTICLE 9**
    **COURT APPROVAL** ................................................................**44**
    Section 9.1    Canadian **Approval and** Sales Process ~~and Conditional Vesting~~
                   Order. ............................................................................44
    Section 9.2    Canadian ~~Final~~ Approval **and Vesting** Order. ......................44
    Section 9.3    U.S. **Approval and** Sales Process ~~and Conditional Vesting~~
                   Recognition Order. ........................................................44
    Section 9.4    U.S. ~~Final~~ Approval **and Vesting** Recognition Order ..............44

**ARTICLE 10**
    **CONDITIONS TO CLOSING** ..........................................**45**
    Section 10.1   Conditions for the Benefit of the Purchaser. ..................45
    Section 10.2   Conditions for the Benefit of the Vendors. ....................48

**ARTICLE 11**
    **TAXES** ......................................................................**49**
    Section 11.1   Payment of Taxes and Other Costs. ..............................49
    Section 11.2   Elections. ......................................................................49

**ARTICLE 12**
    **CLOSING** ..................................................................**50**
    Section 12.1   Location and Time of the Closing. ................................50
    Section 12.2   Closing Deliveries of the Vendors. ................................50
    Section 12.3   Closing Deliveries of the Purchaser. ............................51
    Section 12.4   Maine Real Estate Transfer Taxes. ..............................52
    Section 12.5   Possession. ....................................................................52

**ARTICLE 13**
    **INDEMNIFICATION** ..................................................**52**
    Section 13.1   Indemnification by the Vendors ....................................52

- iii -

**TABLE OF CONTENTS**
(continued)

Page

Section 13.2    Indemnification by the Purchaser ......................................53
Section 13.3    Notice of Claim ...............................................................53
Section 13.4    Original Claims................................................................54
Section 13.5    Third Party Claims..........................................................54
Section 13.6    Additional Rules and Procedures.....................................54
Section 13.7    Indemnification Claims....................................................55

**ARTICLE 14**
**DISPUTE RESOLUTION** ..............................................................**55**
Section 14.1    Arbitration .......................................................................55
Section 14.2    Exceptions .......................................................................56

**ARTICLE 15**
**RISK AND TERMINATION** ...........................................................**56**
Section 15.1    Risk of Loss.....................................................................56
Section 15.2    Termination. ....................................................................57
Section 15.3    Termination Payments. ....................................................58
Section 15.4    Effects of Termination. ...................................................59

**ARTICLE 16**
**MISCELLANEOUS PROVISIONS**.................................................**59**
Section 16.1    Confidentiality. ...............................................................59
Section 16.2    Non-Disclosure................................................................59
Section 16.3    Expenses...........................................................................59
Section 16.4    Solicitors and Agents and Tender....................................60
Section 16.5    Successors and Assigns....................................................60
Section 16.6    Third Party Beneficiaries .................................................60
Section 16.7    Notices..............................................................................60
Section 16.8    Time of Essence...............................................................62
Section 16.9    Further Assurances. .........................................................62
Section 16.10   Counterparts. ...................................................................62
Section 16.11   Paramountcy.....................................................................62

10124776.1110124776.13
13742-2154

199

# ASSET PURCHASE AGREEMENT

**ASSET PURCHASE AGREEMENT**, dated as of December ■,**11,** 2009 (the "Effective Date") by and among Fraser Papers Inc. ("FPI"), a corporation incorporated under the federal laws of Canada, Fraser Papers Limited ("Fraser Madawaska"), a corporation incorporated under the laws of the State of Maine, FPS Canada Inc., a corporation incorporated under the federal laws of Canada ("FPS Canada"), Fraser Papers Holdings Inc. ("FPHI"), a corporation incorporated under the laws of the State of Delaware, Fraser Timber Limited ("FTL"), a corporation incorporated under the laws of the State of Maine, and Fraser N.H. LLC ("FNHL"), a limited liability company formed under the laws of the State of Delaware (collectively, the "Vendors") and Brookfield Asset Management Inc., a corporation amalgamated under the laws of the Province of Ontario.

## RECITALS:

**WHEREAS**, the Vendors, together with their Subsidiaries (as hereinafter defined) and Affiliates (as hereinafter defined) carry on the Business;

**AND WHEREAS**, on June 18, 2009, the Vendors commenced proceedings (the "CCAA Proceedings") in the Ontario Superior Court of Justice (Commercial List) (the "Canadian Court") under the *Companies' Creditors Arrangement Act* (Canada), R.S.C. 1985, c.C-36, as amended (the "CCAA"), pursuant to which, *inter alia*, PricewaterhouseCoopers Inc. was appointed as monitor (the "Monitor");

**AND WHEREAS**, on June 19, 2009, the Vendors sought and obtained recognition and provisional relief in an ancillary proceeding (the "Bankruptcy Case") pursuant to Chapter 15 of Title 11 of the *United States Code* 11 U.S.C. §§,101-1532C, as amended (the "Bankruptcy Code") in the United States Bankruptcy Court for the District of Delaware (the "Bankruptcy Court");

**AND WHEREAS**, the Vendors desire to sell to the Purchaser all of the Purchased Assets, and the Purchaser desires to purchase from the Vendors all of the Purchased Assets and assume all of the Assumed Liabilities, upon and subject to the terms and conditions hereinafter set forth (the "Transaction");

**AND WHEREAS**, the boards of directors of each of the Vendors have determined that it is advisable and in the best interests of each of the Vendors' estates and the beneficiaries of such estates to consummate the transactions provided for herein pursuant to the Canadian Orders (as hereinafter defined) and the U.S. Orders (as hereinafter defined), and have approved this Agreement; and

**AND WHEREAS**, the transactions contemplated by this Agreement and the Ancillary Agreements are subject to the approval of the Canadian Court and the Bankruptcy Court and will be consummated only subject to the terms and conditions set forth herein and in accordance with the Canadian Orders (as hereinafter defined) and the U.S. Orders (as hereinafter defined) to be entered in the CCAA Proceedings and the Bankruptcy Case, respectively;

NOW, **THEREFORE**, in consideration of the premises, representations and warranties and the mutual covenants and agreements set forth herein and other good, valuable and sufficient consideration, the receipt of which is hereby acknowledged, the Parties, agree as follows:

## ARTICLE 1
## DEFINITIONS; INTERPRETATION

**Section 1.1    Definitions.**

As used herein, the following terms shall have the following meanings:

"Accounts Receivable" means any and all accounts receivable, notes receivable, book debts, trade debts, rebates, refunds and other debts or receivables due or accruing due to the Vendors, together with all interest accrued on such items, and the full benefit of any security therefor, relating to the Business or the Purchased Assets.

"Action" means any litigation, action, suit, charge, binding arbitration, Tax audit or investigation or other legal, administrative, regulatory or judicial proceeding.

"Affiliate" shall mean, with respect to any Person, any other Person which controls, is controlled by or is under common control with, directly or indirectly, such Person, and, if such Person is a natural person, includes any member of such Person's immediate family, or, if such Person is an entity, includes any trustee, member, general partner, manager, director or executive officer of, or any Person performing similar functions for, such Person.

"Agreement" shall mean this Asset Purchase Agreement, including the Schedules hereto, in each case as amended or supplemented from time to time.

"Alternative Transaction" means the sale of the Purchased Assets to an entity other than the Purchaser pursuant to the Canadian **Approval and** Sales Process and Conditional Vesting Order and the U.S. **Approval and** Sales Process and Conditional Vesting Recognition Order.

"Amended Canadian Collective Agreements" shall have the meaning given to such term in Section 10.1(q).

"Ancillary Agreements" shall mean various agreements to be entered into between the Parties on Closing on such terms and conditions as may be satisfactory to the Purchaser, in its sole discretion, in connection with or pursuant to the terms of this Agreement and the consummation of the transactions contemplated herein including, without limitation: (i) a transitional services agreement for the provision of (a) administration, transaction processing and IT support, (b) customer service, logistics and supply chain management support, and (c) lumber sales support; (ii) the Non-Competition Agreement; and (iii) the Tolling Agreement.

"Ashland Assets" shall mean the property and assets of every kind and description used solely at the lumber mill owned and operated by the Vendors in Ashland, Maine.

"Ashland Mill" shall mean the lumber mill owned and operated by the Vendors at 100 Levesque Mill Road, Ashland, Maine  04732 and the operations carried on thereat.

- 2 -

"Assumed Liabilities" shall have the meaning given to such term in Section 4.1.

"Audited Financial Statements" shall mean the audited consolidated financial statements for the Vendors at December 31, 2008 and for the year ended December 31, 2008.

"Bankruptcy Case" shall have the meaning given to such term in the recitals.

"Bankruptcy Code" shall have the meaning given to such term in the recitals.

"Bankruptcy Court" shall have the meaning given to such term in the recitals.

"Benefit Plans" means all oral or written plans, arrangements, agreements, programs, policies, practices or undertakings of the Vendors with respect to some or all of the Employees and which provide for or relate to:

      (a)    bonus, profit sharing or deferred profit sharing, performance compensation, deferred or incentive compensation, supplemental retirement arrangements, share compensation, share purchase or share option, share appreciation rights, phantom stock, vacation or vacation pay, sick pay, employee loans, or any other compensation in addition to salary; or

      (b)    insured or self-insured benefits for or relating to income continuation or other benefits during absence from work (including short term disability, long term disability and workers compensation), hospitalization, health, welfare, legal costs or expenses, medical or dental treatments or expenses, life insurance, accident, death or survivor's benefits, supplementary employment insurance, day care, tuition or professional commitments or expenses or similar employment benefits.

"Books and Records" shall mean any and all books and records used by the Vendors or any of their respective Affiliates which pertain to the Business, the Purchased Assets, the Transferred Employees, or the Unionized Employees including, without limitation, customer and vendor lists, together with any and all corresponding files, but excluding for greater certainty any books and records pertaining solely to the Excluded Assets.

"Brookfield" means Brookfield Asset Management Inc.

"Brookfield DIP Facility" means all advances made by Brookfield from and after the Filing Date under the senior secured superpriority revolving loan facility, up to an amount of US$20,000,000.

"Business" shall mean the business of manufacturing and selling specialty paper products and related activities carried on by the Vendors, together with their Affiliates and Subsidiaries, including, *inter alia*, owning and operating integrated paper, pulp and lumber operations in the Province of New Brunswick and in the State of Maine at or relating to the Edmundston Mill, the Juniper Mill, the Madawaska Mill and the Plaster Rock Mill, but for greater certainty not including the business conducted by the Vendors at or relating to the Ashland Mill, the Masardis Mill, the Gorham Mill or the Thurso Mill.

202

"Business Day" shall mean any day of the year other than (a) any Saturday or Sunday, or (b) any other day on which the banks located in the Province of Ontario are required or authorized by Law to be closed for business.

"Canadian Court" shall have the meaning given to such term in the recitals.

"Canadian Employees" shall mean Employees employed in the Business in Canada.

"Canadian ~~Final~~ Approval **and Vesting** Order" shall have the meaning given to such term in Section 9.2.

"Canadian ~~Final~~ Approval **and Vesting** Order Motion" shall have the meaning given to such term in Section 9.2.

"Canadian Transferred Employees" shall mean Transferred Employees who are Canadian Employees.

"Canadian Orders" mean the Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order, the Canadian ~~Final~~ Approval **and Vesting** Order and any other Order of the Canadian Court issued and entered in the CCAA Proceedings in respect of the asset purchase transaction contemplated in this Agreement.

"Canadian Pension Plans" mean the Old FP Hourly Plan, the Old FP Salaried Plan and the Fraser Papers Inc. Defined Contribution Pension Plan, Registration No. 1146166.

"Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order" shall have the meaning given to such term in Section 9.1.

"Canadian **Approval and** Sales Process ~~and Conditional Vesting Order~~ Motion" shall have the meaning given to such term in Section 9.1.

"CCAA" shall have the meaning given to such term in the recitals.

"CCAA Proceedings" shall have the meaning given to such term in the recitals.

"CIBC" means Canadian Imperial Bank of Commerce.

"CIBC Existing Facility" means the revolving credit facility dated as of September 22, 2008 made among FPI, CIBC and the other parties party thereto, as amended from time to time.

"CIT" means CIT Business Credit Canada Inc.

"CIT DIP Facility" means all advances made by CIT from and after the Filing Date under the CIT Financing Agreement by way of a debtor-in-possession revolving loan facility, up to the amount of US$24,000,000.

"CIT Exit Facility" shall have the meaning given to such term in Section 10.1(m).

- 4 -

203

"CIT Financing Agreement" means the Amended and Restated Financing Agreement dated as of May 2, 2008 between FPI and CIT, as amended from time to time.

"Closing" shall have the meaning given to such term in Section 12.1.

"Closing Date" shall have the meaning given to such term in Section 12.1.

"Closing Date Net Working Capital" shall have the meaning given to such term in Section 3.8(a).

"Common Shares" shall mean common shares in the capital of the Purchaser representing 49% of the outstanding common shares of the Purchaser (or, in the case of multiple Purchasers, 49% of the common shares of each Purchaser, other than any given Purchaser that is a wholly-owned Subsidiary of another Purchaser) as at the Closing Date issued to the Monitor, in trust for the benefit of the Vendors, in consideration of a portion of the Purchase Price payable under this Agreement.

"Consents and Approvals" means all consents, approvals, notifications, waivers and/or filings from Third Parties (including any Governmental Authority) as may be required to effectuate the transactions contemplated hereby, including those required by the terms of the Contracts, the Permits, the Timber Licences and the PPGTP Credits, and including the receipt of waivers of any rights in favour of any counterparties under such Contracts and Permits that may be triggered in connection with the transactions contemplated by this Agreement, the CCAA Proceedings or the Bankruptcy Case, and further including any Order of the Canadian Court in the CCAA Proceedings pursuant to section 11.3 of the CCAA, as such Order is recognized by the Bankruptcy Court in the Bankruptcy Case (all such Orders to the satisfaction of the Purchaser, acting reasonably).

"Contracts" means any and all contracts, agreements, leases instruments and other legally binding commitments or arrangements, written or oral, which have been entered into by the Vendors in connection with the operation of the Business or the Purchased Assets, including those contracts, agreements, leases and instruments concerning the supply of goods or services to the Vendors in connection with the Business or the Purchased Assets.

"Court Orders" shall mean the Canadian Orders and the U.S. Orders.

"Cure Costs" shall mean amounts that must be paid, if any, in connection with the assignment and assumption of the Contracts, the Permits, the PPGTP Credits and the Timber Licences, including costs to obtain any Consent and Approval or to cure any defaults thereunder, subject to the CCAA and the Bankruptcy Code, as applicable.

"Designated Employees" shall mean the Employees who are not Unionized Employees and who are designated by the Purchaser on a schedule to be delivered by the Purchaser to the Vendors on or before Closing and which, when delivered, shall form Schedule 3 hereto, which schedule shall include substantially all Employees at the Closing Date who are not Unionized Employees.

- 5 -

"DIP Lenders" shall mean collectively, CIT under the CIT DIP Facility, Brookfield under the Brookfield DIP Facility and GNB under the GNB Plaster Rock DIP Facility (and each a DIP Lender).

"Edmundston Assets" shall mean all of the property and assets of every kind and description relating to the Edmundston Mill including, without limitation, all property and assets which are currently or usually (a) situated at such location and operations or (b) used by or in connection with such location or operations.

"Edmundston Mill" shall mean the pulp and energy complex owned and operated by the Vendors at 27 Rice Street, Edmundston, New Brunswick and the operations carried on thereat.

"Effective Date" shall have the meaning given to such term in the introductory paragraph.

"Employee Liabilities" shall mean any material Liabilities that have been used by the Vendors for purposes of financial reporting in respect of the Business, and shall include, without limitation, wages, salaries, payroll withholdings, unpaid vacation, post-employment benefit obligations, current cost of Benefit Plans, supplemental retirement arrangements, accrued bonus and incentives, unpaid wages and current monthly defined contribution pension plan contributions related to the Transferred Employees, to the extent that such liabilities are outstanding on Closing.

"Employee" shall mean an individual who is employed by the Vendors in the Business, whether on a full-time or a part-time basis.

"Encumbrance" means any interest, charge, lien, claim, mortgage, lease, sublease, hypothecation, deed of trust, pledge, security interest, option, right of use or possession, right of first offer or first refusal, right of way, easement, servitude, restrictive covenant, encroachment, encumbrance, or other restriction or limitation of any kind howsoever erected or arising.

"Environment" shall mean the ambient air, all layers of the atmosphere, surface water, underground water, all land, all living organisms and the interacting natural systems that include components of air, land, water, organic and inorganic matter and living organisms, and includes indoor spaces.

"Environmental Law" shall mean all federal, provincial, municipal or local statutes, regulations, by-laws, Environmental Permits, orders or rules, and any policies or guidelines of any Governmental Authority, and any requirements or obligations arising under the common law, relating to the Environment, the transportation of dangerous goods and occupational health and safety.

"Environmental Permits" means all permits, licences, approvals, consents, authorizations, registrations and certificates issued by or provided to, as the case may be, any Governmental Authority pursuant to an Environmental Law.

"Equity Interests" of a Person shall mean capital stock, capital stock equivalents (including stock options, restricted stock units, stock appreciation rights, any securities convertible into or exchangeable or exercisable for any such capital stock, and phantom stock),

- 6 -

partnership interests, membership interests, participations, shares and other equity interests of any class or kind (however designated) of such Person.

"Excluded Assets" shall have the meaning given to such term in Section 2.4.

"Excluded Letters of Credit" shall mean any and all letters of credit issued in respect of the Vendors, including, without limitation, the letters of credit issued by CIT under the CIT Financing Agreement described on Schedule 4 attached hereto, other than the Workers Compensation L/C.

"Excluded Liabilities" shall have the meaning given to such term in Section 4.3.

"Existing Canadian Collective Agreements" mean:

(a)     Fraser Papers Inc. and Communications, Energy and Paperworkers Union of Canada Local No 29 (Edmundston Mill  - Expires June 30, 2012);

(b)     Fraser Papers Inc. and Communications, Energy and Paperworkers Union of Canada Local No 29 (Edmundston Cleaning Staff - Expires June 30, 2014);

(c)     Fraser Papers Inc. and Communications, Energy and Paperworkers Union of Canada Local No 29 (Edmundston Office Workers - Expires August 31, 2014);

(d)     Fraser Inc. ~~Et Le syndicate~~**et le syndicat** canadien des communications, de l'énergie et du papier, Local 6N (Edmundston Scalers & Clerks - Expires June 30, 2010);

(e)     Fraser Papers Inc. and New Brunswick Regional Council of Carpenters, Millwrights and Allied Workers, Local 2450 (Plaster Rock - Expires January 31, 2013);

(f)     Fraser Papers Inc. and Communications, Energy and Paperworkers Union of Canada Local No. 4N (Security-Expires June 30, 2014); and

(g)     Fraser Papers Inc. and Communications, Energy and Paperworkers Union of Canada Local No. 114 (Expires April 30, 2010, agreement under "AT Limited Partnership").

"Existing Collective Agreements" means the Existing Canadian Collective Agreements and the Existing U.S. Collective Agreements.

"Existing US Collective Agreements" mean:

(a)     Fraser Papers Ltd. and United Steel Workers Local 4-1247, 4-365, 4-291 (Former PACE, USW – Expired October 31, 2009; extended to November 30, 2009); and

(b)     Fraser Papers Ltd. and Office and Professional Employees International Union, Local no. 232 (OPEIU - Expired October 31, 2009; extended to November 30, 2009).

"Filing Date" shall mean the date of the commencement of the CCAA Proceedings, being June 18, 2009.

"Final Order" shall mean an order, judgment or other decree, the operation or effect of which has not been reversed, stayed, modified or amended, and as to which any and all appeal periods with respect to such order, judgment or decree have expired.

"Fixed Assets" means any and all equipment and machinery, improvements, office equipment, furniture, fixtures, signage, tools, storage systems, furnishings and supplies of all kinds of the Vendors relating to the Business or the Purchased Assets, except the Toronto Assets.

"General Conveyance and Assumption of Liabilities Agreement" shall mean a general conveyance and assumption of liabilities agreement to be entered into between the Purchaser and the Vendors on Closing on terms and conditions satisfactory to the Purchaser in its sole discretion.

"GNB" means Her Majesty the Queen in Right of the Province of New Brunswick, as represented by the Minister of Business New Brunswick.

"GNB Loan Agreement" means a loan agreement dated as of June 16, 2008 between FPI and GNB by which GNB agreed to make a term loan available in a principal amount of up to Cdn.$40,000,000.

"GNB Plaster Rock DIP Facility" means advances of up to Cdn.$9,000,000 to be made by GNB under the GNB Loan Agreement after the Filing Date to be used solely for lumber mill facility in Plaster Rock, New Brunswick for the purpose of completing the modernization of the lumber mill including the installation of a new saw line, new kilns and a new energy system.

"Gorham Assets" shall mean the property and assets of every kind and description used solely at the paper mill owned and operated by the Vendors in and around Gorham, New Hampshire, United States.

"Gorham Mill" means the paper mill owned and operated by the Vendors at 72 Cascade Flats, Gorham, New Hampshire, U.S., 03581 and the operations carried on thereat.

"Governmental Authority" shall mean any government (including any Canadian, US or foreign, federal, provincial, state, city, municipal or county government), any political subdivision thereof and any governmental, administrative, ministerial, regulatory, central bank, self-regulatory, quasi-governmental, taxing, executive or legislative department, commission, body, agency, authority or instrumentality of any thereof, including any Judicial Authority.

"Intellectual Property" shall mean all rights to and interests in:

(a)    all business names, trade names, corporate names, telephone numbers, domain names, domain name registrations, website names and worldwide web addresses and other communications addresses related to the Business;

(b)    all inventions, patents, patent rights, patent applications (including all reissues, divisions, continuations, continuations-in-part and extensions of any patent or patent application) related to the Business;

- 8 -

     (c)    all industrial designs and applications for and registration of industrial designs, design patents and industrial design registrations related to the Business;

     (d)    all trade-marks (whether used with wares or services and including the goodwill attaching to such trade-marks) and registrations and applications for registration of trade-marks and all trade dress, logos, slogans and brand names related to the Business;

     (e)    all copyright in all works (including software programs and databases) and database rights and registrations and applications for registrations of copyright related to the Business, and without limiting the generality of the foregoing, all proprietary rights in the computer software and programs (in both the source code and object code forms) and all documentation and other materials related to the computer software and programs;

     (f)    all rights and interests in and to processes, lab journals, notebooks, data, trade secrets, designs, know-how, product formulae and information, manufacturing, engineering and other drawings and manuals, technology, blue prints, research and development reports, agency agreements, technical information, technical assistance, engineering data, design and engineering specifications, and similar materials recording or evidencing expertise or information related to the Business;

     (g)    all of the intellectual property affected by the registrations and applications for registration related to the Business;

     (h)    all other intellectual property rights throughout the world used in carrying on, or arising from the operation of, the Business;

     (i)    all licences granted by the ~~Vendor~~**Vendors** of the intellectual property listed in items (a) to (h) above;

     (j)    all future income and proceeds from any of the intellectual property listed in items (a) to (h) above and the licences listed in item (i) above; and

     (k)    all rights to damages and profits by reason of the infringement of any of the intellectual property listed in items (a) to (h) above and the licences listed in item (i) above.

"Intercompany Receivables" shall mean any and all Accounts Receivables owing by any Vendor or any of such Vendor's Affiliates or Subsidiaries, respectively, to any other Vendor or any of such **other** Vendor's Affiliates or Subsidiaries, respectively.

"Intercompany Liabilities" shall mean any and all Liabilities owing by any Vendor or any of such Vendor's Affiliates or Subsidiaries, respectively, to any other Vendor or any of such **other** Vendor's Affiliates or Subsidiaries, respectively.

"Inventory" shall mean any and all inventories (including finished goods, work-in-process, raw and packaging materials, stores, manufacturing supplies and spare parts) relating to the Business or the Purchased Assets.

~~10124776.11~~10124776.13
13742-2154

"Judicial Authority" shall mean any court, arbitrator, special master, receiver, tribunal or similar body of any kind entitled to exercise judicial authority including without limitation the Canadian Court and the Bankruptcy Court.

"Juniper Assets" shall mean all of the property and assets of every kind and description relating to the Juniper Mill including, without limitation, all property and assets which are currently or usually (a) situated at such location and operations or (b) used by or in connection with such location and operations.

"Juniper Mill" shall mean the lumber mill owned and operated by the Vendors at 35 Juniper Mill Road, Juniper, New Brunswick and the operations carried on thereat.

"Lands" shall mean any and all freehold property and interests therein of the Vendors, and all buildings and other structures, facilities or improvements currently or hereafter located thereon, all fixtures, systems and items of personal property of the Vendors attached or appurtenant thereto and any and all rights of way, licences or rights of occupation, easements or other similar rights of the Vendors, as applicable, in connection with such freehold property, in each case, relating to the Business or the Purchased Assets, including, without limitation, the freehold property municipally known as:

    (a)    27 Rice Street, Edmundston, New Brunswick;

    (b)    31 Renous Road, Plaster Rock, New Brunswick;

    (c)    35 Juniper Mill Road, Juniper, New Brunswick; and

    (d)    82 Bridge Road, Madawaska, Maine.

"Law" shall mean any treaty, code, statute, law (including common law), rule, regulation, or ordinance of any kind of any Governmental Authority.

"Liability" shall mean, with respect to any Person, any liability or obligation of such Person of any kind, character or description, whether known or unknown, absolute or contingent, accrued or unaccrued, disputed or undisputed, liquidated or unliquidated, secured or unsecured, joint or several, due or to become due, vested or unvested, executory, determined, determinable or otherwise, and whether or not the same is required to be accrued on the financial statements of such Person.

"Madawaska Assets" shall mean all of the property and assets of every kind and description relating to the Madawaska Mill including, without limitation, all property and assets which are currently or usually (a) situated at such location and operations or (b) used by or in connection with such location or operations.

"Madawaska Mill" shall mean the paper mill owned and operated by the Vendors at 82 Bridge Street, Madawaska, Maine and the operations carried on thereat.

"Masardis Assets" shall mean the property and assets of every kind and description used solely at the lumber mill owned and operated by the Vendors in Masardis, Maine.

"Masardis Mill" shall mean the lumber mill owned and operated by the Vendors at Route 11, 1220 Masardis Road, Masardis, Maine 04732 and the operations carried on thereat.

"Material Adverse Effect" shall mean any change, event or occurrence, or any material worsening of any current circumstance, event or occurrence, that individually or in the aggregate (taking into account all other such changes, events or occurrences or material worsening) has had, or would in the reasonable opinion of the Purchaser be likely to have (x) a material adverse change in or material adverse effect on the Purchased Assets, the Assumed Liabilities or the Business (excluding the Excluded Assets and the Excluded Liabilities) or the Purchaser's use and enjoyment of the Purchased Assets, in each case taken as a whole, or (y) a material adverse change in or to the ability of the Vendors to consummate the transactions contemplated by this Agreement or to perform their obligations hereunder, or (z) the result or consequence that the Purchaser shall be deemed or required to assume or discharge any debt, liability or obligation other than as may be specifically provided for in this Agreement, but excluding, in any case (a) effects resulting from changes in general economic, regulatory, political or industry conditions or from acts of terror or war, (b) effects resulting from changes in (or proposals to change) any Laws after the date hereof; (c) effects resulting from the identity of, or acts attributable to, or omissions by the Purchaser or any of its Affiliates, (d) effects resulting from changes in commodity or energy prices, in interest or currency exchange rates or in capital market conditions, (e) effects resulting from circumstances that affect the industries in which the Vendors operate generally, or (f) effects resulting from changes in generally accepted accounting principles after the date hereof. For greater certainty and without limiting the generality of the foregoing, any change, event or occurrence, or any material worsening of any current circumstance, event or occurrence, that individually or in the aggregate reduces the reasonable market value of the Purchased Assets or the Business by $10,000,000 or more shall constitute a Material Adverse Effect.

"Monitor" shall have the meaning given to such term in the recitals.

"Monitor's Certificate" means the certificate of the Monitor the form of which is attached as Schedule A to the Canadian Final Approval and Vesting Order confirming that all matters to be completed prior to the consummation of the transactions contemplated hereby have been completed.

"NB Power" means New Brunswick Power Company.

"Net Working Capital" shall mean the sum of the Qualifying Accounts Receivable plus the Inventory minus the Assumed Liabilities as described in Section 3.8(c).

"New U.S. Collective Agreements" shall have the meaning given to such term in Section 10.1(o).

"New Hourly DC Plan" shall have the meaning given to such term in Section 7.6(a).

"New Salaried DC Plan" shall have the meaning given to such term in Section 7.7(a).

"Non-Competition Agreement" means the non-competition agreement between the Vendors and the Purchaser to be entered into for Closing on terms and conditions satisfactory to

the Purchaser, in its sole discretion, pursuant to which, among other things, none of FNHL or any of its Affiliates shall be permitted to manufacture, market or sell certain specified paper products or specified paper grade categories in North America for a period of five (5) years after the Closing Date.

"Non-Purchased Asset" shall have the meaning given to such term in Section 2.5.

"Old FP Hourly Plan" shall have the meaning given to such term in Section 7.6(a).

"Old FP Salaried Plan" shall have the meaning given to such term in Section 7.7(a).

"Order" shall mean any judgment, writ, decree, directive, decision, injunction, ruling, award or order (including any consent decree or cease and desist order) of any kind of any Governmental Authority or Judicial Authority.

"Ordinary Course" shall mean the ordinary course of business, operations and activities conducted by the Vendors, taken as a whole in respect of the Business, taking into account the commencement of the CCAA Proceedings and the Bankruptcy Case.

"Organizational Documents" of a Person at any time shall mean (a) all certificates, articles or agreements of any kind filed with any Governmental Authority or Judicial Authority to form or organize such Person, and (b) all agreements, documents or instruments creating, organizing or governing the internal affairs of such Person, including trust agreements, by-laws, codes of regulations, memoranda of incorporation or association, partnership agreements, limited liability company agreements, articles, charters and operating agreements, in each case, as in effect at such time.

"Party" shall mean a party to this Agreement and any reference to a Party includes its successors and permitted assigns and "Parties" means every Party.

"Pension Plans" shall mean the Canadian Pension Plans and the U.S. Pension Plans.

"Permits" means any and all authorizations, registrations, permits, certificates of approval, approvals, grants, licences, quotas, consents, commitments, rights or privileges (other than those relating to the Intellectual Property) issued or granted by any Governmental Authority to any of the Vendors relating to the Business or the Purchased Assets.

"Permitted Encumbrances" shall mean (i) easements, leases, reservations, or other rights of others in, or minor defects and irregularities in title that do not materially impair the use of the encumbered property or assets for the purposes for which they are held; (ii) mechanics', materialmen's, carriers', workers', repairers' and similar statutory liens arising in the Ordinary Course which liens have not had and are not reasonably likely to have a material impact on the Purchased Assets; (iii) any Encumbrance or privilege vested in any lessor, licensor or permittor for rent or other obligations solely related to the period after Closing in respect of any Contract; (iv) licenses of or other grants of rights to use Intellectual Property entered into prior to the Filing Date in the ordinary course of business consistent with past practice of the Vendors (and from and after the Filing Date, in the Ordinary Course) that do not materially impair the use of the encumbered property or assets for the purposes for which they are held; (v) Encumbrances,

- 12 -

title exceptions or other imperfections of title caused by or resulting from acts of the Purchaser or any of the Purchaser's Affiliates, employees, officers, directors, agents, contractors, invitees or licensees of the Purchaser; (vi) liens for Taxes not yet due and payable; and (vii) such other Liens as permitted by the Purchaser, in its sole discretion.

"Person" shall mean an individual, a partnership, a sole proprietorship, a company, a firm, a corporation, a limited liability company, an association, a joint stock company, a trust, a joint venture, an unincorporated organization, a union, a group acting in concert, a Judicial Authority, a Governmental Authority or any other entity or association of any kind.

"Personal Information" shall mean information about an identifiable individual as defined in Privacy Law.

"Plaster Rock Assets" shall mean all of the property and assets of every kind and description relating to the Plaster Rock Mill including, without limitation, all property and assets which are currently or usually (a) situated at such location and operations or (b) used by or in connection with such location or operations.

"Plaster Rock Mill" shall mean the lumber mill owned and operated by the Vendors at 31 Renous Road, Plaster Rock, New Brunswick.

"Portland Assets" shall mean all of the property and assets of every kind and description currently or usually situated at, used in connection with or relating to the sales administration and other corporate functions carried on by the Vendors in respect of the Business at 707 Sable Oaks Drive, Suite 010, South Portland, Maine, U.S., 04106.

"Post-Retirement Liabilities" shall mean: (a) with respect to Unionized Employees and retirees, all Liabilities for the post-retirement benefits (and not including for greater certainty, any pension plan benefits) provided under the New U.S. Collective Agreements and the Amended Canadian Collective Agreements and, (b) with respect to Transferred Employees, all Liabilities for the post-retirement benefits (and not including for greater certainty, any pension plan benefits) provided under the Benefit Plans, as applicable, solely to the extent such Benefit Plans, as applicable, are assumed by the Purchaser pursuant to Section 7.3 of this Agreement.

"PPGTP Credits" shall mean the credits issued to FPI in connection with the Edmundston Mill in the amount of Cdn.$23,218,367 pursuant to the Pulp and Paper Green Transformation Program administered by Natural Resources Canada.

"Preferred Shares" shall mean the non-voting preferred shares of the Purchaser in the aggregate face amount of $35,000,000 to be issued to GNB in consideration of a portion of the Purchase Price payable under this Agreement. The Preferred Shares shall have a term of 10 years from the issue date. The holders of the Preferred Shares shall be entitled to fixed, cumulative dividends in the amount of 4.7% per annum, payable quarterly on each of March 1, June 1, September 1 and December 1, in cash or, at the Purchaser's option, in additional Preferred Shares. The Preferred Shares shall: (a) be redeemable at any time by the Purchaser by payment in cash at the issue price together with all accrued and unpaid dividends as at the redemption date; and (b) include such other terms and conditions as the Purchaser and the Vendors, in consultation with GNB, may agree, acting reasonably.

"Premises" means all real property, buildings and facilities, including any part of any such property, building or facility owned, leased, or operated by the Vendors in connection with the Business or the Purchased Assets, including the Lands.

"Prepaid Expenses" shall mean any and all of the Vendors' prepaid expenses and deposits at any time relating to the Business or the Purchased Assets.

"Privacy Law" shall mean the *Personal Information Protection and Electronic Documents Act* (Canada) and the *Freedom of Information and Protection of Privacy Act* (Ontario), and any comparable Law of any other jurisdiction related or applicable to the Transferred Employees and the Unionized Employees transferred from the Vendors to the Purchaser pursuant to this Agreement.

"Proceedings" shall mean any action, suit, arbitration, mediation, litigation, hearing, investigation, inquiry or other proceeding of any kind involving any Governmental Authority, any Judicial Authority or any other Person.

"Promissory Note" shall mean the unsecured promissory note dated the Closing Date to be issued by the Purchaser in favour of the Monitor, in trust for the benefit of the Vendors, in the amount of Forty-Two Million Four Hundred Thousand Dollars ($42,400,000), subject to adjustment in Section 3.8, in consideration of a portion of the Purchase Price payable under this Agreement. The Promissory Note shall mature 10 years from the issue date, be non-interest bearing, not include any restrictive or positive covenants on the part of the Purchaser other than in relation to payment on maturity, and be in form as may be determined by agreement of the Purchaser and the Vendors prior to Closing.

"Purchase Price" shall have the meaning given to such term in Section 3.1(a).

"Purchased Assets" shall have the meaning given to such term in Section 2.1.

"Purchaser" shall mean Brookfield or such other Person or Persons as it may designate on or prior to Closing.

"Purchaser's Solicitors" means Torys LLP.

"Qualifying Accounts Receivable" means any Accounts Receivable that: (i) is a binding and valid obligation of the obligor thereon and is in full force and effect; (ii) is evidenced by an invoice and is payable in Canadian Dollars or U.S. Dollars; (iii) is genuine appearing on its face or as represented in the books and records of the Vendors; (iv) is free from claims regarding rescission, cancellation or avoidance whether by operation of law or otherwise; (v) is less than 90 days past the original invoice date thereof and less than 60 days past the original due date thereof; (vi) is net of concessions, offset, deduction, contras, returns, chargebacks or understandings with the obligor thereon that in any way could reasonably be expected to adversely affect the payment of, or the amount of, such Accounts Receivable; (vii) is not an Intercompany Receivable; and (viii) arose in the Ordinary Course of business of the Vendors.

"Real Property Tax Refunds" means any and all rebates or refunds for realty taxes relating to the Business or the Purchased Assets.

"Realty Taxes" means the unpaid realty taxes owing for the period prior to the Closing in respect of the Edmundston Mill, the Juniper Mill and the Plaster Rock Mill and, solely in respect of the Madawaska Mill, the unpaid *ad valorem* taxes on real or personal property accrued with respect to the period prior to Closing. For greater certainty, Realty Taxes do not include tree growth, farmland and open space recapture taxes or penalties.

"Representatives" of a Person shall mean controlling persons, partners, directors, officers, managers, trustees, including any trustee-in-bankruptcy, employees, agents, representatives, consultants, affiliates, advisors, counsel or nominees of such Person.

"Sales Process" shall mean the sales process set out in and approved pursuant to the Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order.

"Subsidiary" means, with respect to any specified Person, any other Person of which such specified Person is, at the time, directly or indirectly, (a) owns at least 50% of the outstanding capital stock (or other shares of beneficial interest) entitled to vote generally, (b) holds at least 50% of the partnership, limited liability company, joint venture or similar interests, or (c) is a general partner, managing member or joint venturer.

"Substance" means any substance or material which under any Environmental Law is defined to be "hazardous", "toxic", "deleterious", "caustic", "dangerous", a "contaminant", a "pollutant", a "dangerous good", a "waste", a "source of contamination" or a source of a "pollutant".

"Tax" shall mean all taxes including all income, sales, use, goods and services, harmonized sales, value added, capital, capital gains, alternative, net worth, transfer, profits, withholding, payroll, employer health, excise, franchise, real property and personal property taxes, and any other taxes, customs duties, fees, levies, imposts and other assessments or similar charges in the nature of a tax including Canada Pension Plan and provincial pension plan contributions, employment insurance and unemployment insurance payments and workers' compensation premiums in respect of Canadian Employees, together with any instalments with respect thereto, and any interest, fines and penalties, in all cases imposed by any Governmental Authority in respect thereof and whether disputed or not.

"Tax Return" shall mean any return, declaration, report, claim for refund, or information return or statement relating to any Tax, including any information return or report with respect to backup withholding and other payments to Third Parties.

"Termination Date" shall have the meaning given to such term in Section 15.2(c)(v).

"Termination Fee" shall have the meaning given to such term in Section 15.3.

"Third Party" shall mean any Person other than a Party or any of its Affiliates.

"Thurso Assets" shall mean the property and assets of every kind and description used solely at the Thurso Mill.

- 15 -

214

"Thurso Mill" shall mean the hardwood pulp mill owned and operated by the Vendors in Thurso, Quebec and the operations carried on thereat.

"Thurso PPTGP Credits" means the credits issued to FPI in connection with the Thurso Mill in the amount of Cdn.$9,876,065 pursuant to the Pulp and Paper Green Transformation Program administered by Natural Resources Canada.

"Timber Licences" shall mean any and all rights of the Vendors to harvest timber from lands owned by the Province of New Brunswick or ~~other~~ any other Person including, without limitation, Forest Licence 9 - Carleton, related to the Business.

"Tolling Agreement" means the tolling agreement between the Vendors and the Purchaser to be entered into for Closing on such terms and conditions as may be satisfactory to the Purchaser, in its sole discretion, pursuant to which, among other things, FNHL and its Affiliates will provide the Purchaser with certain manufacturing outsourcing services for specified products for a period of three (3) years after the Closing Date.

"Toronto Assets" shall mean the furniture, fixtures and equipment of the Vendors located at FPI's head office at Suite 200, Brookfield Place, 181 Bay Street, Toronto, Ontario M5J 2T3.

"Transaction" shall have the meaning given to such term in the recitals.

"Transactional Costs" shall mean all filing fees, recording fees, surveys, notarial fees, software license fees and all other similar fees and costs arising out of this Agreement, the transfer, assignment, conveyance or delivery of the Purchased Assets or the consummation of the transactions contemplated hereby.

"Transactional Taxes" shall mean all sales, use, goods and services, transfer, conveyance, bulk transfer, excise, stamp, documentary, retail sales, land transfer and other taxes and all other governmental duties, charges, fees, imposts and assessments, and all interest and penalties thereon and additions thereto, imposed at any time by any taxing authority with respect to this Agreement, the transfer, assignment, conveyance or delivery of the Purchased Assets or the consummation of the transactions contemplated hereby. For greater certainty, Transactional Taxes do not include tree growth, farmland and open space recapture taxes or penalties.

"Transferred Employees" shall mean the Designated Employees who have accepted the Purchaser's offer of employment as at the Closing Date. For greater certainty, Unionized Employees are not Transferred Employees. In the case of Designated Employees whose employment relates to the Juniper Mill, "Transferred Employees" shall mean such Designated Employees who have accepted the Purchaser's conditional offer of employment set out in Section 7.1(c) of this Agreement, subject to the satisfaction of the conditions in such Section 7.1(c) regarding the deadline for the restart of the Juniper Mill.

"Transferred Hourly Employee" means an hourly paid Employee of FPI who transfers to the Purchaser on the Closing Date namely (a) Designated Employees who are non-union scalers and clerks; and (b) Unionized Employees who are members of one of the Unions at the Closing Date.

- 16 -

"Transferred Salaried Employee" means a salaried Employee who is a Designated Employee who has accepted the Purchaser's offer of employment as at the Closing Date.

"Unassigned Contracts and Permits" has the meaning ascribed thereto in Section 2.2.

"Unaudited Financial Statements" shall mean the unaudited consolidated financial statements of the Vendors at October 3, 2009 and for the nine-month period ended October 3, 2009.

"Unionized Employees" shall mean the Employees who will be governed by the Amended Canadian Collective Agreements and the New U.S. Collective Agreements and who become employees of the Purchaser as of the Closing Date.

"Unions" shall mean the following:

(a)     Communications, Energy and Paperworkers Union of Canada Local No. 29;

(b)     Communications, Energy and Paperworkers Union of Canada Local No. 29 (Cleaning Staff);

(c)     Communications, Energy and Paperworkers Union of Canada Local No. 29 (Office);

(d)     Le ~~syndicate~~**syndicat** canadien des communications, de l'énergie et du papier, Local 6N;

(e)     New Brunswick Regional Council of Carpenters, Millwrights and Allied Workers, Local 2450;

(f)     Communications, Energy and Paperworkers Union of Canada Local No. 4N;

(g)     Communications, ~~Energy and Paperworkers Unions of Canada Local No. 114~~<;>

<~~(h)     United Steel Workers Local 4-1247, 4-365, 4-291~~>;~~(i)     Fraser Papers Inc. and Communications,~~ Energy and Paperworkers Union of Canada Local No. 114 ~~(Expires April 30, 2010, agreement under "AT Limited Partnership"); and~~>;<

>_(h)     United Steel Workers Local 4-1247, 4-365, 4-291_<; **and**

(~~j~~i)     Office and Professional Employees International Union, Local No. 232.

"United States" or "US" shall mean the United States of America

"U.S. DC Plan" shall have the meaning given to such term in Section 7.8(a).

"U.S. Employees" shall mean Employees employed in the Business in the United States.

"U.S. ~~Final~~-Approval **and Vesting** Recognition Motion" shall have the meaning given to such term in Section 9.4.

~~10124776.11~~10124776.13
13742-2154

"U.S. ~~Final~~ Approval **and Vesting** Recognition Order" shall have the meaning given to such term in Section 9.4.

"U.S. Orders" mean the U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Order, the U.S. ~~Final~~ Approval **and Vesting** Recognition Order and any other Order of the Bankruptcy Court issued and entered in the Bankruptcy Case in respect of the asset purchase transaction contemplated in this Agreement.

"U.S. Pension Plan" means the Pension Plan for ~~Eligible~~**U.S. Transferred** Employees of Fraser Papers Limited.

"U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Motion" shall have the meaning given to such term in Section 9.3.

"U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Order" shall have the meaning given to such term in Section 9.3.

"U.S. Transferred Employees" shall mean Transferred Employees who are U.S. Employees.

"Vendors" shall have the meaning given to such term in the introductory paragraph.

"Vendors' Solicitors" means ThorntonGroutFinnigan LLP.

"Workers Compensation L/C" means only the letters of credit described in Schedule 10 in the aggregate amount of $~~13,175,000~~**14,115,500** as of the date hereof~~, such aggregate amount increasing to $14,115,500 hereafter~~, to secure potential workers' compensation obligations of the Vendors in the United States.

**Section 1.2    Headings and Table of Contents.**

The inclusion of headings and a table of contents in this Agreement is for convenience of reference only and shall not affect the construction or interpretation hereof. The terms "hereof", "hereunder" and similar expressions refer to this Agreement and not to any particular Article, Section or other portion hereof. Unless otherwise provided, references herein to Articles, Sections and Schedules are to Articles, Sections and Schedules to this Agreement.

**Section 1.3    Gender and Number and Extended Meanings.**

In this Agreement, unless the context otherwise requires, words importing the singular include the plural and *vice versa*, words importing gender include all genders or the neuter, and words importing the neuter include all genders. The term "includes" and "including" means "includes without limitation" and "including without limitation".

~~10124776.11~~10124776.13
13742-2154

**Section 1.4    Statutory References.**

In this Agreement, unless the context otherwise requires or except as otherwise provided herein, a reference to any statute is to that statute as now enacted or as the same may from time to time be amended, re-enacted or replaced and includes any regulations made thereunder.

**Section 1.5    Currency.**

Except where otherwise expressly provided, all amounts in this Agreement are stated and shall be paid in U.S. currency.

**Section 1.6    Generally Accepted Accounting Principles.**

In this Agreement, except to the extent otherwise expressly provided, references to "generally accepted accounting principles" mean, for all principles stated in the Handbook of the Canadian Institute of Chartered Accountants, such principles so stated.

**Section 1.7    Interpretation.**

The Parties acknowledge and agree that: (i) each Party and its counsel reviewed and negotiated the terms and provisions of this Agreement and have contributed to their revision; (ii) the rule of construction to the effect that any ambiguities are resolved against the drafting party shall not be employed in the interpretation of this Agreement; and (iii) the terms and provisions of this Agreement shall be construed fairly as to the Parties hereto and not in favour of or against any Party, regardless of which Party was generally responsible for the preparation of this Agreement.

**Section 1.8    Invalidity of Provisions.**

Each of the provisions contained in this Agreement is distinct and severable and a declaration of invalidity or unenforceability of any such provision or part thereof by a court of competent jurisdiction shall not affect the validity or enforceability of any other provision hereof. To the extent permitted by Law, the Parties waive any provision of Law which renders any provision of this Agreement invalid or unenforceable in any respect. The Parties shall engage in good faith negotiations to replace any provision which is declared invalid or unenforceable with a valid and enforceable provision, the economic effect of which comes as close as possible to that of the invalid or unenforceable provision which it replaces.

**Section 1.9    Entire Agreement.**

This Agreement constitutes the entire agreement between the Parties pertaining to the subject matter of this Agreement. There are no warranties, conditions, or representations (including any that may be implied by statute) and there are no agreements in connection with such subject matter except as specifically set forth or referred to in this Agreement. No reliance is placed on any warranty, representation, opinion, advice or assertion of fact made either prior to, contemporaneous with, or after entering into this Agreement, or any amendment or supplement thereto, by any Party to this Agreement or its directors, officers, employees or agents, to any other party to this Agreement or its directors, officers, employees or agents, except

to the extent that the same has been reduced to writing and included as a term of this Agreement, and none of the Parties to this Agreement has been induced to enter into this Agreement or any amendment or supplement by reason of any such warranty, representation, opinion, advice or assertion of fact. Accordingly, there shall be no liability, either in tort or in contract, assessed in relation to any such warranty, representation, opinion, advice or assertion of fact, except to the extent contemplated above.

**Section 1.10   Waiver, Amendment.**

Except as expressly provided in this Agreement, no amendment or waiver of this Agreement shall be binding unless executed in writing by the Party to be bound thereby. No waiver of any provision of this Agreement shall constitute a waiver of any other provision nor shall any waiver of any provision of this Agreement constitute a continuing waiver unless otherwise expressly provided.

**Section 1.11   Governing Law.**

This Agreement shall be governed by and construed in accordance with the laws of the Province of Ontario and the laws of Canada applicable therein.

**Section 1.12   Schedules.**

The following are the Schedules attached to this Agreement:

| | | |
|---|---|---|
| **Schedule 1** | — | Accounts Receivable |
| **Schedule 2** | — | Contracts |
| **Schedule 3** | — | Designated Employees |
| **Schedule 4** | — | Excluded Letters of Credit |
| **Schedule 5** | — | Fixed Assets |
| **Schedule 6** | — | Intellectual Property |
| **Schedule 7** | — | Inventory |
| **Schedule 8** | — | Lands |
| **Schedule 9** | — | Encumbrances |
| **Schedule 10** | — | Workers Compensation L/C |
| **Schedule 11** | — | Allocation of Purchase Price |
| **Schedule 12** | — | Quantification and Allocation of Assumed Liabilities |
| **Schedule 13** | — | Permits |
| **Schedule 14** | — | Compliance with Laws |
| **Schedule 15** | — | Environmental Health and Safety Matters |
| **Schedule 16** | — | Litigation |
| **Schedule 17** | — | Tax Liens |
| **Schedule 18** | — | Employment Matters |
| **Schedule 19** | — | Operation of the Business |

- 20 -

**Schedule 20**        —    Critical Suppliers

The Purchaser and the Vendors agree that as at December 3, 2009, the following Schedules have been delivered by the Vendors: (i) Schedule 2 (Contracts); (ii) Schedule 4 (Excluded Letters of Credit), (iii) Schedule 6 (Intellectual Property); (iv) Schedule 8 (Lands). The Vendors covenant and agree to provide the following Schedules to the Purchaser on or before December 9, 2009, such Schedules to be to the satisfaction of the Purchaser and the Vendors, both acting reasonably: (i) Schedule 1 (Accounts Receivable); (ii) Schedule 5 (Fixed Assets); (iii) Schedule 7 (Inventory); (iv) Schedule 9 (Encumbrances); (v) Schedule 10 (Workers Compensation L/C); (vi) Schedule 13 (Permits); (vii) Schedule 14 (Compliance with Laws); (viii) Schedule 15 (Environmental Health and Safety Matters); (ix) Schedule 16 (Litigation); (x) Schedule 17 (Tax Liens); (xi) Schedule 18 (Employment Matters); (xii) Schedule 19 (Operation of the Business) and (xiii) Schedule 20 (Critical Suppliers).  The Parties hereby agree and acknowledge that any updated Schedules to be provided by the Vendors pursuant to the terms of this Agreement to the Purchaser on or before Closing shall be satisfactory to the Purchaser, in its sole and absolute discretion.

## ARTICLE 2
## PURCHASED ASSETS

**Section 2.1    Agreement to Purchase and Sell Purchased Assets.**

Upon the terms and subject to the conditions contained in this Agreement, at the Closing, the Vendors shall sell, convey, transfer, assign and deliver to the Purchaser, and the Purchaser shall purchase and accept from the Vendors, free and clear of any and all Encumbrances (other than Permitted Encumbrances), all right, title and interest of the Vendors in and to the Edmundston Assets, the Juniper Assets, the Madawaska Assets, the Plaster Rock Assets, the Portland Assets and all of the other property and assets of every kind and description used by or in connection with or otherwise relating, in whole or in part, to the Business, other than only the Excluded Assets (collectively, the "Purchased Assets"), as such Purchased Assets shall exist on the Closing Date, including without limitation all of the following assets and properties of the Vendors:

      (a)    the Lands;

      (b)    the Timber Licences;

      (c)    the Contracts;

      (d)    the Fixed Assets;

      (e)    all Inventory;

      (f)    the PPGTP Credits;

      (g)    all Intellectual Property;

- 21 -

220

    (h)     the Books and Records;

    (i)      all Accounts Receivable;

    (j)      all Prepaid Expenses;

    (k)     all Permits (to the extent assignable);

    (l)      the Real Property Tax Returns; and

    (m)    all goodwill associated with the Business or the Purchased Assets.

**Section 2.2    Assignment of Purchased Assets.**

This Agreement and any document delivered under this Agreement shall not constitute an assignment or an attempted assignment of any Purchased Asset contemplated to be assigned to the Purchaser under this Agreement which is not assignable without the Consent and Approval of a Third Party if such Consent and Approval has not been obtained and such assignment or attempted assignment would constitute a breach of such Purchased Asset. The Vendors agree to use their best commercial efforts to obtain the Consents and Approvals, on terms and conditions satisfactory to the Purchaser, on or prior to Closing. Without limiting the Purchaser's right to rely on the condition of closing set out at Section 10.1(t), to the extent any Consent and Approval has not been obtained by the Closing Date in respect of one or more Contracts or Permits and the Purchaser elects to waive its rights to obtain such Consents and Approvals prior to  Closing (collectively the "<u>Unassigned Contracts and Permits</u>"), then, following the Closing, at the reasonable expense of the Purchaser for out-of-pocket expenses incurred by the Vendors, the Vendors (i) shall continue to use best commercial efforts to obtain the Consents and Approvals to the assignment of the Unassigned Contracts and Permits to the Purchaser, on terms and conditions satisfactory to the Purchaser, (ii) upon obtaining any such Consents and Approvals, shall take all steps necessary to promptly complete such assignment, (iii) prior to obtaining any such Consents and Approvals, shall hold such Unassigned Contracts and Permits in trust for the benefit of the Purchaser and shall deal with such Unassigned Contracts and Permits at the direction of the Purchaser and in the name of the Vendors or otherwise as the Purchaser may specify take all action and do or cause to be done all things that are, in the opinion of the Purchaser, necessary or proper in order that the obligations of the Vendors may be performed in such a manner that the value of the Unassigned Contracts and Permits is preserved and enures to the benefit of the Purchaser and the collection of moneys due and payable to the Purchaser in and under the Unassigned Contracts and Permits are recorded by the Purchaser; and (iv) the Vendors will promptly pay over to the Purchaser all moneys collected by or paid to the Vendors in respect of any Unassigned Contract and Permit. With respect to Unassigned Contracts and Permits, the Purchaser agrees to supply all such information to the Vendors and the person whose Consent and Approval has been requested (including, without limitation, credit and financial information) as may be reasonably requested by the Vendors or the person whose Consent and Approval has been requested and to otherwise cooperate, acting reasonably, with the Vendors and the person whose Consent and Approval has been requested in connection with the foregoing.

### Section 2.3    Thurso PPTGP Credits

If at any time the property and assets comprising the Thurso Assets or the Thurso Mill are sold on a going concern basis and the Thurso PPTGP Credits are not included in such going concern sale, the Vendors shall offer to sell the Thurso PPTGP Credits to the Purchaser in consideration for a promissory note of the Purchaser on terms substantially similar to the Promissory Note and having a face value equal to the face value of the Thurso PPTGP Credits. Upon the assignment and transfer of the Thurso PPTGP Credits to the Purchaser, the Thurso PPTGP Credits shall constitute a Purchased Asset under this Agreement.

### Section 2.4    Excluded Assets.

(a)    Notwithstanding anything contained herein to the contrary, only those assets that are Purchased Assets shall be sold, conveyed, transferred, assigned or delivered to the Purchaser under this Agreement. Without limiting the generality of the foregoing, the Purchased Assets shall not include any of the following (collectively, and together with all other assets that are not Purchased Assets, the "Excluded Assets"):

(i)    the Purchase Price delivered to the Vendors pursuant to this Agreement;

(ii)    the Unassigned Contracts and Permits (only to the extent any required Consents and Approvals are never obtained);

(iii)    all cash on hand, cash on deposit, cheques received but not yet deposited or cleared, wire transfers transmitted but not yet received, cash equivalents, certificates of deposit, and marketable securities, including accrued interest thereon, held by or on behalf of the Vendors;

(iv)    the Intercompany Receivables;

(v)    all Equity Interests;

(vi)    all bank accounts of the Vendors;

(vii)    any rights, claims or causes of action of the Vendors under this Agreement or any Ancillary Agreement;

(viii)    the Ashland Assets;

(ix)    the Thurso Assets;

(x)    the Masardis Assets;

(xi)    the Gorham Assets;

(xii)    the Toronto Assets;

- 23 -

     (xiii)    all property and assets relating solely to or arising or generated solely from the business and operations carried on at the Thurso Mill, the Ashland Mill, the Masardis Mill or the Gorham Mill; and

     (xiv)    the Non-Purchased Assets.

**Section 2.5    Designation of Excluded Assets**

Notwithstanding anything contained in this Agreement, on written notice to the Vendors, the Purchaser shall have the right on or before Closing, at its sole option, to delete and remove a Purchased Asset from the definition thereof (a "Non-Purchased Asset") and, in that event, no right, title, or interest of the Vendors in such deleted or removed Purchased Asset shall be purchased by or transferred to the Purchaser in completing the transactions contemplated by this Agreement. For greater certainty, such Non-Purchased Asset shall constitute an Excluded Asset. In no event shall the Purchaser or any of its Affiliates purchase or be deemed to have purchased any assets other than the Purchased Assets.

## ARTICLE 3
## PURCHASE PRICE AND RELATED MATTERS

**Section 3.1    Purchase Price.**

The aggregate purchase price (the "Purchase Price") payable by the Purchaser to the Vendors for the Purchased Assets shall be One Hundred and Eighty-Five Million Dollars ($185,000,000), subject to adjustment in accordance with Section 3.8, as follows:

     (a)    Thirty-Five Million Dollars ($35,000,000) in cash;

     (b)    Forty-Two Million Four Hundred Thousand Dollars ($42,400,000) evidenced by the Promissory Note;

     (c)    Thirty-Five Million Dollars ($35,000,000) in the form of the Preferred Shares;

     (d)    Twenty-Five Million Dollars ($25,000,000) in the form of the Common Shares; and

     (e)    by the assumption of the Assumed Liabilities up to a maximum amount of Forty-Seven Million Six Hundred Thousand Dollars ($47,600,000).

**Section 3.2    Payment of Purchase Price.**

On Closing, the Purchaser shall pay the Purchase Price as follows:

     (a)    an amount equal to Thirty-Five Million Dollars ($35,000,000) in cash to the Monitor on behalf of the Vendors, in trust, to be immediately distributed as follows:

(i)        Ten Million Dollars ($10,000,000) to be immediately distributed to CIT on account of amounts owing under the CIT Financing Agreement; and

(ii)       Twenty-Five Million Dollars ($25,000,000) to be immediately distributed to CIBC on account of amounts owing under the CIBC Existing Facility;

(b)       delivery of the Promissory Note as follows:

(i)        as to $10,000,000, by the Purchaser, on account of a holdback (the "Holdback Amount"); and

(ii)       as to $32,400,000, subject to adjustment in accordance with Section 3.8 of this Agreement, to the Monitor on behalf of the Vendors, in trust, to be distributed in accordance with such Orders of the Canadian Court and the Bankruptcy Court as may be subsequently made.

(c)       issuance and delivery of the Preferred Shares to the Monitor on behalf of the Vendors, in trust, to be immediately distributed to GNB in full satisfaction of the amounts owing under the GNB Loan Agreement;

(d)       issuance and delivery of the Common Shares to the Monitor on behalf of the Vendors, in trust, to be distributed in accordance with such Orders of the Canadian Court and the Bankruptcy Court as may be subsequently made; and

(e)       the assumption of up to a maximum amount of Forty-Seven Million Six Hundred Thousand Dollars ($47,600,000) of Assumed Liabilities which shall be satisfied by the Purchaser's execution and delivery of the General Conveyance and Assumption of Liabilities Agreement.

**Section 3.3    Holdback Amount**

The Holdback Amount shall be held in escrow and shall be available to satisfy any and all rights that the Purchaser shall have following the Closing to receive payment, compensation or return of a portion of the Purchase Price for any reason whatsoever under or in relation to the indemnification obligations of the Vendors pursuant to Article 13 of this Agreement. The escrow period for the Holdback Amount shall end on the date which is the earlier of: (a) for any portion of the Holdback Amount which at any time becomes payable to the Purchaser, the date on which such portion is paid to the Purchaser; orand (b) for the balance of the Holdback Amount, the earlier of the date which is 12 months after the Closing Date and such date, acceptable to the Purchaser, on which a duly approved and sanctioned plan or plans of compromise or arrangement in respect of the Vendors is completed under the CCAA Proceedings (the "Holdback Period"). Upon termination of the Holdback Period, any portion of the Holdback Amount not payable to the Purchaser shall be released and paid to the Monitor, in trust for the Vendors, to be distributed according to the terms and conditions of the Orders to be subsequently made. The terms and conditions of the escrow of the Holdback Amount shall be set out in an escrow agreement to be entered into by the Vendors and the Purchaser on or prior to Closing, on terms and conditions satisfactory to both Parties, acting reasonably.

- 25 -

224

**Section 3.4    Closing Date Estimated Balance Sheet**

Not less than two (2) Business Days before the Closing Date, the Vendors shall deliver to the Purchaser a balance sheet of the Business as at the Closing Date which shall reflect a good faith estimate by the Vendors of the balance sheet of the Business as at the Closing Date (the "Closing Date Estimated Balance Sheet"). The Closing Date Estimated Balance Sheet shall be accompanied by a certificate of the chief financial officer of FPI, or other senior officer of FPI acceptable to the Purchaser, to the effect that such officer has reviewed the Closing Date Estimated Balance Sheet; that the Closing Date Estimated Balance Sheet represents the best estimate, made in good faith, of the financial position of the Business as at the Closing Date, prepared in accordance with this Agreement, and that such officer has no reason to believe that such estimate may not be relied upon for purposes of the Closing. The Closing Date Estimated Balance Sheet shall also be accompanied by a copy of the working papers of the Vendors used in the preparation thereof, together with such other evidence supporting the amounts specified therein as the Purchaser may reasonably request.

**Section 3.5    Closing Date Balance Sheet**

(a)    Not later than sixty (60) days after the Closing Date, the Vendors shall cause a balance sheet of the Business as at the Closing Date to be prepared and delivered to the Purchaser, which balance sheet shall be prepared in a manner consistent with that of the Closing Date Estimated Balance Sheet set out in Section 3.4 of this Agreement (the "Closing Date Balance Sheet"). The form of the Closing Date Balance Sheet shall be satisfactory to the Purchaser, in its sole and absolute discretion.

(b)    If the Purchaser notifies the Vendors that it agrees with the Closing Date Balance Sheet within ten (10) days after receipt thereof, the Closing Date Balance Sheet shall be conclusive and binding on the Purchaser and the Vendors and the Parties shall be deemed to have agreed thereto on the date the Vendors receive the notice. If the Purchaser notifies the Vendors of its disagreement with the Closing Date Balance Sheet within such ten (10) day period, then the Purchaser and the Vendors shall attempt, in good faith, to resolve their differences with respect thereto within five (5) days after the Vendors' receipt of the Purchaser's notice of disagreement. Any disagreement over the Closing Date Balance Sheet (a "Balance Sheet Dispute") not resolved by the Purchaser and the Vendors within such five (5) day period shall be submitted for dispute resolution in accordance with Article 14 set out herein.

**Section 3.6    Determination of Purchase Price and Adjustment of Amount Paid on Closing Date**

On the 2nd Business Day following the date on which the Parties agree to the Closing Date Balance Sheet, or on the 2nd Business Day following the date on which a determination of a Balance Sheet Dispute is made pursuant to Section 3.5, whichever is later, the Purchase Price shall be determined based on the Closing Date Balance Sheet, and shall be adjusted as provided in Section 3.8.

- 26 -

225

### Section 3.7    Financial Statements

All financial statements required to be prepared pursuant to this Agreement shall be prepared in accordance with generally accepted accounting principles applied on a basis consistent with previous fiscal periods, except as otherwise provided in this Agreement.

### Section 3.8    Purchase Price Adjustment

(a)    If the Net Working Capital as at the Closing Date (the "Closing Date Net Working Capital") is greater than Fifty-Four Million Dollars ($54,000,000), then the amount of the Purchase Price evidenced by the Promissory Note shall be increased by an amount equal to the Closing Date Net Working Capital minus $54,000,000. In such event, the Vendors and the Purchaser shall promptly make arrangements for the delivery to the Monitor, in trust for the Vendors, of an additional Promissory Note in the amount of the adjustment pursuant to this clause.

(b)    If the Closing Date Net Working Capital is less than Fifty-Four Million Dollars ($54,000,000), then the amount of the Purchase Price evidenced by the Promissory Note shall be reduced by an amount equal to $54,000,000 minus the Closing Date Net Working Capital. In such event, the Vendors shall promptly make arrangements for the return of the Promissory Note from the Monitor and the Purchaser shall make arrangements for the delivery to the Monitor, in trust for the benefit of the Vendors, of a replacement Promissory Note in the amount of $32,400,000 minus the amount of the adjustment pursuant to this clause. Pending completion of the calculation and payment of the Purchase Price adjustment pursuant to the terms herein, the Monitor shall not distribute or otherwise release the Promissory Note or any portion thereof.

(c)    For the purpose of this Section 3.8, the Assumed Liabilities relevant in calculating the Closing Date Net Working Capital shall mean Liabilities assumed by the Purchaser in respect of the following categories of payables as they may exist on the relevant date:

(i)    all Ordinary Course accounts payable and trade payables for goods provided and services rendered to the Vendors following the Filing Date in relation solely to the Purchased Assets to the extent such amounts are outstanding on Closing, excluding, for greater certainty, any and all Intercompany Receivables and Intercompany Liabilities;

(ii)    accrued payroll and benefits; and

(iii)    amounts owing for unpaid Realty Taxes.

### Section 3.9    Payments.

Any reference in this Agreement or any other document delivered pursuant to this Agreement to payment means cash payment by negotiable cheque certified by a Canadian chartered bank or official bank draft drawn on a Canadian chartered bank to the order of the

- 27 -

Monitor, in trust for the benefit of the Vendors, or by wire transfer in immediately available funds to an account designated by the Monitor, in trust for the benefit of the Vendors.

**Section 3.10   Allocation of Purchase Price.**

The Purchase Price shall be allocated among the Purchased Assets in accordance with an allocation to be proposed by the Purchaser on or before the Closing Date acceptable to the Vendors, acting reasonably, and which, when delivered, shall form Schedule 11 hereto. All Tax Returns and other statements made by the Parties shall be consistent with such allocation and the Parties shall not make any inconsistent written statement on any returns or during the course of any tax audit by any taxation authority except to the extent required by Law.

**Section 3.11   Issuance of Common Shares, Preferred Shares and Promissory Note.**

The Common Shares, the Preferred Shares and the Promissory Note shall be issued by the Purchaser on such terms and conditions, and pursuant to such arrangements, as the Purchaser may deem satisfactory, in its sole and absolute discretion, to ensure that the Purchaser: (a) shall not become, be deemed to be, or have any obligation to become a reporting issuer under any applicable laws; and (b) shall not become subject to any material obligation or liability under any applicable securities laws. For greater certainty, the Common Shares and the Preferred Shares may be subject to, among other things, restrictions on their transferability.

**ARTICLE 4
ASSUMPTION OF LIABILITIES**

**Section 4.1   Assumed Liabilities.**

(a)     On the terms and subject to the conditions set forth in this Agreement, including without limitation Section 4.2 hereof, at the Closing, the Purchaser shall (or shall cause one or more of its Affiliates to) assume and agree to become responsible for, and perform, discharge and pay when due, only the following Liabilities of the Vendors (collectively, the "Assumed Liabilities"):

(i)     all Ordinary Course accounts payable and trade payables for goods provided and services rendered to the Vendors following the Filing Date in relation solely to the Purchased Assets to the extent such amounts are outstanding on Closing, excluding, for greater certainty, any and all Intercompany Receivables and Intercompany Liabilities;

(ii)    all Liabilities under the Contracts included in the Purchased Assets (to the extent assigned or transferred to the Purchaser on Closing), including Cure Costs;

(iii)   all Liabilities under agreements entered into by the Vendors following the Filing Date with certain critical suppliers as set out in Schedule 20;

(iv)    all Liabilities for Transactional Taxes payable in connection with the transactions contemplated by this Agreement as set forth in Section 11.1;

- 28 -

227

(v)    all Liabilities for the Realty Taxes;

(vi)    all Liabilities arising from ownership of the Purchased Assets from and after the Closing Date including the asset retirement obligations described in Schedule 15;

(vii)    all Liabilities under the Workers Compensation L/C relating to the U.S. Transferred Employees;

(viii)    all Liabilities arising from the employment of the Transferred Employees and the Unionized Employees from and after the Closing Date, including, in respect of Transferred Employees, the Benefit Plans, as applicable, only to the extent such Benefit Plans, as applicable, are assumed by the Purchaser pursuant to Section 7.3 of this Agreement. For greater certainty, any and all Liabilities under or in respect of any of any of the following shall not be Assumed Liabilities: (a) Liabilities under the Pension Plans; (b) Liabilities under the Benefit Plans, to the extent such Benefits Plans are not assumed by the Purchaser pursuant to Section 7.3 of this Agreement; and (c) Liabilities in respect of Designated Employees in respect of the Juniper Mill who are not Transferred Employees. For the purposes of this Section 4.1(a)(viii), Benefit Plans shall not include the Post-Retirement Liabilities assumed in Section 4.1(a)(ix) of this Agreement; and

(ix)    all Post-Retirement Liabilities.

(b)    For greater certainty, the Purchaser shall not assume or be deemed by operation of any law or otherwise to have assumed any liabilities or obligations whatsoever in respect of or in connection with the Pension Plans or any other pension plan obligations or commitments of the Vendors or any of their Affiliates or Subsidiaries, whether now existing or hereafter arising.

**Section 4.2    Quantification and Allocation of Assumed Liabilities**

The quantification and allocation of the Assumed Liabilities shall be made in accordance with a quantification and allocation to be proposed by the Vendors on or before Closing acceptable to the Purchaser, in its sole discretion, and, when delivered, shall form Schedule 12 hereto.

**Section 4.3    Excluded Liabilities.**

Notwithstanding anything contained herein to the contrary, neither the Purchaser nor any of its Affiliates shall assume or be deemed to have assumed any Liabilities of the Vendors whatsoever other than the Assumed Liabilities, and the Vendors shall be and remain solely and exclusively liable with respect to all Liabilities of the Vendors other than the Assumed Liabilities (the "Excluded Liabilities"). Without limiting the generality of the foregoing, the Excluded Liabilities shall include:

- 29 -

228

    (a)    any and all Liabilities related to any Excluded Asset;

    (b)    any and all Intercompany Liabilities;

    (c)    any and all Liabilities for or related to any obligation for any Taxes that are not expressly assumed by the Purchaser pursuant to Article 11 (including, for avoidance of doubt, any income or gross receipts Taxes imposed on any of the Vendors);

    (d)    other than as specified in Section 4.1(a)(viii) and Section 4.1(a)(ix) of this Agreement, any and all Liabilities with respect to any Benefit Plan;

    (e)    any and all Liabilities with respect to the Pension Plans;

    (f)    any and all Taxes imposed on the Business or the Purchased Assets that is attributable to any pre-Closing tax period (other than any Transactional Taxes and any Realty Taxes referenced in Section 4.1(a)(iv) and Section 4.1(a)(v));

    (g)    any and all Liabilities with respect to any Excluded Letter of Credit;

    (h)    any and all Liabilities with respect to any current Employees or former Employees of the Vendors who are not Transferred Employees or Unionized Employees (regardless of when such Liability arises); and

    (i)    any and all Liabilities of the Vendors arising under this Agreement or the Ancillary Agreements.

### ARTICLE 5
### REPRESENTATIONS AND WARRANTIES REGARDING THE PURCHASER

    The Purchaser hereby represents and warrants to the Vendors as of the date hereof as follows:

**Section 5.1    Organization.**

    The Purchaser is a corporation, partnership, limited liability company or other entity that is duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation. The Purchaser has the corporate power and authority necessary to (a) execute, deliver and perform its obligations under the Ancillary Agreements, (b) consummate the transactions contemplated hereby and thereby to be consummated by it, and (c) conduct its business as currently conducted by it. The Purchaser is duly qualified or licensed and in good standing as a foreign corporation authorized to do business under the Laws of each jurisdiction in which the ownership, leasing or use of assets by it or the conduct of business by it requires such licensing or qualification, except where the failure to be so licensed or qualified and in good standing would not have a material adverse effect on the Purchaser, the execution, delivery or performance of this Agreement, or any of the Ancillary Agreements by the Purchaser or the consummation of the transactions contemplated hereby and thereby to be consummated by it. The Purchaser is not in violation of any provision of its Organizational Documents.

229

**Section 5.2    Authorization, Execution and Enforceability.**

The execution and delivery of this Agreement and the Ancillary Agreements in each case to which the Purchaser is a party, by the Purchaser, the performance by the Purchaser of its obligations hereunder and thereunder and the consummation by the Purchaser of the transactions contemplated hereby and thereby to be consummated by it have been duly authorized by all necessary corporate action on the part of the Purchaser. This Agreement constitutes and, as of the Closing each of the Ancillary Agreements will constitute, a legal, valid and binding obligation of the Purchaser, enforceable against the Purchaser in accordance with its respective terms, except insofar as enforceability may be limited by bankruptcy, insolvency, moratorium or other Laws which may affect creditors' rights and remedies generally and by principles of equity (regardless of whether such enforceability is considered in a Proceeding in equity or at law). This Agreement has been, and, as of the Closing each Ancillary Agreement will have been, duly executed and delivered by the Purchaser.

**Section 5.3    Financing.**

The Purchaser has sufficient funds available on hand to enable the Purchaser (a) to pay the Purchase Price and all fees and expenses related to the transactions contemplated hereby, to the extent that this Agreement or the Ancillary Agreements requires it to pay such fees and expenses, and (b) to pay and discharge all of its other liabilities and obligations when due.

**Section 5.4    Brokers; Finders.**

No finder, broker or similar intermediary acting on behalf of the Purchaser or any of its Affiliates is entitled to a commission, fee or other compensation in connection with the negotiation, execution or delivery of this Agreement or the Ancillary Agreements or the consummation of any of the transactions contemplated hereby or thereby.

**Section 5.5    Vendors' Acknowledgment; Exclusivity of Representations and Warranties.**

The Vendors acknowledge and agree that except for the representations and warranties expressly set forth herein or in any Ancillary Agreement, the Vendors have not relied on any representation or warranty from the Purchaser or any Affiliate of the Purchaser or any employee, officer, director, accountant, financial, legal or other Representative of the Purchaser or its Affiliates in determining whether to enter into this Agreement.

**ARTICLE 6**
**REPRESENTATIONS AND WARRANTIES OF THE VENDORS**

Each of the Vendors represents and warrants to the Purchaser, as of the date hereof, as follows:

**Section 6.1    Organization.**

Each of the Vendors is a corporation, partnership, limited liability company or other entity that is duly organized, validly existing and in good standing under the Laws of its jurisdiction of formation. Each of the Vendors has the corporate power and authority necessary

- 31 -

to conduct the Business as currently conducted by it. Subject to requisite Canadian Court and Bankruptcy Court approval, each of the Vendors has the corporate power and authority necessary to (a) execute, deliver and perform its obligations under this Agreement and the Ancillary Agreements, and (b) consummate the transactions contemplated hereby and thereby to be consummated by it. Each of the Vendors is duly qualified or licensed and in good standing as a foreign corporation authorized to do business under the Laws of each jurisdiction in which the current ownership, leasing or use of assets by it or the current conduct of business by it requires such licensing or qualification, except where the failure to be so licensed or qualified and in good standing would not, individually or in the aggregate, have a Material Adverse Effect on each of the Vendors, the execution, delivery or performance of this Agreement, or any of the Ancillary Agreements by each of the Vendors or the consummation of the transactions contemplated hereby and thereby to be consummated by each of them. Each of the Vendors is not in violation of any provision of its Organizational Documents except where such violation would not, individually or in the aggregate, have a Material Adverse Effect.

**Section 6.2    Authorization, Execution and Enforceability.**

Subject to requisite Canadian Court approval and Bankruptcy Court approval, the execution and delivery of this Agreement and the Ancillary Agreements by each of the Vendors, the performance by each of the Vendors of its obligations hereunder and thereunder and the consummation by each of the Vendors of the transactions contemplated hereby and thereby to be consummated by it have been duly authorized by all necessary corporate action on the part of each of the Vendors. Subject to requisite Canadian Court approval and Bankruptcy Court approval, this Agreement constitutes, and, as of the Closing each of the Ancillary Agreements will constitute, a legal, valid and binding obligation of each of the Vendors, enforceable against each of the Vendors in accordance with its respective terms, except insofar as enforceability may be limited by general principles of equity.  This Agreement has been, and, as of the Closing each Ancillary Agreement will have been, duly executed and delivered by each of the Vendors.

**Section 6.3    Financial Statements.**

The Audited Financial Statements and the Unaudited Financial Statements have been prepared in accordance with generally accepted accounting principles (subject to usual year end adjustments in the case of the Unaudited Financial Statements) consistently applied throughout the periods indicated and fairly present the consolidated financial position of the Vendors and the consolidated results of the Vendors' operations in the Business as of the dates and throughout the periods indicated.

**Section 6.4    Permits.**

Schedule 13 sets forth all of the material Permits and all pending applications therefore which have been issued to, or are held or used by, each of the Vendors, which are or, upon issuance, would reasonably be expected to be material to the conduct of Business. The Permits have been duly obtained and are to the knowledge of the Vendors, after reasonable inquiry, in full force and effect. The Vendors are in compliance with all material terms of such Permits, in each case except for such violations as would not have, individually or in the aggregate, a Material Adverse Effect.

10124776.1410124776.13
13742-2154

**Section 6.5    Intellectual Property Matters**

Schedule 6 sets forth a true and complete list of all of the Intellectual Property, in each case which is owned or licensed by each of the Vendors as of the Effective Date and which is material to the conduct of the Business except only Intellectual Property the lack of which would not have, individually or in the aggregate, a Material Adverse Effect.

**Section 6.6    Sufficiency of Purchased Assets.**

Except for the Excluded Assets and assets, the absence of which would not have, individually or in the aggregate, a Material Adverse Effect upon the Business and the Purchased Assets, will, as of the Closing Date, constitute all of the material assets and rights necessary to conduct the Business substantially as presently conducted by each of the Vendors.

**Section 6.7    Compliance with Laws.**

Except as set forth in Schedule 14, and except as would not, individually or in the aggregate, have a Material Adverse Effect, the Vendors have conducted and continue to conduct the business in accordance with all Laws and Orders applicable to the Business and the Vendors are not in violation of any Law or any Order applicable to the operation of the Business.

**Section 6.8    Title.**

The Vendors are the beneficial owners of the Purchased Assets, as applicable, and have good and marketable title thereto, subject to Encumbrances that will be discharged by the Vendors on Closing or pursuant to the Court Orders, and Permitted Encumbrances.

**Section 6.9    Environmental and Health and Safety Matters.**

(a)    Except as set forth in Schedule 15 and except as would not, individually or in the aggregate, have a Material Adverse Effect:

(i)    neither the Vendors nor any other Person has emitted, discharged, deposited or released or caused or permitted to be emitted, discharged, deposited or released, any Substances on or to the Premises, or in connection with the operation of the Business, except in compliance with Environmental Law;

(ii)    the soil and subsoil, and the surface and ground water in, on or under the Premises do not contain any Substances, nor do the Premises contain any underground storage tanks; all Substances which have been or are being treated or stored on the Premises have been generated, treated and stored in compliance with Environmental Law;

(iii)    no polychlorinated biphenyls, asbestos containing materials, lead or urea-formaldehyde is or has ever been on, at, in or under the Premises;

- 33 -

232

     (iv)    the Vendors have not permitted the Premises to be used for the disposal of any Substance;

     (v)    all Environmental Permits obtained by the Vendors in connection with the Business (including any applicable expiry dates) are listed in Schedule 15 and are valid and in full force and effect; and

     (vi)    there are no proceedings against or involving the Vendors either in progress, pending, or threatened which allege the violation of, or non-compliance with, any Environmental Law.

     (b)    Schedule 15 describes all Liabilities relating to the asset retirement obligations of the Vendors and an estimated amount of such asset retirement obligations as at the Effective Date or the most recent date of determination, where applicable, which amount shall be updated by the Vendors as of the Closing Date.

### Section 6.10    No Conflict.

Subject to approval of the Canadian Court and the Bankruptcy Court and receipt of the Consents and Approvals, the execution, delivery and performance by each Vendor of this Agreement and the Ancillary Agreements to which such Vendor is, or on the Closing Date will be, a party do not and will not conflict with or result in a breach of the terms, conditions or provisions of, constitute a default under, result in a violation of, give to any Person any right of termination, amendment, modification, acceleration or cancellation or any preemptive right or right to the payment of any penalty under, or result in the creation or imposition of any Encumbrance upon any of the Purchased Assets, or require any consent or other action by or declaration or notice to any Government Authority pursuant to (i) the Organizational Documents of the Vendors, (ii) any material contract to which the Vendors are a party or to which any of their assets are subject, (iii) any order of any Government Authority or Judicial Authority applicable to any Vendor or by which any of their respective properties or Purchased Assets are bound, or (iv) any Laws to which any of the Vendors, or any of the Purchased Assets are subject, except for such defaults, violations and notifications that would not, individually or in the aggregate, materially hinder, delay or impair the performance by the Vendors of any of their obligations under the Ancillary Agreements.

### Section 6.11    Contracts.

     (a)    Schedule 2 lists the material Contracts of the Vendors in respect of the Business or the Purchased Assets as of the Effective Date.

     (b)    Except as disclosed in Schedule 2, each Contract: (i) is valid and binding on the applicable Vendor and is in full force and effect; and (ii) upon the consummation of the Transaction; except to the extent any Consents and Approvals are not obtained, shall continue in full force and effect without penalty or adverse consequence. Except as disclosed in Schedule 2, the Vendors are not in breach of, or default under, any Contract to which any of the them is a party, except for such breaches or defaults that would not have, individually or in the aggregate, a Material Adverse Effect.

- 34 -

**Section 6.12   Litigation.**

As of the date hereof, except for the CCAA Proceedings and the Bankruptcy Case and except as set forth in Schedule 16, there is no Action pending or, to the knowledge of the Vendors, threatened, against, involving or affecting the Business or the Purchased Assets which, if determined adversely, would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect.  As of the date hereof, except for Orders and settlements entered in connection with the CCAA Proceedings and the Bankruptcy Case, there is no Order or settlement to which Vendors are subject that directly and materially affects or restricts the ownership of the Purchased Assets, the Assumed Liabilities or the Business, and no Action is pending or, to the knowledge of Vendors, threatened against the Vendors that questions the validity of this Agreement or the Ancillary Agreements or any action taken or to be taken by the Vendors in connection with this Agreement or the Ancillary Agreements.

**Section 6.13   Tax Liens.**

Except (i) as set forth in Schedule 17; (ii) for the Realty Taxes; and (iii) for matters that would not have, individually or in the aggregate, a Material Adverse Effect, to the Vendors' knowledge: (i) all Tax Returns in respect of Taxes required to have been filed with respect to the Business or the Purchased Assets have been timely filed (taking into account any extension of time to file granted or obtained); (ii) all Taxes shown to be payable on such Tax Returns have been paid or will be timely paid; (iii) the Vendors have not received from any Governmental Authority any written notice of proposed adjustment, deficiency or underpayment of any Taxes related to the Business or the Purchased Assets, other than a proposed adjustment, deficiency or adjustment that has been satisfied by payment or settlement, or withdrawn and (iv) there are no Tax Encumbrances on any of the Purchased Assets (other than Permitted Encumbrances).  As of the Effective Date, the amount outstanding for Realty Taxes is approximately Five Million Dollars ($5,000,000), which amount shall be updated by the Vendors as of the Closing Date.

**Section 6.14   Lands.**

Schedule 8 lists the street address of each parcel of real property in which the Vendors have fee title (or equivalent) interest, to the extent used in the conduct of the Business.  Except as described in Schedule 8 or except as would not have, individually or in the aggregate, a Material Adverse Effect, the Vendors have title in fee simple to each such parcel free and clear of all Encumbrances, except Permitted Encumbrances and Encumbrances that will be discharged by the Vendors on Closing or pursuant to the Court Orders, and no such parcel has been classified as "Tree Growth", "Farmland", or "Open Space" property for tax purposes.

**Section 6.15   Employment Matters.**

    (a)    Schedule 18 sets forth a complete and accurate list of all Benefit Plans.  Except as set out in Schedule 18:

        (i)    The Vendors have provided the Purchaser with a copy of each Benefit Plan and the material documents that support each Benefit Plan.

- 35 -

(ii) All Benefit Plans are, and have been, established, registered, qualified, administered, funded and invested in all material respects in accordance with the terms of such Benefit Plans including the terms of the material documents that support such Benefit Plans, any applicable Existing Collective Agreement and all applicable Laws.

(iii) There is no proceeding, action, suit or claim (other than routine claims for payments of benefits) pending or threatened involving any Benefit Plan or its assets.

(b) Schedule 18 sets forth a complete and accurate list of Employees and individual independent contractors of the Vendors employed or engaged in relation to the Business and their material terms of employment including any employment agreements, retention, bonus on commission arrangements, and Existing Collective Agreements. Except as set out in Schedule 18:

(i) The Vendors have provided the Purchaser with a copy of each material employment agreement and the Existing Collective Agreements relating to the Vendors.

(ii) The Vendors are and have been operated in all material respects in compliance with all applicable Laws relating to Employees.

(iii) There is no grievance, arbitration or other proceeding before any labour tribunal pending or threatened involving any Unionized Employee.

(c) Schedule 18 describes all of the Employee Liabilities arising from the employment of the Transferred Employees and Unionized Employees and the amount of such Employee Liabilities as at the Effective Date or the most recent date of determination, where applicable, which amount shall be updated by the Vendors as of the Closing Date.

(d) Schedule 18 describes all of the Post-Retirement Liabilities and an estimated amount of such Post-Retirement Liabilities as at the Effective Date or the most recent date of determination, where applicable, which amount shall be updated by the Vendors as of the Closing Date.

**Section 6.16  Timber Licences.**

As of the Effective Date and as of the Closing Date:

(a) FPI is the sole and exclusive licensee under the Timber Licence and true and complete copies thereof have been provided to the Purchaser. FPI is listed in the records of the Ministry of Natural Resources of New Brunswick as the holder thereof; the Timber Licence is validly subsisting and in good standing; no notice of suspension or cancellation of the Timber Licence is outstanding; and no rights of FPI under the Timber Licence are under suspension, in whole or in part, under the New Brunswick *Crown Lands and Forests Act*, Chapter C-38.1 and,

to the knowledge of FPI, after reasonable inquiry, no fact or event has occurred or could reasonably be expected to result in any such suspension or cancellation;

(b)    FPI has not received any notice or advice from any Governmental Authority indicating that the annual allowable cut of the Timber Licence may be reduced and, to the knowledge of FPI after reasonable inquiry, there is no reason to believe that such reduction may be forthcoming; and

(c)    There are no contracts or agreements that commit the use or disposition of timber or logs harvested under the Timber Licence.

### Section 6.17   Brokers; Finders.

No finder, broker or similar intermediary acting on behalf of the Vendors is entitled to a commission, fee or other compensation in connection with the negotiation, execution or delivery of this Agreement or the Ancillary Agreements or the consummation of any of the transactions contemplated hereby or thereby.

### Section 6.18   Operation of the Business.

Except as set forth in Schedule 19 and except where no Material Adverse Effect, individually or in the aggregate, would result, since the Filing Date, the Vendors have conducted the Business and operated its properties in the Ordinary Course consistent with past practice and there has been no damage to or loss affecting any portion of the Purchased Assets or any Purchased Asset (regardless of whether such damage or loss is covered by insurance).

### Section 6.19   Non Residents

None of the Purchased Assets held by any of the Vendors, other than FPI and FPS Canada, is taxable Canadian property, as defined in subsection 248(1) of the *Income Tax Act* (Canada).

### Section 6.20   Schedules.

Schedules 1, 4, 5, 7 and 10 hereto contain materially true and complete listings and descriptions of, respectively, Accounts Receivable, Excluded Letters of Credit, Fixed Assets, Inventory and Workers Compensation L/C, in each case as at the Effective Date.

### Section 6.21   Survival of Covenants, Representations and Warranties

The covenants, representations and warranties contained in this Agreement, the Ancillary Agreements and in all certificates and documents delivered pursuant to or contemplated by this Agreement or the Ancillary Agreements shall survive the Closing and shall continue for the Holdback Period.

- 37 -

236

## ARTICLE 7
## EMPLOYEE MATTERS

**Section 7.1    Offers of Employment.**

(a)    The Purchaser shall become the successor employer in respect of the Unionized Employees for the purposes of applicable Law and accordingly shall be bound by and comply with the terms of the Amended Canadian Collective Agreements including continuing the employment after the Closing Date of any Unionized Employee covered by the Amended Canadian Collective Agreements effective as at the Closing Date.

(b)    The Purchaser shall, effective as at the Closing Date, assume all liabilities and obligations of the Vendors in respect of all of the Unionized Employees covered by the New U.S. Collective Agreements. It is specifically understood that as to any Unionized Employees covered by the New U.S. Collective Agreements that all such employees shall be retained by the Purchaser, the Purchaser shall recognize the employee's labour organization as their exclusive bargaining representative, and shall recognize and assume the New U.S. Collective Agreements and all obligations of the employer thereunder.

(c)    The Purchaser shall, effective as at the Closing Date, offer to employ the Designated Employees on terms and conditions of employment substantially similar in the aggregate, including salary, incentive compensation and benefits, to those currently available to such Canadian Employees and the Purchaser shall assume all unpaid vacation pay up to the Closing Date for each Canadian Transferred Employee. Notwithstanding the foregoing or anything else in this Agreement, all offers of employment to Designated Employees whose employment relates to the Juniper Mill shall be conditional on the Juniper Mill re-starting prior to 12 months from the Closing Date.

(d)    The Vendors and the Purchaser acknowledge that the transactions contemplated by this Agreement shall not constitute a severance of employment of any Designated Employee in the U.S. prior to or upon the consummation of the transactions contemplated hereby, and that such employees will have continuous and uninterrupted employment immediately before and immediately after the Closing.

(e)    The Purchaser agrees to provide any required notice under the *Worker Adjustment and Retraining Notification Act*, as amended (the "WARN Act"), and any similar statute, and to otherwise comply with any such statute with respect to any "plant closing" or "mass layoff" (as defined in the WARN Act) or similar event affecting U.S. Transferred Employees (including as a result of the consummation of the transactions contemplated by this Agreement) and occurring on or after the Closing Date. The Purchaser shall not take any action after the Closing Date that would cause any termination of employment of any employees by the Vendors that occur on or before the Closing Date to constitute a "plant closing" or "mass layoff" under the WARN Act or any similar statute, or to create any liability to the Vendors for any employment terminations under Applicable Law. Between the Effective Date and the Closing Date, the Vendors shall not, without the Purchaser's consent, which consent may be withheld in the Purchaser's sole and absolute discretion, take any action whatsoever that would cause any termination of employment of any U.S. Employees by the Vendors during such period of time

- 38 -

237

that would constitute a "plant closing" or "mass layoff" under the WARN Act or any similar statute.

**Section 7.2    Information from Vendors.**

The Vendors shall provide the Purchaser with the Vendors' books and records relating to the Transferred Employees and the Unionized Employees and such other data and information as the Purchaser may reasonably require. The Vendors shall also, at the request of the Purchaser made at any time, provide such authorizations as may be necessary for the Purchaser to gain access to files maintained by the Canada Revenue Agency or such other relevant Governmental Authority. Such requests by the Purchaser shall be funded at the expense of the Purchaser to the extent it will cause the Vendors to incur any time and costs related to these activities.

**Section 7.3    Employee Benefit Plans.**

The Transferred Employees and the Unionized Employees shall cease to accrue benefits under all Benefit Plans and Pension Plans effective as of the Closing Date. Notwithstanding the foregoing, the Purchaser may assume any of the Vendors' Benefit Plans, effective as of the Closing Date, provided that the Purchaser notifies the Vendors in writing prior to the Closing Date with respect to such assumption. The Vendors and the Purchaser agree to take any actions required to give effect to the assignment and assumption of any applicable Benefit Plan of the Vendors.

**Section 7.4    Responsibility for Accrued Claims.**

Except to the extent assumed by the Purchaser pursuant to Section 4.1 of this Agreement, the Vendors shall retain responsibility for all amounts payable by reason of or in connection with any and all claims incurred under the Benefit Plans, the Pension Plans and the Existing Collective Agreements by the Transferred Employees and the Unionized Employees (and their respective eligible dependants) on or prior to the Closing Date whether such claims are reported before or after the Closing Date.

**Section 7.5    Privacy Laws.**

The Purchaser will, following the ~~Effective Time~~Closing, observe all requirements of any applicable Privacy Law with respect to the Personal Information relating to the Transferred Employees and the Unionized Employees transferred from the Vendors to the Purchaser pursuant to this Agreement.

**Section 7.6    Hourly Employees Pension Plan.**

(a)    The Purchaser shall, effective as of the start of business on the Closing Date, establish and file with the applicable Governmental Authority a new defined contribution registered pension plan (the "New Hourly DC Plan") to provide benefits for the Transferred Hourly Employees who, immediately prior to the Closing Date, were members of or were in a category eligible for membership in, the Pension Plan for New Brunswick Hourly Paid Employees of Fraser Papers Inc., Reg. #0251264 (the "Old FP Hourly Plan"). The provisions of the New Hourly DC Plan shall, except as otherwise consented to by the Vendors, contain defined

- 39 -

contribution provisions substantially similar to those in effect under the Old FP Hourly Plan on or immediately prior to the Closing Date.

(b)    Effective as of the Closing Date, each Transferred Hourly Employee who is a member of the Old FP Hourly Plan shall cease to actively participate in the Old FP Hourly Plan and shall commence participation in the New Hourly DC Plan. For each such Transferred Hourly Employee, the New Hourly DC Plan, only for the purposes of vesting and eligibility for benefits, will recognize the period of service recognized under the Old FP Hourly Plan.

(c)    All pension benefits accrued in respect of service prior to the Closing Date by a Transferred Hourly Employee under the Old FP Hourly Plan shall remain the sole responsibility of FPI and shall be sponsored and administered by FPI. For greater certainty, the Purchaser will not assume or have any liability for the funding or payment of any pension benefits accrued by the Transferred Hourly Employees under the Old FP Hourly Plan, while that plan is ongoing or upon the wind up of the Old FP Hourly Plan.

**Section 7.7    Salaried Employees Pension Plan.**

(a)    The Purchaser shall, effective as of the start of business on the Closing Date, establish and file with the applicable Governmental Authority a new defined contribution registered pension plan (the "New Salaried DC Plan") to provide benefits for the Transferred Salaried Employees who, immediately before the Closing Date, were members or were in a category eligible for membership in the Nexfor Inc., Fraser Operations, Salaried Pension Plan (the "Old FP Salaried Plan"). The provisions of the New Salaried DC Plan shall, except as otherwise consented to by the Vendors, contain defined contribution provisions substantially similar to those in effect under the Old FP Salaried Plan on or immediately prior to the Closing Date.

(b)    Effective as of the Closing Date, each Transferred Salaried Employee who is a member of the Old FP Salaried Plan will cease to actively participate in the Old FP Salaried Plan and shall commence participation in the New Salaried DC Plan. For each such Transferred Salaried Employee, the New Salaried DC Plan, only for the purposes of vesting and eligibility for benefits, will recognize the period of service recognized under the Old FP Salaried Plan.

(c)    All pension benefits accrued in respect of service prior to the Closing Date of a Transferred Salaried Employee under the Old FP Salaried Plan shall remain the sole responsibility of FPI and will be sponsored and administered by FPI. For greater certainty, the Purchaser will not assume or have any liability for funding or payment of any pension benefits accrued by Transferred Salaried Employees under the Old FP Salaried Plan, while that plan is ongoing or upon the wind up of the Old FP Salaried Plan.

**Section 7.8    U.S. Pension Plan**

(a)    The Purchaser shall, effective as of the start of business on the Closing Date, establish a new profit sharing and 401(k) plan, or other defined contribution retirement plan (the "US DC Plan") to provide benefits for the U.S. Transferred Employees who, immediately prior to the Closing Date, were participants in the US Pension Plan. The US DC Plan will be qualified under Sections 401 and 501 of the US Internal Revenue Code.

- 40 -

239

(b)      Effective as of the Closing Date, each U.S. Transferred Employee who is a participant in the U.S. Pension Plan shall cease to be an active participant in the U.S. Pension Plan and shall commence participation in the US DC Plan. For each such U.S. Transferred Employee, the US DC Plan, only for the purposes of vesting and eligibility for benefits, will recognize the period of service recognized under the US Pension Plan.

(c)      All pension benefits accrued in respect of service prior to the Closing Date by a U.S. Transferred Employee under the U.S. Pension Plan shall remain the sole responsibility of the Vendors and shall be sponsored and administered by the Vendors. For greater certainty, the Purchaser will not assume nor have any liability for the funding or payment of any pension benefits accrued by U.S. Transferred Employees under the U.S. Pension Plan.

## ARTICLE 8
## ADDITIONAL AGREEMENTS OF THE PARTIES

**Section 8.1      Conduct by the Purchaser.**

The Purchaser covenants and agrees that, except as expressly contemplated by this Agreement, or as otherwise required by Law, after the Effective Date and prior to the earlier of the Closing Date or the Termination Date:

(a)      the Purchaser shall, and shall cause its Affiliates to, refrain from taking any action which would cause any representation or warranty contained in Article 5 to be untrue or incorrect in any material respect as of the Closing; and

(b)      subject to the Orders of the Canadian Court and Bankruptcy Court and subject to the express provisions of this Agreement, the Purchaser shall use commercially reasonable efforts (i) to perform and satisfy all conditions to each of the Purchaser's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by the Purchaser under this Agreement, and (ii) to cause the Closing to occur as promptly as reasonably practicable and the Purchaser shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby.

**Section 8.2      Conduct by the Vendors.**

Each of the Vendors covenants and agrees that, except as expressly contemplated by this Agreement, or as otherwise required by Law, after the Effective Date and prior to the earlier of the Closing Date or the Termination Date:

(a)      each of the Vendors shall use best efforts to refrain from taking any action that would cause any representation or warranty contained in Article 6 to be untrue or incorrect as of the Closing; and

(b)      subject to the Orders of the Canadian Court and Bankruptcy Court and the express provisions of this Agreement, each of the Vendors shall use best efforts (i) to perform and satisfy all conditions to such Vendor's obligations to consummate the transactions contemplated by this Agreement that are to be performed or satisfied by such Vendor under this

- 41 -

240

Agreement; and (ii) to cause the Closing to occur as promptly as reasonably practicable, and each of the Vendors shall not, and shall not permit any of its Affiliates to, intentionally take any action that is reasonably likely to prevent or delay the consummation of the transactions contemplated hereby.

**Section 8.3    Conduct of Business.**

Subject to any Order of the Canadian Court or the Bankruptcy Court, after the Effective Date and prior to the earlier of the Closing Date or the Termination Date, to the extent related solely to the Business, each of the Vendors shall, and shall cause its Affiliates to, except as may otherwise be consented to by the Purchaser, in writing, acting reasonably, in its sole and absolute discretion: (i) carry on business in the Ordinary Course; (ii) use its best efforts to preserve its business organization and goodwill; (iii) maintain its relationships with suppliers, customers, consultants and others having business relations with it; (iv) retain in its employ all of its employees; and (v) make all payments in the Ordinary Course, and shall not, except as may otherwise be consented to by the Purchaser, acting reasonably:

(a)    amend, revise, modify or agree to do any of the foregoing in respect of any Contract material to the Business;

(b)    amend, revise, modify or agree to do any of the foregoing in respect of any of the Benefit Plans; and

(c)    seek any Order in respect of, in relation to or in connection with the Purchased Assets, the Assumed Liabilities or the Business unless such Order is satisfactory to the Purchaser, in its sole and absolute discretion.

**Section 8.4    ~~Sale~~Sales Process**

Each of the Vendors covenants and agrees to comply with and follow the Sales Process.

**Section 8.5    Access to Information.**

Prior to the Closing, the Vendors shall, and shall cause their Subsidiaries to, (i) give the Purchaser and its authorized Representatives, upon reasonable advance notice and during regular business hours, reasonable access to all books, records, personnel, officers and other facilities and properties of the Business, (ii) permit the Purchaser to make such copies and inspections thereof, upon reasonable advance notice and during regular business hours, as the Purchaser may reasonably request, (iii) grant the Purchaser and its Representatives reasonable access to each of the facilities of the Business where Purchased Assets are located for purposes of completing an updated inventory of the fixed assets of the Business for purposes of completing an appraisal of the value thereof, and (iv) cause the officers of the Vendors to furnish the Purchaser with such additional financial and operating data and other information with respect to the Business as is regularly prepared in the Ordinary Course that the Purchaser may from time to time reasonably request; provided, however, that any such access shall be conducted at the Purchaser's expense, in accordance with Law, at a reasonable time, under the supervision of the Vendors' personnel and in such a manner as to maintain confidentiality and not to unreasonably interfere with the normal operations of the businesses of the Vendors and their Affiliates.

- 42 -

**Section 8.6    Regulatory Matters.**

Each of the Parties, as promptly as practicable after the execution of this Agreement, will make, or cause to be made, all such filings and submissions under all Laws, as may be required for it to consummate the purchase and sale of the Purchased Assets in accordance with the terms of this Agreement. The Parties will coordinate and cooperate with one another in exchanging such information and supplying such assistance as may be reasonably requested by each in connection with the foregoing, including providing each other with all notices and information supplied to or filed with any Governmental Authority (except for notices and information which any Party, acting reasonably, considers highly confidential and sensitive which may be filed on a confidential basis), and all notices and correspondence received from any Governmental Authority.

**Section 8.7    Maintenance of Books and Records; Access after Closing.**

The Purchaser shall use its commercially reasonable efforts to retain all of the Books and Records delivered to it by the Vendors hereunder and relating to any period ending on or prior to the Closing Date for a period of six (6) years following the Closing Date. At any time during such six-year period, each of the Vendors and its Representatives shall have reasonable access thereto, during normal business hours, in connection with the affairs of the Vendors but the Purchaser shall not be responsible or liable to any of the Vendors for or as a result of any unintentional loss or destruction of or damage to any of the Books and Records.

**Section 8.8    Ancillary Agreements.**

The Parties shall use their reasonable efforts to promptly negotiate and finalize in good faith the Ancillary Agreements to which it is contemplated they will be Parties. All Ancillary Agreements must be in form and content satisfactory to the Purchaser, in its sole and absolute discretion.

**Section 8.9    Accounts Receivable.**

The Vendors agree that the Purchaser shall have the right after the Closing to endorse all payments received in respect of any of the Accounts Receivable in the name of the Vendors and to deposit the same into the Purchaser's bank accounts. The Vendors shall deliver at the Closing such resolutions or other documents as the Purchaser may reasonably request in order to permit the implementation of the provisions of this Section.

**Section 8.10    Insurance**

Prior to Closing, the Parties shall enter into commercial arrangements acceptable to the Vendors and the Purchaser to amend, modify, replace or apportion existing policies of insurance maintained by the Vendors in respect of the Purchased Assets and/or the Business on such terms and such conditions as may be acceptable to the Vendors and the Purchaser, each acting reasonably.

- 43 -

**Section 8.11   Vendors' Post-Closing Covenants**

Each of the Vendors covenants and agrees that none of its obligations under this Agreement or any Ancillary Agreement shall be subject to compromise or arrangement pursuant to a plan or plans of compromise or arrangement in respect of any such Vendor under the CCAA Proceedings, any recognition proceedings under the Bankruptcy Case, or any other applicable Law or proceeding.

## ARTICLE 9
## COURT APPROVAL

**Section 9.1   Canadian Approval and Sales Process ~~and Conditional Vesting~~ Order.**

As promptly as practicable, but in any event no later than December 5, 2009, the Vendors shall file with the Canadian Court a motion (the "Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order Motion") and a proposed order seeking: (a) approval of the execution, delivery and performance of this Agreement, including payment of the Termination Fee~~;~~ **and** (b) approval of a process for the sale of the ~~Purchased Assets; and (c) subject to (i) obtaining the Canadian Final Approval Order, and (i) delivery of a Monitor's Certificate certifying all matters required for Closing have occurred, the~~ <*vesting of the Purchased Assets in the Purchaser, free and clear of all Encumbrances, except Permitted Encumbrances*>~~, such orders~~**Purchased Assets, such order** to be in the form and on terms as the Purchaser may reasonably require (as approved, the "Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order").

**Section 9.2   Canadian ~~Final~~ Approval and Vesting Order.**

As promptly as practicable, but in any event no later than two (2) Business Days from the date of the completion of the Sales Process, the Vendors shall file with the Canadian Court a motion (the "Canadian ~~Final~~ Approval **and Vesting** Order Motion") seeking an order of the Canadian Court**: (a)** finally approving this Agreement**, as it may be amended pursuant to the Sales Process;** and the transactions contemplated herein following the Sales Process**; and (b)**> *vesting of the Purchased Assets in the Purchaser, free and clear of all Encumbrances, except Permitted Encumbrances*<, such order to be in the form and on terms as the Purchaser may reasonably require (as approved, the "Canadian ~~Final~~ Approval **and Vesting** Order").

**Section 9.3   U.S. Approval and Sales Process ~~and Conditional Vesting~~ Recognition Order.**

As promptly as practicable, but in no event later than two (2) Business Days after the Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order is entered, the Vendors shall file with the Bankruptcy Court a motion (the "U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Motion") and a proposed order seeking recognition of the Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order, such order to be in the form and on terms as the Purchaser may reasonably require (as approved, the "U.S. **Approval and Sales Process ~~and Conditional Vesting~~** Recognition Order").

- 44 -

243

**Section 9.4    U.S. ~~Final~~ Approval and Vesting Recognition Order**

(a)    As promptly as practicable, but in any event no later than two (2) Business Days after the Canadian ~~Final~~ Approval and Vesting Order is entered, the Vendors shall file with the Bankruptcy Court a motion (the "U.S. ~~Final~~ Approval and Vesting Recognition Motion") and a proposed order seeking recognition of the Canadian ~~Final~~ Approval and Vesting Order and vesting the Purchased Assets in the Purchaser free and clear of all Encumbrances, other than Permitted Encumbrances, such order to be in the form and on terms as the Purchaser may reasonably require (as approved, the "U.S. ~~Final~~ Approval and Vesting Recognition Order").

(b)    The Vendors shall provide notice of the U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Motion and the U.S. ~~Final~~ Approval **and Vesting** Recognition Motion to: (i) all Tax authorities or recording offices which have a reasonably known interest in the relief requested, (ii) the United States Trustee for the District of Delaware in the Bankruptcy Case, (iii) the Monitor, (iv) counsel to the DIP Lenders, (vi) all federal, state, and local regulatory authorities with jurisdiction over the Vendors, (vii) all non-debtor parties to the Contracts, (viii) any entity known or believed to have an Encumbrance on any Purchased Asset owned by the Vendors and any entity that has asserted a Encumbrance on any Purchased Asset owned by the Vendors, (ix) each of the entities that had received an invitation from the Vendors to acquire or had previously expressed an interest in acquiring the Purchased Assets; and (x) the general service list established in the Bankruptcy Case pursuant to Bankruptcy Rules.

**ARTICLE 10**
**CONDITIONS TO CLOSING**

**Section 10.1    Conditions for the Benefit of the Purchaser.**

The obligations of the Purchaser to consummate the transactions contemplated hereby are, unless waived by the Purchaser, subject to the fulfillment, at or before the Closing **or as otherwise specified below**, of each of the following conditions:

(a)    except for such changes as are permitted or required pursuant to the terms hereof, either (i) the representations and warranties of the Vendors set forth in Article 6 shall be true and correct in all material respects (except that those representations and warranties which are (x) not qualified as to materiality or Material Adverse Effect or similar expressions; or (y) qualified as to knowledge, shall be true and correct in all respects) as of the Closing Date with the same effect as though such representations and warranties had been made at and as of the Closing (except for representations and warranties that are made as of a particular date specified therein, which representations and warranties shall be true and correct in all material respects as of such date), or (ii) if there is any breach of, or inaccuracy in, the representations and warranties of the Vendors set forth in Article 6 (without giving effect to any qualification as to materiality or Material Adverse Effect or knowledge or similar expressions) as of the Closing Date, then such breach or inaccuracy (or the fact or circumstance to which such breach or inaccuracy relates) shall not have, and would not be reasonably expected to have, individually or in the aggregate, a Material Adverse Effect;

- 45 -

244

(b)    any of the Schedules provided on or before the Effective Date and required to be updated and delivered for Closing pursuant to the terms of this Agreement shall not contain any new information at Closing not otherwise available to or disclosed to the Purchaser, which information would, or would reasonably be expected to have, individually or in the aggregate, a Material Adverse Effect;

(c)    (i) no Law shall be in effect, and (ii) no Governmental Authority shall have enacted, issued, promulgated or entered an Order which is in effect, in each case that has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(d)    the Vendors shall have performed and complied with all covenants and agreements set forth in this Agreement required to be performed or complied with by the Vendors prior to or concurrently with the Closing;

(e)    the Purchaser shall have received the Ancillary Agreements required to be delivered to it by the Vendors at or before the Closing pursuant to this Agreement duly executed by all necessary Persons (other than the Purchaser) and in form and content satisfactory to the Purchaser, in its sole and absolute discretion;

(f)    the Canadian Court shall have entered the Canadian **Approval and** Sales Process and Conditional Vesting Order; and (ii) the Bankruptcy Court shall have entered the U.S. **Approval and** Sales Process and Conditional Vesting Recognition Order, which orders shall not have been stayed, modified or amended in any way;

(g)    the Canadian Court shall have entered the Canadian Final Approval **and Vesting** Order; and (ii) the Bankruptcy Court shall have entered the U.S. Final Approval **and Vesting** Recognition Order, which orders shall be in form and content satisfactory to the Purchaser, in its sole and absolute discretion, and shall have become Final Orders, and shall not have been stayed, modified or amended in any way, provided, however, that after entry of the Canadian Final Approval **and Vesting** Order and the U.S. Final Approval **and Vesting** Recognition Order, the Purchaser, in its sole and absolute discretion, shall have the right, but not the obligation, to waive the requirement that the Canadian Final Approval **and Vesting** Order and the U.S. Final Approval **and Vesting** Recognition Order become Final Orders;

(h)    no injunction or other Order shall have been issued to enjoin, restrict or prohibit any of the transactions contemplated by this Agreement;

(i)    all actions, proceedings, instruments and documents required to complete the Transaction, including the Agreement and the Ancillary Agreements, shall have been approved as to form, substance and legality by the Purchaser and the Purchaser and the Vendors shall have entered into the Ancillary Agreements;

(j)    satisfaction of the Purchaser, in its sole and absolute discretion, that it is not assuming any Liabilities and will not be liable for any Liabilities of the Vendors in respect of, in connection with or otherwise related to the Purchased Assets or the Business upon and after the Closing of the transactions contemplated herein and the Ancillary Agreements, other than the Assumed Liabilities solely as specifically and expressly provided for in this Agreement;

- 46 -

245

(k)    the DIP Lenders shall have consented to this Agreement and the Transaction and Brookfield and CIT shall have entered into revised intercreditor and related arrangements arising from the fact that each will be a DIP Lender to the Vendors after the Closing Date;

(l)    FPI and NB Power shall have entered into arrangements satisfactory to the Purchaser in its sole and absolute discretion;

(m)    on or before the earlier of February 10, 2010 (or such later date to which the deadline for submitting unconditional qualifying offers in the Sales Process may be extended) and Closing, the Purchaser shall have entered into a binding agreement with CIT in form and content satisfactory to the Purchaser, in its sole and absolute discretion, providing for a revolving credit facility (the "CIT Exit Facility") in the minimum amount of $50,000,000 secured by accounts receivable and inventory.  The minimum availability under the CIT Exit Facility on Closing shall be $25,000,000;

(n)    Her Majesty in Right of Canada, as represented by the Minister of Natural Resources Canada, shall have confirmed in form satisfactory to the Purchaser that FPI has qualified for the PPGTP Credits in the minimum amount of Twenty-Three Million Dollars (Cdn.$23,000,000) and that such credits are validly transferred and assigned to the Purchaser on Closing;

(o)    the Vendors shall have legally amended the Existing U.S. Collective Agreements with the Unions on such terms as may be acceptable to the Purchaser in its sole and absolute discretion by January 15, 2010 (the "New U.S. Collective Agreements");

(p)    the amount of the Assumed Liabilities on Closing shall not exceed $48,000,000;

(q)    the Existing Canadian Collective Agreements shall have been legally amended such that the Purchaser shall have no liability for any Pension Plan (the "Amended Canadian Collective Agreements");

(r)    the Purchaser shall be satisfied, in its sole and absolute discretion, that the Purchaser shall have no liability or obligations whatsoever for any Pension Plan of the Vendors;

(s)    at the option of the Purchaser, the Pension Plans will be wound up or otherwise dealt with to the sole and absolute satisfaction of the Purchaser on or before the Closing Date;

(t)    all Consents and Approvals shall have been obtained or filed, on terms and conditions satisfactory to the Purchaser in its sole discretion in respect of the Purchased Assets, including, without limitation, the Contracts, the Permits, the Timber Licences and the PPGTP Credits, and the Purchaser shall be satisfied that such Purchased Assets are validly transferred or assigned to the Purchaser on Closing;

(u)    the Unions, whose members participate in the Old Hourly FP Plan or the U.S. Pension Plan, shall have confirmed in a form satisfactory to the Purchaser, in its sole and

- 47 -

absolute discretion, that neither the Purchaser, nor its officers, directors, employees, agents or delegates, nor the officers, directors, employees, agents or delegates of the Vendors, shall have any liabilities with respect to the Old FP Hourly Plan or the U.S. Pension Plan, as applicable;

(v)    no Material Adverse Effect shall, individually or in the aggregate, have occurred between the Effective Date and the Closing Date; and

(w)    delivery of legal opinions from the Vendors' counsel confirming that on Closing and upon the consummation of the transactions contemplated in the Agreement and the Ancillary Agreements, the Purchaser should not be liable for and should not assume any liabilities whatsoever, whether by operation of law or otherwise, under or pursuant to the Pension Plans or the Existing Collective Agreements.

The foregoing conditions are for the exclusive benefit of the Purchaser. Any condition may be waived by the Purchaser in whole or in part. Any such waiver shall be binding on the Purchaser only if made in writing.

### Section 10.2    Conditions for the Benefit of the Vendors.

The obligations of the Vendors to consummate the transactions contemplated hereby are, unless waived by the Vendors, subject to the fulfillment, at or before the Closing, of each of the following conditions:

(a)    payment of the Purchase Price as set forth in Section 3.2, subject to adjustment as set forth in Section 3.8;

(b)    the representations and warranties of the Purchaser set forth in Article 5 shall be true and correct in all material respects (except that those representations and warranties which are qualified as to materiality or similar expressions shall be true and correct in all respects) on and as of the Closing Date with the same effect as though such representations and warranties had been made at and as of the Closing (except for representations and warranties that are made as of a particular date specified therein, which representations and warranties shall be true and correct in all material respects as of such date);

(c)    (i) no Law shall be in effect, and (ii) no Governmental Authority shall have enacted, issued, promulgated or entered an Order which is in effect, in each case that has the effect of making illegal or otherwise prohibiting the consummation of the transactions contemplated by this Agreement;

(d)    the Purchaser shall have performed and complied in all material respects with all covenants and agreements set forth in this Agreement required to be performed or complied with by the Purchaser prior to or concurrently with the Closing;

(e)    each of the Vendors shall have received the Ancillary Agreements required to be delivered to it by the Purchaser at or before the Closing pursuant to this Agreement duly executed by all necessary Persons (other than the Vendors);

- 48 -

(f)    each of the Vendors shall have approved as to form, substance and legality all actions, proceedings, instruments and documents required to complete the Transaction, including this Agreement and the Ancillary Agreements;

(g)    (i) the Canadian Court shall have entered the Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order; and (ii) the Bankruptcy Court shall have entered the U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Order, which orders shall not have been stayed, modified or amended in any way;

(h)    (i) the Canadian ~~Final~~ Approval **and Vesting** Order; and (ii) the Bankruptcy Court shall have entered the U.S. ~~Final~~ Approval **and Vesting** Recognition Order, which orders shall have become Final Orders, and shall not have been stayed, modified or amended in any way, provided, however, that after entry of the Canadian ~~Final~~ Approval **and Vesting** Order and the U.S. ~~Final~~ Approval **and Vesting** Recognition Order, the Purchaser, in its sole discretion, shall have the right, but not the obligation, to waive the requirement that the Canadian ~~Final~~ Approval **and Vesting** Order and the U.S. ~~Final~~ Approval **and Vesting** Recognition Order become Final Orders; and

(i)    no injunction or other Order shall have been issued to enjoin, restrict or prohibit any of the transactions contemplated by this Agreement.

The foregoing conditions are for the exclusive benefit of the Vendors. Any condition may be waived by the Vendors in whole or in part. Any such waiver shall be binding on the Vendors only if made in writing.

### ARTICLE 11
### TAXES

**Section 11.1    Payment of Taxes and Other Costs.**

The Purchaser shall assume and become solely liable for and will pay or cause to be paid all of its own Transactional Costs (except with respect to expenses provided for and subject to Section 16.3 of this Agreement) and Transactional Taxes payable under any Law on or with respect to the sale and purchase of the Purchased Assets under this Agreement. On the Closing Date, the Purchaser will either pay the Transactional Taxes to the Vendors or deliver to the Vendors evidence confirming the Purchaser's payment of or exemption from payment of the Transactional Taxes in form and substance acceptable to the Vendors, acting reasonably. The Purchaser will prepare and file any affidavits or returns required in connection with the foregoing at its own cost and expense. To the extent that any Transactional Taxes are required to be paid by or are imposed upon the Vendors, the Purchaser will reimburse to the Vendors such taxes within five (5) Business Days of payment of such taxes by the Vendors. The Purchaser will indemnify and hold the Vendors harmless in respect of any Transactional Taxes.

**Section 11.2    Elections.**

(a)    The Vendors and the Purchaser will on or before the Closing Date jointly execute an election, if available, in the prescribed form and containing the prescribed information, to have subsection 167(1.1) of the *Excise Tax Act* (Canada) apply to the sale and

purchase of the Purchased Assets hereunder so that no tax is payable in respect of such sale and purchase under Part IX of the *Excise Tax Act* (Canada). The Purchaser will file such election with the Minister of National Revenue within the time prescribed by the *Excise Tax Act* (Canada).

(b)     The Vendors and the Purchaser agree to make, execute and file with the appropriate taxing authorities such other elections or purchase exemption certificates as the parties hereto agree are mutually desirable, if any, in prescribed form and within the prescribed time. After the Closing, the Purchaser shall make or cause to be made all necessary filings with respect to all Transactional Costs and Transactional Taxes. Promptly after the Closing, the Purchaser shall reimburse the Vendors for all deposits, prepayments or advances which the Vendors may have made with respect to Transactional Taxes, other than any such deposits, prepayments or advances that are Excluded Assets.

(c)     Notwithstanding anything to the contrary in this Section 11.2, the Purchaser shall indemnify and hold the Vendors harmless in respect of any goods and services tax, sales tax, penalties, interest and other amounts or Taxes which may be assessed against the Vendors as a result of the transactions under this Agreement not being eligible for such elections provided for in this Section 11.2 or as a result of the Purchaser's failure to file the elections within the prescribed time.

## ARTICLE 12
## CLOSING

**Section 12.1   Location and Time of the Closing.**

Upon the terms and subject to the conditions hereof, the closing of the sale of the Purchased Assets and the assumption of the Assumed Liabilities contemplated hereby (the "Closing") shall take place at the offices of ThorntonGroutFinnigan LLP, located at Suite 3200, 100 Wellington St. West, Toronto-Dominion Centre, Toronto, Ontario, M5K 1K7, or such other place as the Purchaser and the Vendors may mutually agree, no later than three (3) Business Days following the date on which the conditions set forth in Section 10.1 and Section 10.2 of this Agreement have been satisfied or (if permissible) waived (other than the conditions which by their nature are to be satisfied at the Closing, but subject to the satisfaction or (if permissible) waiver of such conditions), or such other date as the Vendors and the Purchaser may mutually agree (the "Closing Date"). The Closing shall be deemed to have been consummated and become effective for all purposes as of 12:01 a.m. Toronto time on the Closing Date.

**Section 12.2   Closing Deliveries of the Vendors.**

At the Closing, the Vendors shall deliver or cause to be delivered to the Purchaser:

(a)     a General Conveyance and Assumption of Liabilities Agreement, together with such other deeds of conveyance (in the case of the Lands relating to the Madawaska Assets and the Madawaska Mill, one or more quitclaim deed with covenant), bills of sale, assurances, transfers, assignments, consents, and such other agreements, documents and instruments as may be reasonably required by the Purchaser to complete the Transactions provided for in this Agreement;

- 50 -

(b)    a certificate, dated the Closing Date, confirming that all of the representations and warranties of the Vendors contained in this Agreement are true as of the Closing Date, with the same effect as though made on and as of the Closing Date. For greater certainty, the representations and warranties of the Vendors contained in this Agreement made as of the Closing Date shall not be qualified by knowledge;

(c)    the Schedules to this Agreement updated and delivered for Closing pursuant to the terms of this Agreement in form and content satisfactory to the Purchaser, in its sole and absolute discretion;

(d)    an acknowledgement, dated the Closing Date, that each of the conditions precedent in Section 10.2 of this Agreement have been fulfilled, performed or waived as of the Closing Date;

(e)·    a certified copy of the Canadian Approval and ~~Conditional Vesting~~**Sales Process** Order and the Canadian ~~Final~~ Approval **and Vesting** Order;

(f)    a certified copy of the U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Order and the U.S. ~~Final~~ Approval **and Vesting** Recognition Order;

(g)    to the extent available, the originals and, if originals are not available, copies of the Books and Records;

(h)    the Consents and Approvals;

(i)    a certified copy of the Amended Canadian Collective Agreements;

(j)    a certified copy of the New U.S. Collective Agreements;

(k)    an executed copy of the Monitor's Certificate;

(l)    legal opinions referred to in Section 10.1(w);

(m)    if applicable, a certificate issued by Maine Revenue Services certifying that the sale of the Lands relating to the Madawaska Assets and/or the Madawaska Mill is exempt from Maine income tax withholding under 36 M.R.S. § 5250 A;

(n)    a counterpart signature page to each Ancillary Agreement, duly executed by each of the Vendors, as applicable; and

(o)    such other certificates, instruments and documents, in form and substance reasonably satisfactory to the Purchaser, as may be contemplated by this Agreement or as the Purchaser may reasonably request.

**Section 12.3    Closing Deliveries of the Purchaser.**

At the Closing, the Purchaser shall deliver, or cause to be delivered, to the Vendors:

(a)    payment of the Purchase Price as set forth in Section 3.2;

- 51 -

(b)    an executed copy of a General Conveyance and Assumption of Liabilities Agreement duly executed by the Purchaser;

(c)    a counterpart signature page to each Ancillary Agreement, duly executed by the Purchaser;

(d)    payment or evidence of payment of applicable Transactional Taxes or alternatively, appropriate exemption certificates, as required under this Agreement;

(e)    a certificate, dated the Closing Date, confirming that all of the representations and warranties of the Purchaser contained in this Agreement are true as of the Closing Date, with the same effect as though made on and as of the Closing Date;

(f)    the Promissory Note payable to the Monitor, in trust for the benefit of the Vendors;

(g)    the Preferred Shares issued in the name of GNB or to a trustee on its behalf;

(h)    the Common Shares issued in the name of the Monitor, in trust for the benefit of the Vendors;

(i)    an acknowledgement, dated the Closing Date, that each of the conditions precedent in Section 10.1 of this Agreement have been fulfilled, performed or waived as of the Closing Date; and

(j)    such other certificates, instruments and documents in form and substance reasonably acceptable to the Vendors, as the Vendors may reasonably request.

### Section 12.4    Maine Real Estate Transfer Taxes.

At Closing, the Purchaser and the Vendors, as applicable, conveying the Lands relating to the Madawaska Assets and/or the Madawaska Mill shall execute one or more real estate transfer declarations that shall establish the portion of the ~~Purchaser~~Purchase Price that is allocable to such Lands. The Purchaser and the Vendors, as applicable, shall use best commercial efforts to establish that the transfer of such Lands hereunder is exempt from taxation under 36 MRSA Sec. 4641-C(14).

### Section 12.5    Possession.

The Purchaser shall be entitled to vacant possession of the Purchased Assets on and after Closing. The Vendors shall deliver to the Purchaser on Closing such keys, lock and safe combinations and other similar items as the Purchaser may require to obtain immediate and full occupation, possession and control of the Purchased Assets.

~~10124776.11~~10124776.13
13742-2154

## ARTICLE 13
## INDEMNIFICATION

### Section 13.1   Indemnification by the Vendors

The Vendors shall, jointly and severally, indemnify and save the Purchaser harmless for and from:

(a)     all losses, costs and damages suffered by the Purchaser as a result of any breach of representation, warranty or covenant on the part of any of the Vendors contained in this Agreement, the Ancillary Agreements, or in any certificate, document or instrument delivered to the Purchaser hereunder or thereunder;

(b)     all losses, costs and damages suffered by the Purchaser as a result of the failure of any of the Vendors to perform any of its obligations relating to or in respect of the Business not assumed by the Purchaser pursuant to this Agreement or any Ancillary Agreement;

(c)     all losses, costs and damages suffered by the Purchaser as a result of the failure of any of the Vendors to perform any of its obligations arising under contracts or other agreements assumed by the Purchaser pursuant to this Agreement or any Ancillary Agreement, but relating to or arising out of action or inaction of the Vendors and relating to events which occurred prior to the Closing Date (for greater certainty, not including the Assumed Liabilities);

(d)     all losses, costs and damages suffered by the Purchaser (for greater certainty, not including the Assumed Liabilities) arising from the Vendors' operation of the Business prior to the Closing Date;

(e)     all losses, costs and damages suffered by the Purchaser as a result of any failure of the Vendors to transfer legal and beneficial ownership of the Purchased Assets to the Purchaser free and clear of all Encumbrances, except Permitted Encumbrances; and

(f)     all claims, demands, costs and expenses, including legal fees, in respect of the foregoing.

### Section 13.2   Indemnification by the Purchaser

The Purchaser shall indemnify and save the Vendors harmless for and from:

(a)     all losses, costs and damages suffered by the Vendors as a result of any breach of representation, warranty or covenant on the part of the Purchaser contained in this Agreement or in any certificate, document or instrument delivered to the Vendors hereunder;

(b)     all losses, costs and damages suffered by the Vendors as a result of the Purchaser's failure to pay, discharge or perform any of the Assumed Liabilities; and

(c)     all claims, demands, costs and expenses, including legal fees, in respect of the foregoing.

- 53 -

252

### Section 13.3   Notice of Claim

If the Purchaser or the Vendors wish to make a claim for indemnification (a "Claim") pursuant to this Article 13 (such party herein called the "Indemnified Party") against the Vendors, on the one hand, or the Purchaser, on the other hand (the party or parties against whom the claim is made herein called the "Indemnifying Parties"), the Indemnified Party shall promptly give notice to the Indemnifying Parties of the Claim.  Such notice shall specify whether the Claim originates with the Indemnified Party (an "Original Claim") or with a Person other than the Indemnified Party (a "Third Party Claim"), and shall also specify with reasonable particularity (to the extent that the information is available):

(a)     the factual basis for the Claim; and

(b)     the amount of the Claim, or, if an amount is not then determinable, an approximate and reasonable estimate of the potential amount of the Claim.

### Section 13.4   Original Claims

Following receipt of notice of an Original Claim from an Indemnified Party, the Indemnifying Parties shall have 30 days to make such investigation of the Original Claim as the Indemnifying Parties consider necessary or desirable.  For the purpose of such investigation, the Indemnified Party shall make available to the Indemnifying Parties the information relied upon by the Indemnified Party to substantiate the Original Claim.  If the Indemnified Party and the Indemnifying Parties agree at or prior to the expiration of such 30 day period (or any mutually agreed upon extension thereof) to the validity and amount of the Original Claim, the Indemnifying Parties shall immediately pay to the Indemnified Party the full agreed upon amount of the Original Claim.  If the Indemnified Party and the Indemnifying Parties do not agree within such period (or any mutually agreed upon extension thereof), the Indemnifying Parties and the Indemnified Party agree that the dispute shall be submitted for dispute resolution in accordance with Article 14 set out herein.

### Section 13.5   Third Party Claims.

With respect to any Third Party Claim, the Indemnifying Parties shall have the right, at their own expense, to participate in or assume control of the negotiation, settlement or defence of the Third Party Claim and, in such event, the Indemnifying Parties shall reimburse the Indemnified Party for all of the Indemnified Party's out-of-pocket expenses as a result of such participation or assumption.  If the Indemnifying Parties elect to assume such control, the Indemnified Party shall cooperate with the Indemnifying Parties, shall have the right to participate in the negotiation, settlement or defence of such Third Party Claim at its own expense and shall have the right to disagree on reasonable grounds with the selection and retention of counsel, in which case counsel satisfactory to the Indemnifying Parties and the Indemnified Party shall be retained by the Indemnifying Parties.

### Section 13.6   Additional Rules and Procedures

The obligation of the Parties to indemnify each other pursuant to this Article shall also be subject to the following:

- 54 -

(a)    any Claim arising as a result of a breach of a representation or warranty contained in Article 5 or Article 6 shall be made during the Holdback Period.

(b)    in the event that any Third Party Claim is of a nature such that the Indemnified Party is required by applicable law to make a payment to ~~any Person~~ (a "Third Party") with respect to such Third Party Claim before the completion of settlement negotiations or related legal proceedings, the Indemnified Party may make such payment and the Indemnifying Parties shall, forthwith after demand by the Indemnified Party, reimburse the Indemnified Party for any such payment.  If the amount of any liability under the Third Party Claim in respect of which such a payment was made, as finally determined, is less than the amount which was paid by the Indemnifying Parties to the Indemnified Party, the Indemnified Party shall, forthwith after receipt of the difference from the Third Party, pay such difference to the Indemnifying Parties.

(c)    the Indemnified Party shall not negotiate, settle, compromise or pay any Third Party Claim except with the prior written consent of the Indemnifying Parties (which consent shall not be unreasonably withheld).

(d)    the Indemnified Party shall not permit any right of appeal in respect of any Third Party Claim to terminate without giving the Indemnifying Parties notice thereof and an opportunity to contest such Third Party Claim.

(e)    the Purchaser and the Vendors shall cooperate fully with each other with respect to Third Party Claims, shall keep each other fully advised with respect thereto (including supplying copies of all relevant documentation promptly as it becomes available) and shall each designate a senior officer who will keep himself informed about and be prepared to discuss the Third Party Claim with his counterparts and with counsel at all reasonable times.

(f)    the Indemnifying Parties shall not settle any Third Party Claim or conduct any related legal or administrative proceeding in a manner which would, in the opinion of the Indemnified Party, acting reasonably, have a material adverse impact on the Indemnified Party.

**Section 13.7    Indemnification Claims**

(a)    Except for fraud, fraudulent misrepresentation, or intentional breach, and except as provided in Section 15.3 and Section 16.3 of this Agreement, the Parties agree that Article 13 sets out the sole and exclusive manner by which the Purchaser may seek monetary compensation from the Vendors, or by which the Vendors may seek monetary compensation from the Purchaser, for any matter in respect of which the Purchaser or the ~~Vendor~~**Vendors** may make a Claim under Section 13.1 and Section 13.2, and the Parties further agree that, except for fraud, fraudulent misrepresentation, or intentional breach, and except as provided in Section 15.3 and Section 16.3, the Purchaser may have recourse for monetary compensation against the Holdback Amount.

(b)    Notwithstanding anything in this Agreement to the contrary, the Parties agree that any Claim by the Purchaser, as an Indemnified Party against any or all of the Vendors, as an Indemnifying Party, in excess of the Holdback Amount may be subject to compromise in the CCAA Proceedings.

- 55 -

## ARTICLE 14
## DISPUTE RESOLUTION

### Section 14.1    Arbitration

Subject to Section 14.2, disputes, disagreements, controversies, questions or claims arising out of or relating to this Agreement, and the Ancillary Agreements, including, without limitation, with respect to their formation, execution, validity, application, interpretation, performance, breach, termination or enforcement, or, for greater certainty, with respect to the Purchase Price adjustment or the indemnification obligations set out herein, ("Disputes") shall be determined by arbitration under the *Arbitration Act, 1991* (Ontario) (the "Arbitration Act"), provided that:

(a)    any hearing in the course of the arbitration shall be held in Toronto, Ontario in the English language;

(b)    the application of section 7(2) of the Arbitration Act is expressly excluded;

(c)    subject to section 44 of the Arbitration Act, any Party shall have the right to appeal any award or determination of an arbitrator on any ground, including, for greater certainty, any appeal on a question of law, a question of fact, or a question of mixed fact and law, to the Canadian Court;

(d)    despite section 28(1) of the Arbitration Act, an arbitrator shall not, without the written consent of all Parties to the arbitration, retain any expert;

(e)    an arbitrator may apportion the costs of the arbitration, including the reasonable fees and disbursements of the Parties, between or among the Parties in such manner as the arbitrator considers reasonable;

(f)    all awards for the payment of money shall include prejudgment and postjudgment interest in accordance with sections 127 to 130 of the *Courts of Justice Act* (Ontario) with necessary modifications; and

(g)    all matters relating to the arbitration shall be kept confidential to the full extent permitted by Law and no individual shall be appointed as an arbitrator unless he or she agrees in writing to be bound by this dispute resolution provision.

### Section 14.2    Exceptions

Section 14.1 shall not apply, unless otherwise agreed to by the Parties, acting reasonably, in respect of:

(a)    any Dispute involving a claim which exceeds, or an approximate and reasonable estimate of the potential amount of which exceeds, $5,000,000; and

(b)    any Dispute that arises within 60 days after the Closing Date, in which case, the Parties shall submit the Dispute to the Canadian Court in the CCAA Proceedings for resolution.

## ARTICLE 15
## RISK AND TERMINATION

**Section 15.1    Risk of Loss.**

The Purchased Assets shall be and remain the risk of the Vendors until Closing and at the risk of the Purchaser from and after Closing. If, prior to Closing, the Purchased Assets shall be substantially damaged or destroyed by fire or other casualty, then, at its option, the Purchaser may decline to complete the Transaction. Such option shall be exercised within five (5) Business Days after notification to the Purchaser by the Vendors of the occurrence of damage or destruction (or prior to the Closing Date if such occurrence takes place within five (5) Business Days of the Closing Date) in which event this Agreement shall be terminated automatically and the Purchaser shall be entitled to the Termination Fee (as hereinafter defined). If the Purchaser does not exercise such option, it shall complete the Transaction and shall be entitled to an assignment of the proceeds of insurance referable to such damage or destruction. Where any damage or destruction is not substantial, the Purchaser shall complete the Transaction and shall be entitled to an assignment of the proceeds of insurance referable to such damage or destruction provided that such damage or destruction is insured or, otherwise by an agreed abatement. If any dispute arises under this Section as to whether damage or destruction is substantial or with respect to the amount of any abatement, such dispute will be determined in accordance with Article 14 herein.

**Section 15.2    Termination.**

This Agreement may be terminated at any time prior to the Closing:

(a)    by mutual written consent of the Parties;

(b)    by either the Vendors or the Purchaser, upon written notice to the other upon the entry of an Order by the Canadian Court approving an Alternative Transaction;

(c)    by either the Vendors or the Purchaser, upon written notice to the other:

(i)    if the Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order shall not have been issued and entered by December 14, 2009;

(ii)    if the Canadian ~~Final~~ Approval **and Vesting** Order shall not have been issued and entered within five (5) Business Days of the completion of the Sales Process;

(iii)    if the U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Order shall not have been issued and entered by January 8, 2010;

- 57 -

(iv)     if the U.S. ~~Final~~ Approval **and Vesting** Recognition Order shall not have been issued and entered by February 26, 2010; or

(v)     if the Closing does not take place by February 26, 2010 or on or before such later date as the Parties agree to in writing (the "<u>Termination Date</u>"); provided, however, that the right to terminate this Agreement pursuant to this Section 15.2(c) shall not be available to the Party seeking to terminate if such Party has failed to perform any one or more of its material obligations or covenants under this Agreement to be performed at or prior to Closing and the Closing has not occurred because of such failure.

(d)     by the Purchaser if any of the Vendors withdraw or seek authority to withdraw any of the Canadian **Approval and** Sales Process ~~and Conditional Vesting~~ Order Motion, the Canadian ~~Final~~ Approval **and Vesting** Order Motion, the U.S. **Approval and** Sales Process ~~and Conditional Vesting~~ Recognition Motion or the U.S. ~~Final~~ Approval **and Vesting** Recognition Motion, or publicly announce any stand alone plan of reorganization or liquidation (or support any such plan filed by any other Person) in respect of the Business;

(e)     by the Purchaser in the event of a material breach by the Vendors of the Vendors' representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 10.1 of this Agreement provided, however, that the right to terminate this Agreement pursuant to this Section 15.2(e) shall not be available to the Purchaser where a breach of this Agreement by the Purchaser has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause;

(f)     by the Vendors in the event of a material breach by the Purchaser of the Purchaser's representations, warranties, agreements or covenants set forth in this Agreement, which breach would result in a failure to satisfy the conditions to Closing set forth in Section 10.2 of this Agreement provided, however, that the right to terminate this Agreement pursuant to this Section 15.2(f) shall not be available to the Vendors where a breach of this Agreement by the any of the Vendors has been the cause of, or has resulted in, the event or condition giving rise to a right to terminate this Agreement pursuant to such clause;

(g)     by the Purchaser if any of the conditions in Section 10.1 of this Agreement have not been satisfied by Closing and the Purchaser has not waived such condition at or prior to Closing; or

(h)     by the Vendors if any of the conditions in Section 10.2 of this Agreement have not been satisfied by Closing and the Vendors have not waived such condition at or prior to Closing.

**Section 15.3   Termination Payments.**

In the event that this Agreement is terminated for any reason, other than pursuant to Section 15.2(a) or Section 15.2(f) of this Agreement, then the Vendors shall pay to the Purchaser in immediately available funds within two (2) Business Days following such termination; (i) a

- 58 -

cash fee of $2,000,000 (the "Termination Fee"); and (ii) the expenses provided for and subject to Section 16.3 of this Agreement.

**Section 15.4   Effects of Termination.**

If this Agreement is terminated pursuant to Section 15.2, all further obligations of the Parties under or pursuant to this Agreement shall terminate without further liability of any Party to the other except for the provisions of: (i) Section 6.21 (Survival of Covenants, Representations and Warranties); (ii) Article 13 (Indemnification); (iii) Section 15.2 (Termination); (iv) Section 15.3 (Termination Payments); (v) Section 15.4 (Effects of Termination); and (vi) Article 16 (Miscellaneous), provided, that neither the termination of this Agreement nor anything in this Section shall relieve any Party from liability for any breach of this Agreement occurring before the termination hereof and thereof.

## ARTICLE 16
## MISCELLANEOUS PROVISIONS

**Section 16.1   Confidentiality.**

The Parties hereby agree to keep confidential this Agreement and the terms and conditions contained herein, and not at any time to disclose such information except: (i) where such information is in the public domain through no breach of the terms of this Agreement by either Party, (ii) where such information is required by Law to be disclosed to any Governmental Authority (including, without limitation, any stock exchange), (iii) on a need to know basis to each of the Parties' Representatives, (iv) as required in connection with the CCAA Proceedings and the Bankruptcy Case, or as otherwise directed by the Canadian Court and the Bankruptcy Court, or (v) where disclosure is agreed to in writing between the Parties.

**Section 16.2   Non-Disclosure.**

Except (i) as and to the extent required by Law, the CCAA Proceedings or the Bankruptcy Case, (ii) to its Representatives, (iii) to the Monitor and its Representatives, or (iv) to the DIP Lenders and their Representatives, neither the Purchaser nor the Vendors shall, and each shall direct its Representatives not to, without the prior written consent of the other Party, directly or indirectly, make any public comment, statement or communication with respect to, or otherwise disclose or permit the disclosure of the existence of discussions regarding, a possible transaction between the Parties or any of the terms, conditions or other aspects of the Transaction or the contents of this Agreement or the Ancillary Agreements.

**Section 16.3   Expenses.**

The Vendors shall promptly pay, as and when requested by the Purchaser, any and all out-of-pocket fees and expenses incurred by the Purchaser or any Affiliate thereof in connection with this Agreement, the Ancillary Agreements, any and all documents, discussions, negotiations, correspondence, enquiries and other activities relating hereto, and the transactions contemplated hereby, whether or not the transactions contemplated hereby are consummated, including, without limitation, the fees and expenses of legal and financial advisors, accountants, appraisers or other consultants or advisors, but subject to an aggregate maximum amount of one

10124776.1110124776.13
13742-2154

million dollars ($1,000,000) or, if an Alternative Transaction is approved by the Canadian Court, then an aggregate maximum amount of one million five hundred thousand dollars ($1,500,000).

**Section 16.4    Solicitors and Agents and Tender**

Any notice, approval, waiver, agreement, instrument, document or communication permitted, required or contemplated in this Agreement may be given or delivered and accepted or received by the Purchaser's Solicitors on behalf of the Purchaser and by the Vendors' Solicitors on behalf of the Vendors and any tender of this Agreement or the Ancillary Agreements and the balance of the Purchase Price may be made upon the Vendors' Solicitors and the Purchaser's Solicitors, as the case may be.

**Section 16.5    Successors and Assigns.**

This Agreement shall enure to the benefit of, and be binding on, the Parties and their respective successors and permitted assigns. This Agreement may not be assigned by either Party without the prior written consent of the other, which consent shall not be unreasonably withheld; provided, however, that the Purchaser may, without the consent of the Vendors, assign and delegate its rights under this Agreement to one or more Affiliates of the Purchaser and in interpreting this Agreement, any such assignee(s) shall be considered the "Purchaser".

**Section 16.6    Third Party Beneficiaries**

Each Party hereto intends that this Agreement shall not benefit or create any right or cause of action in or on behalf of any Person other than the Parties hereto and their successors and permitted assigns, and no Person, other than the Parties hereto and their successors and their permitted assigns, shall be entitled to rely on the provisions hereof in any action, suit, proceeding, hearing or other forum.

**Section 16.7    Notices.**

(a)    <u>Mode of Giving Notice</u>. Any notice, direction, certificate, consent, determination or other communication required or permitted to be given or made under this Agreement shall be in writing and shall be effectively given and made if (i) delivered personally, (ii) sent by prepaid courier service or mail, or (iii) sent prepaid by fax or other means of electronic communication, in each case to the applicable address set out below:

(i)    if to the Purchaser, to:

c/o Brookfield Asset Management Inc.
181 Bay Street, Suite 300
Brookfield Place
Toronto, Ontario  M5J 2T3

| | |
|---|---|
| Attention: | Sam Pollock/Justin Beber |
| Email: | spollock@brookfield.com/jbeber@brookfield.com |
| Fax No.: | 416.365.9642 |

- 60 -

259

with a copy to:

Torys LLP
Suite 3000, 79 Wellington Street West
Toronto-Dominion Centre
Toronto, Ontario  M5K 1N2

Attention:      Tony DeMarinis/Natasha De Cicco
Email:          tdemarinis@torys.com/ndecicco@torys.com
Fax No.:        416.865.7380

(ii) if to the Vendors, to:

c/o Fraser Papers Inc.
181 Bay Street, Suite 200
Brookfield Place
Toronto, Ontario  M5J 2T3

Attention:      Glen McMillan
Email:          gmcmillan@toronto.fraserpapers.com
Fax No.:        (416) 359-8606

with a copy to:

Thornton Grout Finnigan LLP
Suite 3200, 100 Wellington Street West
Toronto-Dominion Centre
Toronto, Ontario  M5K 1K7

Attention:      Robert Thornton/D.J. Miller
Email:          rthornton@tgf.ca/djmiller@tgf.ca
Fax No.:        416.304.1313

with a copy to counsel for the Monitor:

Goodmans LLP
250 Yonge Street
Suite 2400
Toronto, Ontario  M5B 2M6

Attention:      Robert Chadwick/Cathy Costa

email:          rchadwick@goodmans.ca/ccosta@goodmans.ca
Fax:            416.979.1234

10124776.1410124776.13
13742-2154

(b)    <u>Deemed Delivery of Notice</u>. Any such communication so given or made shall be deemed to have been given or made and to have been received on the day of delivery if delivered, or on the day of faxing or sending by other means of recorded electronic communication, provided that such day in either event is a Business Day and the communication is so delivered, faxed or sent before 4:30 p.m. (Toronto time) on such day. Otherwise, such communication shall be deemed to have been given and made and to have been received on the next following Business Day. Any such communication sent by mail shall be deemed to have been given and made and to have been received on the fifth Business Day following the mailing thereof; provided however that no such communication shall be mailed during any actual or apprehended disruption of postal services. Any such communication given or made in any other manner shall be deemed to have been given or made and to have been received only upon actual receipt.

## Section 16.8    Time of Essence.

Time shall be of the essence of this Agreement in all respects.

## Section 16.9    Further Assurances.

Each of the Parties hereto shall promptly do, make, execute or deliver, or cause to be done, made, executed or delivered, all such further acts, documents and things as the other Party hereto may reasonably require from time to time for the purpose of giving effect to this Agreement and shall use reasonable efforts and take all such steps as may be reasonably within its power to implement to their full extent the provisions of this Agreement.

## Section 16.10    Counterparts.

This Agreement may be executed in counterparts, each of which shall be deemed to be an original and both of which taken together shall be deemed to constitute one and the same instrument. To evidence its execution of an original counterpart of this Agreement, a Party may send a copy of its original signature on the execution page hereof to the other Party by facsimile transmission or other means of electronic communication and such transmission shall constitute delivery of an executed copy of this Agreement to the receiving Party.

## Section 16.11    Paramountcy.

In the event of any conflict or inconsistency between the provisions of this Agreement and any other agreement, document or instrument executed or delivered in connection with the Transaction or this Agreement, the provisions of this Agreement shall prevail to the extent of such inconsistency.

**[Remainder of the Page Intentionally Left Blank; Signature Page Follows]**

~~10124776.11~~10124776.13
13742-2154

261

**IN WITNESS WHEREOF** the Parties have executed this Agreement as of the date first above written.

**FRASER PAPERS INC.**

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

**FRASER PAPERS LIMITED**

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

**FPS CANADA INC.**

By: _____
       Name:
       Title:

By: _____
       Name:
       Title:

262

**FRASER PAPERS HOLDINGS INC.**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**FRASER TIMBER LIMITED**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

**FRASER N.H. LLC**

By: _____
    Name:
    Title:

By: _____
    Name:
    Title:

263

**BROOKFIELD ASSET MANAGEMENT INC.**


By: _____
      Name:
      Title:


By: _____
      Name:
      Title:

- 65 -

264

Document comparison by Workshare Professional on March 25, 2010 8:17:24 PM

| Input: | |
|---|---|
| Document 1 ID | interwovenSite://INVENTORYS1/TorysAtWork/10124776/11 |
| Description | #10124776v11<TorysAtWork> - Brookfield Fraser Papers APA |
| Document 2 ID | interwovenSite://INVENTORYS1/TorysAtWork/10124776/13 |
| Description | #10124776v13<TorysAtWork> - Brookfield Fraser Papers APA |
| Rendering set | STRIKEOUT |

| Legend: | |
|---|---|
| **Insertion** | |
| ~~Deletion~~ | |
| *<Moved from>* | |
| >*Moved to* < | |
| Style change | |
| Format change | |
| ~~Moved deletion~~ | |
| Inserted cell | |
| Deleted cell | |
| Moved cell | |
| Split/Merged cell | |
| Padding cell | |

| Statistics: | Count |
|---|---|
| Insertions | 127 |
| Deletions | 122 |
| Moved from | 3 |
| Moved to | 3 |
| Style change | 0 |
| Format changed | 0 |
| Total changes | 255 |